IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| JAMISON J. SHEFTS, an Individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 CV 1104 |
| **v.** | ) | |
| | ) | |
| JOHN PETRAKIS, an Individual, | ) | |
| KEVIN MORGAN, an Individual, | ) | |
| and HEIDI HUFFMAN, an | ) | |
| Individual, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AGAINST HEIDI HUFFMAN ON COUNTS I AND III AND JOHN PETRAKIS
ON COUNTS I, II AND III OF THE FIRST AMENDED VERIFIED COMPLAINT**

NOW COMES the Plaintiff, JAMISON J. SHEFTS, ("Shefts"), by and through his

attorneys, Elias, Meginnes, Riffle & Seghetti, P.C., and as and for his Memorandum of Law in

Support of his Motion for Summary Judgment against Heidi Huffman on Counts I and III and

John Petrakis on Counts I, II and III of the First Amended Verified Complaint, states as follows:

**A.    INTRODUCTION**

This case involves the improper interception and accessing of electronic communications

between Shefts and third parties by Defendants John Petrakis ("Petrakis"), Kevin Morgan

("Morgan") and Heidi Huffman ("Huffman") (collectively, the "Defendants").  Specifically,

Defendants have violated 18 U.S.C. §2511, 720 ILCS §5/14-2, 18 U.S.C. §2701 and 18 U.S.C

§30.  For purposes of this Motion, Shefts' requests summary judgment be entered against

Petrakis and Huffman on Count I-Violation of the Electronic Communications Privacy Act, 18

U.S.C. §2501, against Petrakis on  Count II-Violation of 720 ILCS 5/14-2 and Petrakis and

Huffman on Count III-Violation of the Stored Communications Act, 18 U.S.C §2701.  Because

Petrakis and Huffman intercepted electronic communications between Shefts and third parties and accessed stored electronic communications between Shefts and third parties, all without authorization from Shefts and without legal justification, summary judgment should be awarded in favor of Shefts.

## B.     STANDARD OF LAW

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989).  In doing so, the Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable."  Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## C.    UNDISPUTED MATERIAL FACTS

### A.  The Oppression Suit

1.      Shefts is the founder, President and Chief Executive Officer at Access2Go, Inc. (Complaint, ¶1).

2.      Until January 1, 2006, Shefts owned all Series A Common Stock (Voting) issued by Access2Go.  Effective January 1, 2006, pursuant to a Purchase Agreement, Morgan, Petrakis and Shefts each became owners of thirty percent (30%) of the shares of Series A Common Stock (Voting) in Access2Go, (Complaint, ¶¶ 2,4; Answer ¶¶ 2,4) effectively making Shefts a minority shareholder.   Shefts, however, remained President, Chairman of the Board and Chief Executive Officer of Access2Go.

3.      Shortly after the Purchase Agreement was executed, Petrakis and Morgan began taking numerous actions in order to oppress Shefts in his capacity as a stockholder, employee and director of Access2Go, including the suspension of Shefts from the Access2Go offices and the eventual suspension of Shefts as an employee of Access2Go.  (Complaint, ¶11).

4.      On November 14, 2008, Shefts filed actions in state court (Peoria County Case No. 08 CH 696) and with the American Association of Arbitrators ("AAA") (Case No. 51 494 01446 08) regarding the oppressive actions taken by Petrakis and Morgan with the intent of forcing Shefts out of Access2Go.   The state case and the AAA arbitration are together referred to as the "Oppression Lawsuit."  (Complaint, ¶12, 13).

### B.    Interception and Access of Shefts' Electronic Communications

5.      Prior to and during the Oppression Lawsuit, Shefts had three avenues through which he sent and received electronic communications:  (1) his Access2Go email account, which used the email address jshefts@acc2go.com (the "Access2Go Email Account"); (b) his Yahoo

3

email account, which used the email address jshefts@yahoo.com (the "Yahoo Email Account"); and (3) his Blackberry handheld messaging device, on which he could send and receive Short Message Service ("SMS") text messages using his Verizon cellular telephone number (309) 303-1171 and send and receive emails from his Access2Go Email Account (the "Blackberry"). (Affidavit of Jamison J. Shefts, attached hereto and hereinafter referred to as Exhibit A, ¶5).

6.      Shefts personally owned the Blackberry and paid for all charges associated with his use of the Blackberry on a regular basis.  (Exhibit A, ¶6).

7.      In order to avoid any potential monitoring of his electronic communications, Shefts began to primarily use his Yahoo Email Account and his Blackberry as his means of sending and receiving electronic communication between himself and third parties, including attorney-client privileged communications between him and his attorneys regarding the Oppression Lawsuit and his divorce case.  (Exhibit A, ¶7).

8.      During the course of the Oppression Lawsuit, Shefts was approached by John Tandeski, a ten (10%) percent shareholder of Access2Go stock and a defendant in the Oppression Lawsuit.  Tandeski informed Shefts that Petrakis and Morgan had directed and authorized the installation of SpectorPro spyware on Shefts' office computer, without authorization of the Access2Go Board or permission of Shefts. (Exhibit A, ¶8).

9.      According to Tandeski, Petrakis had been monitoring Shefts' actions by reading work-related and personal electronic communications between Shefts and third parties sent and received by Shefts using his Access2Go Email Account, his Blackberry device and his Yahoo Email Account.   (Affidavit of John Tandeski, attached hereto and hereinafter referred to as Exhibit B, ¶¶20, 21, 30).

4

10.     Included in the electronic communications that had been read by Petrakis were attorney-client privileged emails between Shefts and his counsel regarding strategy in the Oppression Lawsuit. (Exhibit B, ¶30).

11.     Tandeski provided Shefts with an email sent by Shefts from his Yahoo Email Account between Shefts and his counsel, Lane G. Alster, dated June 30, 2008, that Tandeski had been given to Tandeski by Petrakis. (the "Yahoo Email") (Exhibit B, ¶30). A copy of the Yahoo Email is attached to the First Amended Verified Complaint as Exhibit A and is filed under seal.

12.     According to Tandeski, in or about July, 2008, Petrakis informed Tandeski that he had spyware installed on the computers at Access2Go in order to monitor employee activity. (Exhibit B, ¶22).

13.     Tandeski had been informed by Huffman on numerous occasions between late 2007 and throughout 2008 that Petrakis spent a large percentage of his time at the Access2Go office using his computer to spy on Shefts. (Exhibit B, ¶26).

14.      Huffman, under the direction of Petrakis, also used the spyware on Access2Go's computers to obtain personal information about Access2Go employees. (Exhibit B, ¶20).

15.     In or about February, 2009, Tandeski, believing that Petrakis had been improperly intercepting emails from the Yahoo Email Account, confronted Petrakis regarding whether he had been accessing the Yahoo Email Account in order to determine Shefts' daily activities and strategy in regards to the Oppression Lawsuit. (Exhibit B, ¶30).

16.     In response to Tandeski's question, Petrakis admitted to Tandeski that he had read emails between Shefts and third parties on the Yahoo Email Account. (Exhibit B, ¶31).

**C.     Access2Go Employee Manual**

17.     Prior to July 2, 2008, Access2Go had no formal policy regarding monitoring of its employees electronic communications.  (Exhibit A, ¶12).

18.     At no time prior to July, 2008, had the Access2Go Board of Directors taken a vote on monitoring of Access2Go employee's electronic communications, including the electronic communications of Access2Go's officers and directors.  (Exhibit A, ¶10).

19.     At no time prior to July, 2008, did Shefts believe that he, or any other officer and/or director of Access2Go, could have their electronic communications monitored by Access2Go.  (Exhibit A, ¶13).

20.     In the months preceding July, 2008, Petrakis and Morgan tasked Tandeski with drafting an employee handbook that contained language which would allow Access2Go to monitor electronic communications of Access2Go employees with prior approval of the Access2Go Board of Directors.  (Supplemental Affidavit of John Tandeski, attached hereto and hereinafter referred to as Exhibit E, ¶20).

21.     On July 2, 2008, the Access2Go Board of Directors voted in favor of adopting an employee manual created by Tandeski (the "Employee Manual").  (Exhibit E, ¶23).

22.     A copy of the Employee Manual is attached hereto and hereinafter referred to as Exhibit C.

23.     Section 6.7 of the Employee Manual states, in part, as follows:

> No employee may access another employee's computer, computer files, or electronic mail messages **without prior authorization from the Board of Directors**.

Exhibit C, §6.7 (emphasis added).

24.     Shefts is Chairman of the Board of Directors of Access2Go and has been since the formation of Access2Go.  (Exhibit A, ¶3).

25.     Since July 2, 2008, the Access2Go Board of Directors has never voted to allow monitoring of the computers, computer files or electronic mail message of any Access2Go employees, including Shefts.  (Exhibit A, ¶10).

26.     Since July 2, 2008, the Access2Go Board of Directors has never taken a vote on whether to access or monitor an Access2Go employee's computer usage and/or electronic communications.  (Exhibit A, ¶11).

27.     The Employee Manual has not been modified since July 2, 2008.

**D.     Confirmation of Use of Spyware by ICR**

28.     The installation of SpectorPro spyware was confirmed by Shawn Patton, an employee of Integrated Computer Resources ("ICR"), a company that provided Access2Go with computer support.  (Affidavit of Shawn Patton, attached hereto and hereinafter referred to as Exhibit D).

29.     According to Shawn Patton, Petrakis selected and purchased SpectorPro spyware along with multiple licenses for the program.  Exhibit D, ¶6).  Copies of emails sent from Petrakis to Shawn Patton regarding Petrakis's purchase of the SpectorPro spyware are attached to the First Supplemental Affidavit of Shawn Patton, attached hereto and hereinafter referred to as Exhibit H.

30.     At the direction of Petrakis and Huffman, Shawn Patton installed the SpectroPro spyware on several computers in the Access2Go offices, including Shefts' desktop computer at Access2Go.  (Exhibit D, ¶¶7-8).

31.     Petrakis also instructed Shawn Patton to set up a "dummy account" to route all emails sent to or received by Shefts using his Access2Go Email Account to Petrakis as they were being sent and received.  Pursuant to Petrakis's request, Shawn Patton created the "dummy

account" and set up a program to intercept all outgoing and incoming emails of Shefts.  (Exhibit D, ¶10).

32.    Petrakis and Huffman had access to the "dummy account."  (Exhibit D, ¶10).

33.    Shawn Patton also assisted Huffman, working with Blackberry text support, to enable logging of text messages sent by Access2Go employees, thus allowing Huffman and Petrakis that ability to log in and view text messages by and to Shefts.  (Exhibit D, ¶15).

34.    In Spring, 2008 or Summer, 2008, Petrakis instructed Shawn Patton to set up the exchange server to allow Petrakis access to Access2Go employee email accounts, including Shefts' account.  (Exhibit D, ¶11).

35.    In April, 2010, Huffman requested that Shawn Patton explain to her the process by which she could access Shefts' Access2Go Email Account through her new laptop computer. Pursuant to her request, Shawn Patton walked her through the steps necessary to utilize her new laptop to access Shefts' Access2Go Email Account.   (Exhibit D, ¶12).   Attached to the Supplemental Affidavit of Shawn Patton is an email between Heidi Huffman and Shawn Patton confirming her monitoring of the Blackberry text messages.

**E.    Forensic Examination by James Feehan**

36.    In order to further determine the extent of monitoring of Shefts' electronic communications by Petrakis, James Feehan, a computer forensic expert, was hired by Shefts' counsel to examine and analyze Shefts' Access2Go computer, as well as numerous hard drives that were used by Petrakis and/or Huffman at Accces2Go.

37.    Upon analyzing Shefts' Access2Go computer, Mr. Feehan discovered that SpectorPro spyware was, in fact, installed on Shefts' computer. (Affidavit of James Feehan, attached hereto and hereinafter referred to as Exhibit F, ¶25).

38.     During his investigation of Shefts' Access2Go Computer, James Feehan also inspected the Yahoo Email.  (Exhibit F, ¶17-24).

39.     Based on his inspection, James Feehan determined that the file location located at the bottom of the Yahoo Email, "file://C:\Documents and Settings\jpetrakis\ACC2GO\Local Settings\Temtmp1838216.h...," indicated that the Yahoo Email was printed on June 30, 2008, from a computer possessing Microsoft Windows XP by the computer user "JPetrakis."  (First Supplemental Affidavit of James Feehan, attached hereto and hereinafter referred to as Exhibit G, ¶¶22, 23).

40.     Additionally, based on his inspection of the Yahoo Email, James Feehan confirmed that "JPetrakis" accessed the Yahoo Email directly from the Yahoo Email Account. (Exhibit F, ¶23).

41.     Based on his professional experience, James Feehan concluded that, because the Yahoo Email Account is password protected, the computer user "JPetrakis" had to possess Shefts' username and password for the Yahoo Email Account in order to gain access to the Yahoo Email which "JPetrakis" viewed and printed.  (Exhibit F, ¶24).

42.     Subsequently, on May 31, 2010, James Feehan conducted a forensic examination of data on a Dell laptop, model X463MA00, serial number 16644708685, data from which indicated that it was utilized solely by Petrakis.  (First Supplemental Affidavit of James Feehan, attached hereto and hereinafter referred to as Exhibit G, ¶33).

43.     The data located on the computer indicated that it had been utilized to view intercepted electronic communications to and from Shefts. (Exhibit G ¶33).

44.    Specifically, the file titled "recovered text.xls" was a Microsoft Excel spreadsheet, created April 19, 2010, which contained text messages to and from Shefts' Blackberry.  (Exhibit G, ¶33).

45.    The text messages were collected into the spreadsheet from July, 2008 through March, 2009. (Exhibit G, ¶33).  This file resided in the "Documents and Settings\jpetrakis\Local Settings\Temporary Internet Files\Content.Outlook\265NFH1C" directory.  (Exhibit G, ¶33).

46.    On June 05, 2010, James Feehan conducted a forensic examination of data on a Seagate Momentus 4200.2 80GB PATA IDE hard drive, model ST9808210A, serial number 3LF2XV4S, data from which indicated that it was utilized solely by Petrakis (the "Old Hard Drive").  (Exhibit G, ¶35).

47.    While the hard drive was damaged, James Feehan did locate evidence of the interception of electronic communications of Shefts. (Exhibit G, ¶35).  Specifically, the Access2Go mailbox, calendar and contacts of Shefts were stored within the directory "C:\Masters\js\mailbox_-_jamison_shefts."  (Exhibit G, ¶35).  Calendar entries by Shefts for meetings with attorneys Ed Murphy, John Elias and Lane Alster were stored within this directory.  (Exhibit G, ¶36).

48.    On June 12, 2010, James Feehan conducted a forensic examination of data on a Hewlett Packard Pavilion laptop, model DV8 possessing serial number CNF0066164, data from which indicated that it was utilized solely by Heidi Huffman, beginning February 23, 2010. (Exhibit G, ¶38).

49.    Data was located which indicated that the computer had been utilized to view intercepted electronic communications to and from Shefts' Blackberry.  (Exhibit G, ¶39).  These electronic communications were in the form of Simple Messaging Service (SMS) text messages

sent and received by Shefts. (Exhibit G, ¶39). The intercepted SMS text messages occurred between July 2008 and January 14, 2009 and were stored within numerous Microsoft Excel spreadsheets. (Exhibit G, ¶39). All of the spreadsheets were deleted and stored within the "Recycle Bin." (Exhibit G, ¶39). These recycle bin files were deleted on March 23, 2010 and April 23, 2010. (Exhibit G, ¶39).

50.    One Microsoft Excel spreadsheet titled "Recovered Text.xls" was located within the Huffman Outlook deleted email directory. (Exhibit G, ¶40). This spreadsheet was an attachment to an email which was sent from hhuffman23@yahoo.com to hhuffman@acc2go.com and jpetrakis@acc2go.com on March 29, 2010 at 1:02 PM. (Exhibit G, ¶40).

51.    The "Recovered Text.xls" spreadsheet contained **over 400** intercepted SMS text messages to and from Shefts' personal Verizon Wireless cellular telephone account (309) 303-1171. These intercepted SMS text messages occurred between July 2008 and March 2009. (Exhibit G, ¶40).

52.    James Feehan's forensic examination also revealed that, while SpectorPro was installed on Shefts' computer, it was not installed on any computer used by Petrakis and/or Huffman. (Exhibit G, ¶¶34, 36).

**F.    Manner in which Electronic Communications are Sent and Received**

53.    The three different methods by which Shefts sent and received electronic communications include three distinct manners in which the electronic communication is transferred.

54.    In the case of the Access2Go Email Account, any time Shefts sends or receives an electronic communication using the Access2Go account, it is routed through the Access2Go server. Access2Go utilizes a Microsoft Exchange email server for email communications. This

server can be located anywhere, including within the company itself or provided by a third party, such as Klaus Companies. Regardless of where the server is located, email stored and distributed through a Microsoft Exchange email server operates similar to the Yahoo email server.  The only major difference with Microsoft Exchange is in the local computers' ability to view the email messages. With Microsoft Exchange, a local computer, often called a "client," must have a "mail client" application such as Microsoft Outlook installed on the computer to transfer and view emails stored on the Exchange server. As a user logs into Outlook, the application communicates with the Exchange server and updates the email data on the client computer. As new email messages or calendar events are received by the Exchange server, the server distributes those messages to the Outlook client locally, assuming the client is logged into his or her account. If a user is not logged into his or her account, the email messages remain on the Exchange server pending the account login, at which time the server will update the client. (Exhibit G, ¶52-53).

55.    In the case of the Yahoo Email Account, Yahoo Inc. offers its customers a free electronic mail service in which a user can create an email which is then sent to an email server located in Sunnyvale, California. The email resides on this server until the Yahoo account holder chooses to access it. When the Yahoo user logs into his or her Yahoo email account, the email application is provided to the user, in this case Shefts, via a web page. The user can then view the various email messages stored within the server for that user. When a user chooses to view an email message, the Yahoo email server simply transmits the message from the Sunnyvale California based server to the user's computer locally, in the form of a web page. (Exhibit G, ¶51).

56.    BES is a computer software application which allows companies the ability to send and receive e-mail to and from their employees' Blackberry devices. This computer

application was utilized by Shefts to send and receive his Access2Go Email through his personal Blackberry device. BES version 4.1 also allows business administrators the ability to log SMS text messages sent and received by their employees. This logging of SMS text messages is completed through the wireless synchronization of the SMS message database of the Blackberry device. (Exhibit G, ¶44-46).

57.    Once BES SMS auditing/logging/synchronization is enabled, the wireless synchronization of the SMS message database of the Blackberry device occurs automatically without the Blackberry user's knowledge. As that database is synchronized, the BES creates a .csv Microsoft Excel spread sheet containing the sent and received text message logs. These logs can then be viewed by a person who has access to the logs. (Exhibit G, ¶46).

**G.    Admissions by Petrakis and Huffman**

58.    Petrakis admits that he read and reviewed electronic communications sent and received by Shefts on his Access2Go Email Account and SMS text messages sent and received by Shefts on his Blackberry device. (Answer to First Amended Complaint, ¶49, ¶68).

59.    Petrakis admits that SpectorPro software was installed on Shefts' computer. (Answer to First Amended Complaint, ¶50).

60.    Huffman admits that she viewed and read electronic communications sent and received by Shefts from his Access2Go Email Account. (Heidi Huffman's Answer to First Amended Complaint, ¶68).

### D.  DISPUTED MATERIAL FACTS

There are no genuine issues of material fact in dispute that are relevant to the issues raised in this motion for summary judgment.

## E.  ARGUMENT

### I.    Introduction

This case involves blatant and systematic actions of the Defendants in improperly accessing, intercepting and retaining Plaintiff's electronic communications with third parties, including privileged communications with Shefts' attorneys.

Shefts' has moved for summary judgment under three separate causes of action:  Count I against Petrakis and Huffman for violation of the Electronic Communication Privacy Act (18 U.S.C. §2511); Count II against Petrakis for violation of the Stored Communications Act (18 U.S.C. §2701); and Count III against Petrakis and Huffman for violation of the Illinois Eavesdropping Statute (720 ILCS §5/14-1).  The evidence presented to the Court in this Motion for Summary Judgment establishes that Petrakis and Huffman regularly and intentionally violated the aforementioned Acts in order to monitor Shefts' activity and further the conspiracy of Petrakis and Morgan to oppress Shefts that is the subject of the Oppression Suit.

In 2006, Petrakis and Morgan each purchased 30% of the stock in Access2Go.  (Facts, ¶2).  Using their combined majority shareholder power, as well as their voting power on the Access2Go Board of Directors, Petrakis and Morgan conspired to force Shefts out of Access2Go.  (Facts, ¶3).  They began to take actions to force Shefts out of Access2Go, including eliminating monthly payments of Shefts' salary, suspending Shefts from the Access2Go office and suspending Shefts as an employee of Access2Go.  (Facts, ¶3).  Petrakis and Morgan also took numerous actions to oppress Shefts under the guise that their actions were approved by the Board of Directors.

In furtherance of their conspiracy to oppress Shefts, Petrakis, with the assistance of Huffman, began to monitor Shefts' electronic communications.  Shefts utilized three primary

forms of electronic communication:  (1) his Yahoo Email Account; (2) his Access2Go Email Account; and (3) his Blackberry device, (Facts, ¶5), Petrakis, with the assistance of Huffman, determined, method by which he could intercept, monitor and/or access Shefts' electronic communications on each account.

In order to access the Yahoo Email Account, Petrakis used the SpectorPro software package purchased by Access2Go and intentionally installed on Shefts' computer without Shefts knowledge or authorization.  (Facts, ¶30).  The SpectorPro software allowed Petrakis to capture Shefts' Yahoo login and password information, with which he was able to access the Yahoo Email Account on his own computer and print, at the very least, the Yahoo Email, which contained attorney-client privileged communications between Shefts and his attorney, Lane Alster regarding the Employee Handbook.  (Facts, ¶39-41) .

Petrakis accessed Shefts' Access2Go Email Account by directing Shawn Patton of ICR to place a "dummy account" on Petrakis's computer so that he could regularly review all emails sent and received by Shefts using his Access2Go Email Account as if he was sitting at Shefts' computer.  (Facts, ¶31).  Once again, Shefts never authorized or had knowledge of the "dummy account.  (Facts, ¶19)."  According to John Tandeski, Petrakis directed Huffman to review the emails sent and received by Shefts using his Access2Go Email Account as well.  (Facts, ¶14).  In their answers, Petrakis and Huffman both admitted to reading and reviewing Shefts' email sent and received from his Access2Go Email Account in order to monitor his actions.  (Facts, ¶58-60).

Finally, in order to monitor Shefts' electronic communications, Petrakis directed Huffman to use the BES software to intercept Shefts' SMS text messages sent and received using his Blackberry device.  Shawn Patton assisted Huffman in setting up the BES software on her

15

computer so that she could intercept text messages of Shefts. (Facts, ¶33). She then catalogued over 400 text messages between Shefts and third parties in a Microsoft Excel spreadsheet, which also included commentary on each text, and emailed these text messages to Petrakis. (Facts, ¶51).

The actions of Petrakis and Huffman have been confirmed by the forensic analysis of James Feehan, a computer forensics expert, as well as the sworn statements of Shawn Patton and John Tandeski. (Facts, ¶28-52).

The undisputed material facts establish that Petrakis violated the Electronic Communications Privacy Act by directing Huffman to use BES software in order to intercept over 400 SMS text messages from Shefts' Blackberry device. Additionally, the undisputed material facts establish that Petrakis violated the Stored Communications Act in at least two distinct ways: (1) by accessing the Yahoo Email Account and obtaining the Yahoo Email; and (2) by accessing Shefts' Access2Go Email Account using a "dummy account" on Petrakis's computer and obtaining Shefts' Access2Go Email. Finally, the undisputed material facts establish that Petrakis violated the Illinois Eavesdropping Statute in three distinct ways: (1) by accessing the Yahoo Email Account and obtaining the Yahoo Email; (2) by accessing the Shefts' Access2Go Email Account and obtaining Shefts' Access2Go Email; and (3) by directing Huffman to use the BES software to intercept SMS text messages from Shefts' Blackberry device, and then receiving and reviewing these text messages. Therefore, as a result of the numerous violations of the Stored Communications Act, the Electronic Communications Privacy Act and the Illinois Eavesdropping Act, summary judgment should be granted in favor of Shefts as to Counts I, II and III of the First Amended Verified Complaint.

**II.** **Summary judgment should be granted against Petrakis and Huffman as to Count I of the First Amended Verified Complaint because they violated the ECPA by**

**intentionally intercepting SMS text messages from Shefts' Blackberry through use of the BES software, without authorization from Shefts.**

Petrakis and Huffman violated the ECPA by intentionally intercepting SMS text messages from Shefts' Blackberry through use of the BES software, without authorization from Shefts.  Pursuant to the ECPA, a violation of 18 U.S.C. §2511 occurs as follows:

> (1) Except as otherwise specifically provided in this chapter any person who--
>
> (a) intentionally intercepts, endeavors to intercept, or **procures any other person to intercept** or endeavor to intercept, any wire, oral, or electronic communication;
>
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when--
>
> (i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
>
> (ii) such device transmits communications by radio, or interferes with the transmission of such communication; or
>
> (iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or
>
> (iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
>
> (v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
>
> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was

obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(e) (i) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by sections 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518 of this chapter, (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation,

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. §2511(1) (West 2010) (emphasis added).

"Intercept" is defined in the ECPA as follows:

(4) "intercept" means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.

18 U.S.C. §2510(4) (West 2010).

18 U.S.C. §2511(1)(d) states as follows:

a. Except as otherwise specifically provided in this chapter any person who—

*       *       *

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

*       *       *

shall be punished as provided in subsection (4) or shall be subject to
suit as provided in subsection (5).

18 U.S.C. §2511(1)(d) (West 2010).

All other definitions stated in this Section are the same as were previously defined in

Section I, *infra*.

In Global Policy Partners, LLC et. al. vs. Yessin, 2009 WL 4307459 (E.D. Va. 2009), the

United States District Court for the Eastern District of Virginia the following:

> [A] qualifying intercept occurs only where the acquisition of the
> communication occurs contemporaneously with its transmission by
> sender.  Thus interception includes accessing messages in transient
> storage on a server during the course of transmission, but does not
> include accessing the messages stored on a destination server.
>
> *                *                *
>
> [The email must be] accessed at some point between the time the
> communication is sent and the time it is received by the destination
> server, at which point it becomes a "stored communication" within
> the meaning of the SCA.

Id. at *5.

Here, Petrakis and Huffman clearly violated the ECPA when Petrakis and Huffman,

pursuant to instructions from Petrakis, intercepted over 400 of Shefts' SMS text messages from

the Blackberry device so that he could closely monitor Shefts' daily activities, whether or not

they were related to his employment at Access2Go.  First, it is undisputed that Petrakis read and

reviewed certain SMS text messages sent and received by Shefts using his Blackberry.  Petrakis

has admitted that he read and reviewed Shefts' text messages in his Answer to the First Amended

Verified Complaint.

Second, the undisputed genuine material facts establish that Huffman intentionally

intercepted text messages sent and received from the Blackberry and provided the text messages

to Petrakis.  As stated in paragraph 48 of the Facts, *infra*, on June 12, 2010, James Feehan

conducted a forensic examination of data on a Hewlett Packard Pavilion laptop, model DV8, possessing serial number CNF0066164, data from which indicated that it was utilized solely by Heidi Huffman, beginning February 23, 2010. Data located on the computer indicated that electronic communications to and from Shefts' Blackberry in the form of Simple Messaging Service (SMS) text messages sent and received by Shefts were located on Huffman's computer. Shawn Patton attested to the fact that he assisted Huffman, working with Blackberry text support, to enable her to log text messages sent by Access2Go employees, including Shefts, using their Blackberry devices. Specifically, Huffman used BES in order to log Shefts' text messages. (Facts, ¶¶48-51).

BES version 4.1 allows business administrators to log SMS text messages sent and received by their employees. The logging of SMS text messages is completed through the wireless synchronization of the SMS message database of the Blackberry device. Once BES SMS auditing/logging/synchronization is enabled, the wireless synchronization of the SMS message database of the Blackberry occurs automatically without the Blackberry user's knowledge. As that database is synchronized, the BES creates a .csv Microsoft Excel spread sheet containing the sent and received text message logs. These logs can then be viewed by a person who has access to the logs. Because the BES software logs the text messages before they reach the recipient of the text message, an interception is occurring each time a text message is logged. (Facts, ¶¶56-57).

Based on James Feehan's investigation, the interceptions, which were evidence from his review, occurred between July, 2008 and January 14, 2009 and were stored by Huffman within numerous Microsoft Excel spreadsheets. All of the spreadsheets were deleted and stored within the "Recycle Bin." (Facts, ¶45). The recycle bin files were deleted on March 23, 2010 and April

23, 2010.   James Feehan's forensic investigation also revealed that a Microsoft Excel spreadsheet titled "Recovered Text.xls" was located within the Huffman Outlook deleted email directory.    The spreadsheet was an attachment to an email which was sent from hhuffman23@yahoo.com to hhuffman@acc2go.com and jpetrakis@acc2go.com on March 29, 2010 at 1:02 PM.   (Facts, ¶50).  The "Recovered Text.xls" spreadsheet contained intercepted SMS text messages to and from Shefts' personal Verizon Wireless cellular telephone account (309) 303-1171.   (Facts, ¶51).  Petrakis uses the email account jpetrakis@acc2go.com.   James Feehan's forensic examination of the Dell laptop, model X463MA00, serial number 16644708685, data from which indicated that it was utilized solely by Petrakis, uncovered a file titled "recovered text.xls" that was a Microsoft Excel spreadsheet, created April 19, 2010, which contained text messages to and from Shefts Blackberry.   (Facts, ¶45).  The file resided in the "Documents      and         Settings\jpetrakis\Local          Settings\Temporary      Internet Files\Content.Outlook\265NFH1C" directory.   The existence of the file "recovered text.xls" establishes that Petrakis received the Excel spreadsheet he instructed Huffman to create, and reviewed the SMS text messages contained therein.   Therefore, because Petrakis and Huffman, pursuant to instructions from Petrakis, intercepted SMS text messages from the Blackberry using the BES software, without authorization from Shefts, they have violated 18 U.S.C. §2511, and summary judgment should be granted in Shefts' favor and against Petrakis and Huffman as to Count I of the First Amended Verified Complaint.

III.    **Summary judgment should be granted against Petrakis as to Count II of the First Amended Verified Complaint because his intentional access of the Yahoo Email Account, without authorization from Shefts, and obtaining the Yahoo Email therefrom, constitutes a violation of the Stored Communications Act.**

Petrakis violated the Stored Communications Act when he intentionally accessed the Yahoo Email Account and read, printed and disbursed the Yahoo Email.  18 U.S.C. §2701(a) states as follows:

> (a) Offense.--Except as provided in subsection (c) of this section whoever--
>
> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
>
> (2) intentionally exceeds an authorization to access that facility;
>
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

18 U.S.C. §2701(a) (West 2010).

An "electronic communication" is defined in the Stored Communications Act as follows:

> [A]ny transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce.

18 USC §2510(12) (West 2010).

An "electronic communication service" is defined in the Stored Communications Act as follows:

> any service which provides to users thereof the ability to send or receive wire or electronic communications.

18 USC §2510(15) (West 2010).

An "electronic communication system" is defined in the Stored Communications Act as follows:

> any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications.

18 U.S.C. §2510(14) (West 2010).

"Electronic storage" is defined in the Stored Communications Act as follows:

> any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof, and any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

18 U.S.C. §2510(17) (West 2010).

A computer may act as the "facility through which an electronic communication service is provided:

> The SCA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications[.]" 18 U.S.C. § 2510(15) (incorporated by reference in 18 U.S.C. § 2711(1) of the SCA). "Electronic storage" is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and any storage of such communication by an electronic communication service for purposes of backup protection of such communication[.]" Id. § 2510(17)(A), (B). The language of § 2701 of the SCA does not require that a plaintiff's computers be "electronic services provider[s]," rather, what the statute requires is that a plaintiff's computers or workplace be a "facility" through which an electronic communication is provided. See 18 U.S.C. § 2701(a)(1); In re Intuit Privacy Litigation, 138 F.Supp.2d 1272, 1275 n. 3 (C.D.Cal.2001) (stating that § 2701 "does not require that Plaintiffs' computers be 'communication service providers' only that they be a facility through which an electronic communication service is provided" (emphasis in original)).

<u>Expert Janitorial, LLC v. Williams</u>, 2010 WL 908740, *4 (E.D.Tenn., 2010).

Here, the facts establish that a violation of the Stored Communications Act occurred when Petrakis accessed the Yahoo Email Account from the Yahoo website and read, printed and distributed the Yahoo Email.

First, it is undisputed that Shefts never gave anybody, including Petrakis, authorization to access his Yahoo Email Account.  (Facts, ¶19).

Second, it is undisputed that the Yahoo Email includes a communication between Shefts and a third party.  Specifically, the Yahoo Email is an electronic communication between Shefts and one of his attorneys in the Oppression Lawsuit, Lane Alster.  (Facts, ¶11).  Therefore, it is undisputed that Petrakis had no right to read the contents of the Yahoo Email.

Third, it is clear that Petrakis's use of his Access2Go computer to access the Yahoo Email Account constitutes access of a "facility through which an electronic communication service is provided."  As stated in the Affidavit of Shawn Patton, Petrakis instructed ICR to install SpectorPro software on Shefts' Acces2Go computer.  (Exhibit D, ¶¶7-8).  The SpectorPro spyware contained keystroking software that would allow Petrakis to determine Shefts' Yahoo Email Account login and password information by determining the keystrokes used by Shefts when he typed in his login and password when accessing his Yahoo Email Account.  Based on the expert analysis of James Feehan, the Yahoo Email was printed on June 30, 2008, from a computer possessing Microsoft Windows XP by the computer user "JPetrakis" directly from the Yahoo Email Account.  (Facts, ¶40).  Petrakis admitted to Tandeski that he was monitoring the Yahoo Email Account.  (Facts, ¶17).  The Yahoo Email was stored in the Yahoo Email Account on the Yahoo server located in Sunnyvale, California.  (Facts, ¶55).  The Yahoo server is an electronic communication system and Yahoo constitutes an electronic communication service, as

defined in the Stored Communications Act. Therefore, because the undisputed material facts establish that Petrakis intentionally accessed the Yahoo Email Account without authorization from Shefts and subsequently read, printed and distributed the Yahoo Email, summary judgment should be awarded in favor of Shefts as to Count II of the First Amended Verified Complaint.

IV.    **Summary judgment should be granted against Petrakis as to Count II of the First Amended Verified Complaint because his intentional access of the Access2Go Email Account from the Access2Go server, without authorization, and obtaining therefrom electronic communications between Shefts and third parties, constitutes a violation of the Stored Communications Act.**

In addition to the violation of the Stored Communications Act committed by Petrakis when he accessed the Yahoo Email Account, Petrakis violated the Stored Communication Act when he exceeded his authority to access the Access2Go server by creating a "dummy account" of the Access2Go Email Account on his computer, without authorization from Shefts, in order to obtain therefrom electronic communications between Shefts and third parties. For purposes of Section II, Shefts incorporates the legal definitions and analysis discussed in Section I, *infra*.

First, the undisputed material facts establish that Petrakis exceeded his authority to access a facility through which an electronic communication service was provided when he had a "dummy account" for the Access2Go Email Account placed on his computer. The Affidavit of Shawn Patton establishes that, pursuant to Petrakis's instruction, Shawn Patton from ICR set up a "dummy account" to route all emails sent to or received by Shefts using his Access2Go Email Account to Petrakis's computer as they were being sent and received. The forensic examination of the Old Hard Drive by James Feehan confirmed that Petrakis had been accessing the Access2Go Email Account on his laptop computer. Specifically, the Access2Go mailbox, calendar and contacts of Shefts were stored within the directory "C:\Masters\js\mailbox_-_jamison_shefts" on the Old Hard Drive. Additionally, calendar entries by Shefts for meetings

with attorneys Ed Murphy, John Elias and Lane Alster were stored within the directory on the Old Hard Drive.  Petrakis admits in his Answer to the First Amended Verified Complaint that he read and reviewed emails from the Access2Go Email Account sent by Shefts.  All Access2Go emails sent and received by Shefts on the Access2Go Email Account constitute electronic communications as defined in the Stored Communications Act.  Based on the forensic investigation of the Seagate Momentus 4200.2 80GB PATA IDE hard drive, model ST9808210A, serial number 3LF2XV4S, conducted by James Feehan,  the Access2Go mailbox, calendar and contacts of Shefts were stored within the directory of the aforementioned computer at "C:\Masters\js\mailbox_-_jamison_shefts."  James Feehan was able to read calendar entries by Shefts for meetings with Shefts' divorce attorney, Ed Murphy, and his Oppression Suit attorneys, John Elias and Lane Alster, that were stored within this directory.  (Facts, ¶47).  Additionally, James Feehan's forensic analysis of the aforementioned hard drive established that Petrakis was the user of the aforementioned hard drive.  (Facts, ¶46).

Shefts anticipates that Petrakis will argue that he had authority to read Shefts' electronic communications between himself and third parties based on the Employee Manual.  Such logic is flawed for a number of reasons.  First, the undisputed material facts in this case establish that Petrakis, as well as the other Defendants, were monitoring Shefts' electronic communications prior to July 2, 2008, the date on which the Employee Manual was approved by the Access2Go Board of Directors.  (Facts, ¶38-40).  Prior to July 2, 2008, Access2Go did not have a written policy regarding access to employees' Access2Go email accounts.  There was definitely no policy that allowed Petrakis, or any other person, to access the Access2Go Email Account without authorization.  As a result, Shefts, being President and CEO of Access2Go, had an expectation of privacy that any and all electronic communications that he sent and/or received

using his Access2Go Email Account were not being read and reviewed by Petrakis or any other party. Additionally, Shefts, in his capacity as Chairman of the Access2Go Board of Directors, would have been aware if any monitoring of any employee had been discussed and/or approved by the Board of Directors. Therefore, prior to July 2, 2008, Shefts' expectation of privacy regarding use of his Access2Go computer and Access2Go Email Account was high because of his role within Access2Go. Shefts reasonably believed that he would be involved in any decision-making process regarding monitoring of any employee's electronic communications, including his own electronic communications.

Second, the undisputed material facts establish that, following the July 2, 2008 vote of the Board of Directors approving the Employee Manual, the Employee Manual stated the policies of Access2Go. Section 6.7 of the Employee Manual expressly requires the Access2Go Board of Directors to approve any monitoring of an Access2Go employee's electronic communications, including Shefts. As previously stated, Section 6.7 of the Employee Manual states, in part, as follows:

> No employee may access another employee's computer, computer files, or electronic mail messages **without prior authorization from the Board of Directors**. (emphasis added). (Exhibit C)

The Employee Manual would have only allowed Petrakis to monitor Access2Go employee email activity, including the electronic communications of Shefts on his Access2Go Email Account, upon an express affirmative vote of the Board of Directors, of which Shefts was and is the Chairman. The required vote in favor of authorizing such monitoring simply never occurred. (Facts, ¶25-26). The Access2Go Board of Directors has <u>never</u> authorized monitoring of <u>any</u> Access2Go employees' computers, computer files, or electronic mail messages, including those of Shefts. (Facts, ¶18, 25-26). For this reason, Shefts arguably had an even heightened

expectation of privacy regarding monitoring of his electronic communication on his Access2Go Email Account subsequent to the implementation of the Employee Manual as the policy of Accses2Go.  (Facts, ¶23-26).

Because the Stored Communications Act was violated by Petrakis when he exceeded his authorization to access the Access2Go server in order to create a "dummy account" of Shefts' Access2Go Email Account, after which he read and reviewed electronic communications between Shefts and third parties, summary judgment should be granted in favor of Shefts and against Petrakis as to Count II of the First Amended Verified Complaint.

**V.**      **Summary judgment should be granted against Petrakis and Huffman as to Count III of the First Amended Verified Complaint because they violated the Illinois Eavesdropping statute, 720 ILCS §5/14-1 et.seq., by knowingly and intentionally using the BES software to intercept communications between Shefts and third parties sent and received using his Blackberry device.  Petrakis also violated the Illinois Eavesdropping statute by using the "dummy account" and SpectorPro spyware to access communications between Shefts and third parties on the Access2Go Email Account and the Yahoo Email Account.**

Petrakis and Huffman violated the Illinois Eavesdropping Statute (720 ILCS §5/14-1 et. Seq.) by knowingly and intentionally using the BES software to intercept SMS text messages between Shefts and third parties.  Additionally, Petrakis violated 720 ILCS §5/14-1 by using the "dummy" account and the SpectorPro spyware for the purpose of retaining electronic communications between Shefts and third parties using his Access2Go Email Account and Yahoo Email Account, without the consent of Shefts or the other parties to the communication. Section 14-2(a)(1) of the Illinois Eavesdropping Statute provides as follows:

> (a) A person commits eavesdropping when he:
>
> (1) Knowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation or intercepts, retains, or transcribes electronic communication unless he does so (A) with the consent of all of the parties to such conversation or electronic communication or (B) in

accordance with Article 108A or Article 108B of the "Code of Criminal Procedure of 1963," approved August 14, 1963, as amended;

720 ILCS 5/14-2(a)(1) (West 2010).

An "eavesdropping device" is defined under the Illinois Eavesdropping statute as follows:

> An eavesdropping device is any device capable of being used to hear or record oral conversation or intercept, retain, or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means; Provided, however, that this definition shall not include devices used for the restoration of the deaf or hard-of-hearing to normal or partial hearing.

720 ILCS 5/14-1(a) (West 2010).

An "electronic communication" is defined under the Illinois Eavesdropping statute as follows:

> For purposes of this Article, the term electronic communication means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, where the sending and receiving parties intend the electronic communication to be private and the interception, recording, or transcription of the electronic communication is accomplished by a device in a surreptitious manner contrary to the provisions of this Article. Electronic communication does not include any communication from a tracking device.

720 ILCS 5/14-1(e) (West 2010).

Petrakis violated 720 ILCS §5/14-1 by using his computers, and the software on his computers, as eavesdropping devices to intercept and/or retain emails sent and received by Shefts using his Yahoo Email Account, Access2Go Email Account and Blackberry.  First, the computers used by Petrakis to intercept and/or retain the electronic communications between Shefts and third parties are "eavesdropping devices" as defined within 720 ILCS §5/14.  On each

occasion, Petrakis used different software, such as the SpectorPro spyware, "dummy account" and BES software, in order to make his computer an eavesdropping device that allowed him to intercept and/or retain the electronic communications.  The testimony of James Feehan and Shawn Patton establishes that the computer, aided by the "dummy account," SpectorPro spyware and BES software allowed Petrakis to intercept and/or retain the electronic communications between Shefts and third parties.  (Facts, ¶31-32, 37, 49-52).

Second, the undisputed material facts establish that Petrakis did not have permission from Shefts to read and review his electronic communications between third parties.  Petrakis does not deny that he had no right to read the Yahoo Email Account.  Petrakis even admits to reading the Access2Go Email Account and text messages on the Blackberry.  Instead, Petrakis argues that he had authorized access to read and review the text messages and the Access2Go Email Account because they were stored on the Access2Go server and the Employee Manual allowed for monitoring of electronic communications contained on the Accesss2Go server.  While Petrakis relies on the "policy" of Access2Go in support of his contention that he permissibly read and reviewed the aforementioned communications, the evidence does not support his position regarding the policy of Access2Go.  As stated above, Access2Go did not have any formal written policy regarding monitoring of electronic communications prior to July 2, 2009.  (Facts, ¶17).  According to Shefts, no policy existed at all prior to July 2, 2009.  As Shefts was President and CEO of Access2Go at such time, no policy regarding monitoring of his electronic communications could have been added without his knowledge.  After July 2, 2009, the Employee Manual requires approval of the Access2Go Board of Directors before any monitoring of employees could be conducted, including monitoring of Shefts emails and text messages.  No vote has been taken by the Board of Directors at any time giving Petrakis and/or Huffman the

right to monitor Shefts' electronic communications.  (Facts, ¶18, 25-26).  If such authorization

had been given, Shefts would have been aware since he is the Chairmen of the Access2Go Board

of Directors.    Therefore, it is clear that each of the electronic communications that were

intercepted, accessed, and/or retained by Petrakis and Huffman from Shefts' Yahoo Email

Account, Access2Go Email Account and Blackberry, without Shefts' authorization, were

intercepted, accessed and/or retained in violation of the Illinois Eavesdropping Statute and, as a

result, summary judgment should be granted in favor of Shefts and against Petrakis and Huffman

as to Count III of the First Amended Verified Complaint.

## F.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court enter summary

judgment in favor of Jamison Shefts and against Defendant Heidi Huffman as to Counts I and II

of the First Amended Verified Complaint and against Defendant John Petrakis as to Counts I, II

and III of the First Amended Verified Complaint and that the Court grant such other or additional

relief as the Court deems just.

Respectfully submitted

By:     /s/ Robert M. Riffle
        Robert M. Riffle
        ELIAS, MEGINNES, RIFFLE & SEGHETTI, P.C.
        416 Main St., Suite 1400
        Peoria, IL 61602
        (309) 637-6000
        *Counsel for Plaintiff*

410-0566.1

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## <u>CENTRAL DISTRICT OF ILLINOIS LOCAL RULE 7.1</u>

Pursuant to Local Rule 7.1(D) of the Rules of the United States District Court, Central District of Illinois, the undersigned hereby certifies that an analysis of Sections E and F of the foregoing Memorandum using the document information program of Microsoft Word yields the following results:

|  |  |
|---|---|
| Words: | 5,105 |
| Characters: | 34,149 (with spaces) |

The Memorandum is therefore in compliance with the volume type limitation of Local Rule 7.1(D).

Date: July 21, 2010

/s/ Robert M. Riffle
Robert M. Riffle, Esq.
*Attorney for Plaintiff*
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
Telephone: (309) 637-6000
Facsimile: (309) 637-8514

## PROOF OF SERVICE

I hereby certify that on July 21, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

>   George Mueller
>   Mueller Anderson, P.C.
>   609 Etna Road
>   Ottawa, IL 61350

I also hereby certify that on <u>n/a</u>, 2010, I served a copy of the foregoing document on the following at the respective business addresses below by deposit in the U. S. Mail, postage prepaid, at Peoria, Illinois:

>   None.

>   <u>          /s/ Robet M. Riffle          </u>
>   Robert M. Riffle, Esq.
>   *Attorney for Plaintiff*
>   Elias, Meginnes, Riffle & Seghetti, P.C.
>   416 Main Street, Suite 1400
>   Peoria, IL 61602
>   Telephone:  (309) 637-6000
>   Facsimile:  (309) 637-8514