IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JAMISON J. SHEFTS, an Individual,    ) | |
|      ) | |
|    Plaintiff,    ) | |
|      ) | Case No. 10 CV 1104 |
|    v.    ) | |
|      ) | |
| JOHN PETRAKIS, an Individual,    ) | |
| KEVIN MORGAN, an Individual,    ) | |
| and HEIDI HUFFMAN, an    ) | |
| Individual,    ) | |
|      ) | |
|    Defendant.    ) | |

**RESPONSE OF JOHN PETRAKIS TO MOTION FOR SUMMARY JUDGMENT
ON COUNTS I, II AND III OF COMPLAINT, AND OF HEIDI HUFFMAN
ON COUNTS I AND III OF COMPLAINT**

Defendants JOHN PETRAKIS and HEIDI HUFFMAN, by their attorney J. Reed Roesler

of Davis & Campbell L.L.C., file this response in opposition to Shefts' Motion for Summary

Judgment.  Note that while Shefts' Motion recites that it is brought pursuant to FRCP Rule 56(b),

it should be pursuant to FRCP Rule 56(a), as conceded by Shefts in his subsequent pleading

[#55] opposing the Motion to Extend Deadline for Response filed by Petrakis and Huffman.

## I.   INTRODUCTION

On June 18, 2008, the Access2Go Board of Directors appointed Petrakis to serve as the

Board's "liaison for security" in anticipation of the Board's adoption of a new Employee

Manual.  This new Employee Manual, issued prior to June 30, 2008, and ratified by the Board on

July 2, 2008, recognized that:

- members of the Board had the authority to monitor the emails and text messages of Access2Go employees, officers and directors; and that

- Petrakis would be the Board member assigned an affirmative responsibility to monitor these communications in order to safeguard company resources.

After issuance of the Employee Manual, Petrakis and Huffman, who acted at the direction of Petrakis, began to monitor emails and text messages stored on Access2Go's information systems that had been sent to and received by Shefts.  Petrakis did so because of concerns that Shefts was sexually harassing Access2Go employees and violating the fiduciary duties he owed to Access2Go by, among other things, disclosing confidential Access2Go information to unauthorized individuals.

The concerns that Petrakis had about Shefts' activities prompted Petrakis, Morgan and Tandeski, as 3 of the 4 members of Access2Go's Board of Directors [with Shefts being the 4th], and as the owners of 70% of the stock of Access2Go, to take the following actions:

- on June 16, 2008, Shefts was formally notified of their claim that Shefts was violating his fiduciary duties to Access2Go; and

- on August 26, 2008, Shefts was suspended as Access2Go's President and CEO, with pay.

On September 9, 2008, at a meeting of the Access2Go Board of Directors, Petrakis, Morgan and Tandeski ratified the suspension of Shefts and recommended that he be terminated as Access2Go's President and CEO.  On September 16, 2008, Petrakis, Morgan and Tandeski, voting as the majority of Access2Go's shareholders, left Shefts' suspension unchanged, and deferred the recommendation that Shefts be terminated until December 22, 2009, when Shefts was formally terminated as Access2Go's President and CEO at an Access2Go shareholders meeting.

In his Motion for Summary Judgment, Shefts now claims that his rights were violated by the means through which evidence supporting his suspension and ultimate termination was obtained.

Shefts' Motion should be denied for the following reasons:

a)  The federal Electronic Communications Privacy Act [Count I] was not violated because neither Petrakis nor Huffman "intercepted" Shefts' text messages [these communications were monitored after being stored on Access2Go's information system].

b)  The federal Stored Communications Act [Count III] was not violated because Petrakis did not directly access Shefts' Yahoo email account and because he was authorized to monitor the emails stored on Access2Go's information system, and reasonably believed he had the responsibility to do so.

c)  The Illinois eavesdropping act [Count II] is an unconstitutional exercise of government power, and was not, in any case, violated because Petrakis did not directly access Shefts' Yahoo email account, and because the emails and text messages monitored by Petrakis and Huffman were not private or recorded surreptitiously.

Note that, in the Argument section of Shefts' Memorandum of Law, Count II is incorrectly identified as the claim under the federal Stored Communications Act and Count III is incorrectly identified as the claim under the Illinois eavesdropping act.  On the other hand, these claims are correctly identified in the Introduction and Conclusion sections of the Memorandum of Law.  Further complicating matters, in his Motion for Summary Judgment, and in the Introduction and Conclusion sections of his supporting Memorandum of Law, Shefts requests summary judgment against Huffman under the federal Electronic Communications Privacy Act ("ECPA") and federal Stored Communications Act.  However, the Argument section of Shefts' Memorandum argues for summary judgment against Huffman as to the claims under the ECPA and Illinois eavesdropping act, but not as to the claim under the federal Stored Communications Act.  Because the substance of Shefts' allegations is contained in his Argument, this Response addresses the issues as presented by Shefts in that section of his Memorandum of Law.

**INDEX**

II.   RESPONSE TO UNDISPUTED MATERIAL FACTS ……………………….....  6

    A.  Undisputed Material Facts……………………………………………  6

    B.  Disputed Material Facts…………………………………………… 10

    C.  Disputed Immaterial Facts……………………………………… 13

    D.  Undisputed Immaterial Facts…………………………………… 13

    E.  Additional Material Facts…………………………………….... 16

III.  ARGUMENT……………………………………………………… 21

A.   Summary judgment should be denied on Count I because neither
    Petrakis nor Huffman "intercepted" Shefts' text messages within
    the meaning of the federal Electronic Communications Privacy Act. ………...21

B.   Summary judgment should be denied on Count III because Petrakis
    did not directly access Shefts' Yahoo email account, because the
    federal Stored Communications Act exempts Petrakis' actions
    as a person authorized by Access2Go to monitor emails stored on
    the company's information system, and because Petrakis reasonably
    believed he had a responsibility to monitor Shefts' emails. ……………..…….. 26

C.   Summary judgment should be denied on Count II because the Illinois
    eavesdropping act is an unconstitutional exercise of government power,
    and was not, in any case, violated because Petrakis did not directly
    access Shefts' Yahoo email account, and because emails and text
    messages monitored by Petrakis and Huffman were not private or
    recorded surreptitiously. ……………………………………………..….31

      1.  The Illinois eavesdropping act is void because its core provisions
        violate the free speech clause of the First Amendment………………... 31

      2.  Without regard for its unconstitutionality, Shefts cannot claim a
        Violation of the Illinois eavesdropping act because Petrakis did not
        directly access Shefts' Yahoo email account, and because the email
        and text messages accessed by Petrakis and Huffman were not
        private or recorded surreptitiously…………………………………...… 32

          a)  Petrakis did not directly access Shefts' Yahoo email account. ... 33

          b)  Shefts' emails and text messages were not private. …………… 33

i)     **No claim of privacy can be made for communications sent and received on equipment connected to Access2Go's information systems**……………………...…..33

ii)     **No claim of privacy can be made for communications That are subject to a litigation hold.** …………………... 36

iii)     **No claim of privacy can be made for communications monitored in response to evidence of workplace misconduct.** ……………………………………..…………38

c)  **The manner by which Petrakis and Huffman monitored Shefts' emails and text messages was not surreptitious.** ……… 39

**IV. CONCLUSION**……………………………………………………40

## II.  RESPONSE TO UNDISPUTED MATERIAL FACTS

### A.  Undisputed Material Facts

Paragraph 1.  Shefts is the founder of Access2Go, Inc., a telecommunications company.  Also see Part II (B).

Paragraph 2.  For purposes of Shefts' Motion, Petrakis and Huffman admit that until January 1, 2006, Shefts owned all Series A Common Stock (Voting) issued by Access2Go, and that effective January 1, 2006, pursuant to a Purchase Agreement, Morgan, Petrakis and Shefts each became owners of thirty percent (30%) of the shares of Series A Common Stock (Voting) in Access2Go, effectively making Shefts a minority shareholder.  Also see Parts II (B) and (D).

Paragraph 3.  Petrakis, Morgan and Tandeski suspended Shefts from the Access2Go offices and eventually suspended him as an Access2Go employee.  Also see Part II (C) and paragraph 17 of Part II (E).

Paragraph 5.  For purposes of Shefts' Motion, it is admitted that at all relevant times, Shefts had three avenues through which he sent and received email and text messages: (1) his Access2Go email account, which used the email address jshefts@acc2go.com; (2) his Yahoo email account, which used the email address jshefts@yahoo.com; and (3) his Blackberry handheld messaging device, on which he could send and receive short message service text messages using his Verizon cellular phone number (309) 303-1171 and send and receive emails from his Access2Go email account.  Petrakis and Huffman challenge the legal conclusion that Shefts' email or text messages are "electronic communications" as defined by the Illinois eavesdropping act.

Paragraph 7.  Shefts knew that his Access2Go emails could be monitored.  Also see Parts II (B) and (D), and paragraph 11 of Part II (E).

Paragraph 21 & 22.  On July 2, 2008, the Access2Go Board of Directors ratified the referenced Employee Manual created by Tandeski.  Also see paragraph 5 of Part II (E).

Paragraph 27.  For purposes of Shefts' Motion, the Employee Manual has not been modified since July 2, 2008.

Paragraph 28, 29 & 30.  Petrakis admits that SpectorPro monitoring software was installed on Access2Go computers at his direction, including Shefts' desktop computer at Access2Go.

Paragraph 32.  Petrakis and Huffman admit that they had access to the "dummy account" used to retrieve from Access2Go's information system the stored emails sent or received by Shefts using his Access2Go email account.

Paragraph 34.  Petrakis admits that in spring, 2008 or summer, 2008, he instructed Shawn Patton to set up Access2Go's exchange server to allow him access to Access2Go employee email accounts, including Shefts' account.

Paragraph 35.  Huffman admits that in April, 2010, at the direction of Petrakis, she requested that Shawn Patton explain to her the process by which she could access Shefts' Access2Go email account from the servers owned by Access2Go through her new laptop computer.  Pursuant to her request, Shawn Patton walked her through the steps necessary to utilize her new laptop to access Shefts' Access2Go email account.

Paragraph 36.  For purposes of Shefts' Motion, it is admitted that James Feehan was hired to examine and analyze Shefts' Access2Go computer account as well as numerous hard drives that were used by Petrakis and/or Huffman at Access2Go.

Paragraph 37.  Petrakis and Huffman admit that SpectorPro monitoring software was installed on Shefts' computer.

Paragraph 38.  For purposes of Shefts' Motion, it is admitted that James Feehan also inspected Shefts' Yahoo email.

Paragraph 42.  For purposes of Shefts' Motion, it is admitted that on May 31, 2010, James Feehan conducted a forensic examination of the designated Dell laptop.

Paragraph 44 & 45.  For purposes of Shefts' Motion, it is admitted that the referenced file contained text messages to and from Shefts between July, 2008 through March, 2009.

Paragraph 46.  For purposes of Shefts' Motion, it is admitted that James Feehan conducted a forensic examination of data on the designated hard drive.

Paragraph 48.  For purposes of Shefts' Motion, it is admitted that James Feehan conducted a forensic examination of data on the designated Hewlett Packard Pavilion laptop.

Paragraph 53.  For purposes of Shefts' Motion, it is admitted that the three different methods by which Shefts sent and received emails and text messages include three distinct manners in which these communication are transferred. Petrakis and Huffman challenge the legal conclusion that Shefts' emails or text messages are "electronic communications" as defined by the Illinois eavesdropping act.

Paragraph 54.  For purposes of Shefts' Motion, it is admitted that in the case of the Access2Go Email account, anytime Shefts sends or receives an email using the Access2Go account, it is routed through the Access2Go server.  Access2Go utilizes a Microsoft Exchange server for email communications.  The server can be located anywhere, including within the company itself or provided by a third company, such as Klaus Companies.  Regardless of where the server is located, email stored and distributed to the Microsoft Exchange email server operates similar to the Yahoo email server.  The only major difference with Microsoft Exchange is in the computer's ability to view the email messages.  With Microsoft Exchange, a local

computer, often called a "client," must have a "mail client" application such as Microsoft Outlook installed on the computer to transfer and view emails stored on the Exchange server.  As a user logs into Outlook, the application communicates with the Exchange server and updates the email data on the client computer.  As new email messages or calendar events are received by the Exchange server, the server distributes those messages to the Outlook client locally, assuming the client is logged into his or her account.  If a user is not logged into his or her account, the email messages remain on the Exchange server pending the account log in, at which time the server will update the client.  Petrakis and Huffman challenge the legal conclusion that Shefts' emails are "electronic communications" as defined by the Illinois eavesdropping act.

Paragraph 56.  For purposes of Shefts' Motion, it is admitted that BES is a computer software application which allows companies the ability to send and receive email to and from their employees' Blackberry devices.  This computer application was utilized by Shefts to send and receive his Access2Go email through his personal Blackberry device.  BES Version 4.1 also allows business administrators the ability to log SMS text messages sent and received by their employees.   This logging of SMS text messages is completed through the wireless synchronization of the SMS message data base of the Blackberry device.

Paragraph 57.  For purposes of Shefts' Motion, it is admitted that once BES SMS auditing/logging/synchronization is enabled, the wireless synchronization of the SMS message database of the Blackberry device occurs automatically.  As that database is synchronized, the BES creates a .csv Microsoft Exchange spreadsheet containing the sent and received text message logs.  These logs can be viewed by a person who has access to the logs.  Also see Part II (B).

Paragraph 58. Petrakis admits that he read and reviewed emails sent and received by Shefts on his Access2Go email account and SMS text messages sent and received by Shefts on his Blackberry device, both by retrieving the communications stored on an Access2Go server.

Paragraph 59. Petrakis admits that SpectorPro monitoring software was installed on Shefts' computer.

Paragraph 60. Huffman admits that she viewed and read emails sent and received by Shefts from his Access2Go email account by retrieving the communications stored on an Access2Go server.

**B. Disputed Material Facts**

Paragraphs 1 & 2. Shefts was President and Chief Executive Officer of Access2Go, Inc. until December 22, 2009 [see paragraph 1 of the Petrakis Affidavit, Exhibit A]. Also see Parts II (A) and (D).

Paragraph 6. Although Shefts purchased a handheld Blackberry messaging device, he sought and received reimbursement from Access2Go for all charges associated with his use of the Blackberry [see paragraph 2 of the Petrakis Affidavit, Exhibit A].

Paragraph 7. Shefts knew that by connecting his Blackberry to Access2Go's BES server, text messages sent to and by him on the Blackberry could be monitored [see paragraph 29 of the Petrakis Affidavit, Exhibit A]. Also see Parts II (A) and (D).

Paragraph 10. Although Petrakis accessed email communications between Shefts and his counsel, as soon as he recognized that a communication was with legal counsel, Petrakis did not read the communication further [see paragraph 3 of the Petrakis Affidavit, Exhibit A].

Paragraph 11. Petrakis did not give Tandeski the email attached to Shefts' First Amended Verified Complaint [see paragraph 4 of the Petrakis Affidavit, Exhibit A].

Paragraph 12.  Petrakis did not inform Tandeski that he had spyware installed on computers at Access2Go in order to monitor employee activity [see paragraph 5 of the Petrakis Affidavit, Exhibit A].

Paragraph 13.  Huffman did not inform Tandeski on numerous occasions between late 2007 and throughout 2008 that Petrakis spent a large percentage of his time at the Access2Go office using his computer to spy on Shefts [see paragraph 1 of the Huffman Affidavit, Exhibit B].

Paragraph 14.  Huffman did not use the spyware on Access2Go's computers to obtain personal information about Access2Go employees [see paragraph 2 of the Huffman Affidavit, Exhibit B].

Paragraph 15.  Tandeski did not, in or about February 15, 2009, confront Petrakis regarding whether he had been accessing Shefts' Yahoo email account in order to determine Shefts' daily activities and strategy in regards to the Oppression Lawsuit [see paragraph 6 of the Petrakis Affidavit, Exhibit A].

Paragraph 16.  Petrakis did not admit to Tandeski that he had read emails between Shefts and third parties on Shefts' Yahoo email account [see paragraph 7 of the Petrakis Affidavit, Exhibit A].

Paragraph 18.  On June 18, 2008, Petrakis was appointed by the Access2Go Board of Directors to serve as the Board's liaison for security under Access2Go's new Employee Manual, a position that recognized that members of the Board had the authority to monitor the emails and text messages of Access2Go employees, officers and directors, and that Petrakis had the affirmative responsibility to do so to safeguard company resources [see paragraph 9 of the Petrakis Affidavit, Exhibit A; also see paragraph 10 of Part II (E)].

11

Paragraph 19. Shefts knew that the members of Access2Go's Board of Directors had the authority to monitor his emails and text messages using Access2Go's information systems [see paragraph 10 of the Petrakis Affidavit, Exhibit A].

Paragraph 25 & 26. On June 18, 2008, Petrakis was appointed by the Access2Go Board of Directors to serve as the Board's liaison for security under Access2Go's new Employee Manual, a position that recognized that members of the Board had the authority to monitor the emails and text messages of Access2Go employees, officers and directors, and that Petrakis had the affirmative responsibility to do so to safeguard company resources [see paragraph 9 of the Petrakis Affidavit, Exhibit A; also see paragraph 10 of Part II (E)].

Paragraph 31. Although Petrakis instructed Shawn Patton to set up a "dummy account" to route emails sent or received by Shefts using his Access2Go email account, these emails were not "intercepted," but were retrieved after being stored on Access2Go's server [see paragraph 19 of the Gossett Affidavit, Exhibit C].

Paragraph 33. Although Huffman requested that Shawn Patton update Access2Go's BES server with current software that included, among other standard features, the logging of text messages sent to or from any Blackberry connected or "registered" to the BES server, including text messages by and to Shefts, those text messages were not "intercepted" [see paragraph 4 of the Huffman Affidavit, Exhibit B; also see paragraph 24 of the Gossett Affidavit, Exhibit C].

Paragraph 39. The email identified as having been printed on June 30, 2008, was not printed by Petrakis [see paragraph 11 of the Petrakis Affidavit, Exhibit A].

Paragraph 40. Petrakis did not access the email identified as having been printed on June 30, 2008, directly from Shefts' Yahoo email account [see paragraph 12 of the Petrakis Affidavit, Exhibit A; also see paragraph 17 of the Gossett Affidavit, Exhibit C].

Paragraph 41. Petrakis did not possess or use Shefts' user name and/or password for his Yahoo email account in order to gain access to the email said to have been printed on June 30, 2008 [see paragraph 12 of the Petrakis Affidavit, Exhibit A].

Paragraphs 43 & 47. Petrakis did not "intercept" emails or text messages to or from Shefts [see paragraphs 10, 19 & 24 of the Gossett Affidavit, Exhibit C].

Paragraphs 49, 50 & 51. Huffman did not use any computer to view "intercepted" emails or text messages to and from Shefts' Blackberry [see paragraphs 10, 19 & 24 of the Gossett Affidavit, Exhibit C].

Paragraph 57. Shefts knew that by synchronizing his handheld Blackberry messaging device, SMS text messages sent and received by him would be logged on Access2Go's BES server [see paragraph 29 of the Petrakis Affidavit, Exhibit A; also see paragraph 7 of the Huffman Affidavit, Exhibit B]. Also see Part II (A).

### C. Disputed Immaterial Facts

Paragraph 3. Petrakis and Morgan did not take actions to oppress Shefts [see paragraph 13 of the Petrakis Affidavit, Exhibit A]. The allegation they did so is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion. Also see Part II (A).

### D. Undisputed Immaterial Facts

Paragraph 2. Although Shefts remained Chairman of the Access2Go Board of Directors after January 1, 2006, this fact is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion. Also see Parts II (A) and (B).

Paragraph 4.   Although Shefts filed actions in state court and with the American Arbitration Association regarding the oppressive actions taken by Petrakis and Morgan, this fact is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion.

Paragraph 7.   Although Petrakis and Huffman cannot speak to whether, and if so why, Shefts began to use his Yahoo email account, his use of that account is immaterial because it was never accessed by Petrakis [see paragraph 12 of the Petrakis Affidavit, Exhibit A].   Also see Parts II (A) and (B).

Paragraph 8.   Although Petrakis and Huffman cannot speak to whether John Tandeski approached Shefts, and if he did, what he told Shefts, Tandeski's approaching Shefts with information about Petrakis and Morgan is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion.

Paragraph 9.   Although Petrakis and Huffman cannot speak to what Tandeski told Shefts about Petrakis monitoring Shefts' emails and text messages, what Tandeski told Shefts is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion.

Paragraph 17.   Although Access2Go had no formal policy regarding monitoring of its employees' emails and text messages prior to the issuance of its new Employee Manual, the actions challenged by Shefts concern those of a member of Access2Go's Board of Directors, and those of Huffman acting at the direction of a Board member, in regards to another Board member [see paragraphs 9, 10 & 17 of the Petrakis Affidavit, Exhibit A; also see paragraphs 5 through 10 of Part II (E)].   Petrakis and Huffman challenge the legal conclusion that employee emails or text messages are "electronic communications" as defined by the Illinois eavesdropping act.

Paragraph 20.   Although Tandeski was tasked with drafting an employee handbook that, in its final form, contained language which would allow Access2Go to monitor emails and

14

text messages of Access2Go employees with prior authorization from the Access2Go Board of Directors, the requirement of prior Board authorization did not limit the authority of Board members to monitor the emails and text messages of Access2Go employees, officers and directors, and authorization was in any case given to Petrakis on June 18, 2008, when he was appointed by the Board to serve as its liaison of security under Access2Go's new Employee Manual, a position that carried with it the affirmative responsibility to monitor the emails and text messages of Access2Go employees, officers and directors in order to safeguard company resources [see paragraphs 9, 10 & 17 of the Petrakis Affidavit, Exhibit A; also see paragraphs 5 through 10 of Part II (E)].

      Paragraph 23. Section 6.7 of the Employee Manual ratified by the Access2Go Board of Directors on July 2, 2008, did not limit the authority of Board members to monitor the emails and text messages of Access2Go employees, officers and directors [see paragraphs 9, 10 & 17 of the Petrakis Affidavit, Exhibit A; also see paragraphs 5 through 10 of Part II (E)].

      Paragraph 24. Although Shefts has, at all relevant times, been Chairman of the Board of Directors of Access2Go, this fact is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion.

      Paragraph 52. Although the SpectorPro monitoring software was not installed on any computer used by Petrakis and/or Huffman, this fact is not an element of the claims asserted against Petrakis and Huffman in Shefts' Motion.

      Paragraph 55. Because Petrakis never accessed Shefts' Yahoo email account, this allegation is immaterial [see paragraph 12 of the Petrakis Affidavit, Exhibit A].

### E.  Additional Material Facts

1.  Access2Go owns the rights to all data and files in any computer, network, or other information system used in the company [see paragraph 14 of the Petrakis Affidavit, Exhibit A].

2.  Prior to June 18, 2008, Petrakis, Morgan and Tandeski had concerns that Shefts was sexually harassing Access2Go employees and violating the fiduciary duties he owed to Access2Go by, among other things, disclosing confidential Access2Go data to unauthorized individuals [see paragraph 8 of the Petrakis Affidavit, Exhibit A].

3.  On June 18, 2008, in response to these concerns, which were ongoing since 2006, and with Shefts present, Petrakis was appointed by the Access2Go Board of Directors to serve as the Board's liaison of security, a position that carried with it the affirmative responsibility under Access2Go's new Employee Manual to monitor the emails and text messages of Access2Go employees, officers and directors in order to safeguard company resources [see paragraph 9 of the Petrakis Affidavit, Exhibit A; also see paragraph 10 of this Part II (E)].

4.  Petrakis worked with Tandeski to purchase Spector Pro monitoring software on the Access2Go computer used by Shefts in Access2Go's offices [see paragraph 16 of the Petrakis Affidavit, Exhibit A].

5.  Access2Go's new Employee Manual, issued prior to June 30, 2008, and ratified by the Access2Go Board on July 2, 2008, addressed, among other things, Internet, email, and computer usage, and in doing so reserved a right that had existed before, which was that members of Access2Go's Board had the authority to monitor the emails and text messages of Access2Go employees, officers and directors [see paragraphs 9 and 17 of the Petrakis Affidavit A].

6.   Access2Go has never had a policy that electronic mail messages, their content, or any use of the Internet or computer equipment, could be considered private [see paragraph 15 of the Petrakis Affidavit, Exhibit A

7.   The Employee Manual states on page 22, in the first sentence under the header "Ownership and Access of Electronic Mail, Internet Access, and Computer File:"

> The Company owns the rights to all data and files in any computer, network, or other information system used in the Company.

The sentence that follows reiterates a right that existed prior to adoption of the Manual:

> The Company also reserves the right to monitor electronic mail messages (including personal/private/instant messaging systems) and their content, as well as any and all use of the Internet and of computer equipment used to create, view, or access e-mail and Internet content.

8.   The Employee Manual also provided that an access2Go employee could not monitor another employee's computer, computer files, or electronic mail messages without prior authorization from the Access2Go Board of Directors.  See page 22 of the Employee Manual.

9.   While this monitoring limitation applied to employees, it did not apply to the shareholders/Directors of Access2Go, who are instead referred to in the Manual collectively as "managing partners."  See Step 2 of the Grievance Resolution policy on page 19 of the Manual, where an employee's complaint is to be referred to Petrakis as the liaison between the complaining employee and the Board of Directors, and is then to be investigated by the "managing partners" of Access2Go.  Also see the policy concerning Financial Controls on page 26 of the Manual, which provides that contracts are to be approved by one or more "managing partners."

10.   Beyond the authority which, notwithstanding the adoption of the Employee Manual, continued to reside in the shareholders/Directors of Access2Go to monitor the emails and text messages of Access2Go employees, officers and directors, Petrakis was appointed by the Board of Directors as the Board's "liaison for security" per the new Employee Manual, and was then responsible for:

> "… the establishment of an adequate system of internal control that is designed to prevent and detect errors or irregularities that may lead to fraudulent activities, and designed to safeguard company resources."

Among other things, this appointment imposed an affirmative duty on Petrakis to monitor all emails and text messages sent to or received by anyone through Access2Go's information systems [see paragraph 9 of the Petrakis Affidavit, Exhibit A; also see page 24 of the Access2Go Employee Manual].

11.   Shefts repeatedly stated that with the issuance of the Employee Manual, he knew that Petrakis could monitor his emails and text messages [see paragraph 18 of the Petrakis Affidavit, Exhibit A].

12.   After issuance of the Employee Manual, Petrakis and Huffman, who acted at the direction of Petrakis, began to monitor Access2Go's information systems for the emails and text messages sent and received by Shefts [see paragraph 19 of the Petrakis Affidavit, Exhibit A].

13.   Petrakis believed it to be his responsibility, as the Access2Go Board of Director's liaison for security, to monitor Shefts' emails and text messages to investigate the extent of Shefts' sexually harassing activities, and to identify and preserve evidence related to Shefts' violations of the fiduciary duties owed to Access2Go [see paragraph 20 of the Petrakis Affidavit, Exhibit A; also see paragraph 10 of this Part II (E)].

14.   On July 16, 2008, at a meeting of the Access2Go shareholders and Board, Shefts was placed on notice of the claim made by Petrakis, Morgan and Tandeski that Shefts was violating his fiduciary duties to Access2Go by, among other things, disclosing confidential information to unauthorized individuals [see paragraph 21 of the Petrakis Affidavit, Exhibit A].

15.   At the same July 16, 2008, meeting, Petrakis, Morgan and Tandeski voted to explore legal remedies for Shefts' violation of his fiduciary duties to Access2Go [see paragraph 22 of the Petrakis Affidavit, Exhibit A].

16.   The evidence that Petrakis had about Shefts' activities lead to Shefts' suspension, with pay, on August 26, 2008 [see paragraph 23 of the Petrakis Affidavit, Exhibit A].

17.   On September 9, 2008, Petrakis, Morgan and Tandeski, being a majority of the members of the Access2Go Board of Directors, ratified the suspension of Shefts as Access2Go's President and CEO, and recommended that he be terminated based on evidence that:

   a) Shefts advised employees not to sign a non-compete non-disclosure agreement required by Access2Go;
   b) Shefts sent confidential information to unauthorized individuals;
   c) Shefts sexually harassed Access2Go employees;
   d) Shefts made demeaning comments about other Access2Go directors/shareholders to third parties; and
   e) Shefts sent confidential information to Access2Go competitors

[see paragraph 24 of the Petrakis Affidavit, Exhibit A].

18.   On September 16, 2008, at a meeting of the Access2Go shareholders, Shefts' suspension as Access2Go's President and CEO was left unchanged [see paragraph 25 of the Petrakis Affidavit, Exhibit A].

19.   At the same September 16, 2008, shareholders meeting, the recommendation that Shefts be terminated was deferred [see paragraph 26 of the Petrakis Affidavit, Exhibit A].

20. On December 22, 2009, the recommendation that Shefts be terminated was adopted by the Access2Go shareholders and Shefts was formally terminated as Access2Go's President and CEO [see paragraph 27 of the Petrakis Affidavit, Exhibit A].

21. Prior to the issuance of Access2Go's new Employee Manual, Shefts arranged for the purchase and installation by Access2Go of a BES server to support his handheld Blackberry messaging device and those of any other approved Access2Go employee, officer and director who wished to connect such a device to Access2Go's information systems [see paragraph 28 of the Petrakis Affidavit, Exhibit A].

22. Prior to the issuance of Access2Go's new Employee Manual, Huffman was assigned "administrative" rights to Access2Go's BES server [see paragraph 3 of the Huffman Affidavit, Exhibit B].

23. Prior to the issuance of Access2Go's new Employee Manual, Huffman requested that Access2Go's BES server be updated with current software that included, among other features, the logging of SMS text messages from any Blackberry connected to the BES server [see paragraph 4 of the Huffman Affidavit, Exhibit B].

24. Before and after the issuance of Access2Go's new Employee Manual, Shefts contacted Huffman, knowing that she had administrative rights to the Access2Go BES server, to request that his Blackberry be connected to the server so that he would have access to his Access2Go email account [see paragraphs 5, 6 & 7 of the Huffman Affidavit, Exhibit B].

25. Before and after the issuance of Access2Go's new Employee Manual, the connection between Shefts' Blackberry and Access2Go's BES server would sometimes fail, prompting Shefts to contact Huffman to request that his Blackberry be reconnected to the Acceses2Go BES server [see paragraphs 6 & 7 of the Huffman Affidavit, Exhibit B].

26.    Shefts knew, as a sophisticated businessman in the telecommunications industry, that by connecting to an electronic information system, including Access2Go's email and BES servers, every email and text message sent and received could be logged and stored on that system [see paragraph 29 of the Petrakis Affidavit, Exhibit A].

27.    Since his suspension and termination as Access2Go's President and CEO, Shefts has made repeated requests for Access2Go corporate records, which Shefts has asserted includes emails and text messages recorded on Access2Go's information systems [see paragraph 30 of the Petrakis Affidavit, Exhibit A].

## III.    ARGUMENT

**A.    Summary judgment should be denied on Count I because neither Petrakis nor Huffman "intercepted" Shefts' text messages within the meaning of the federal Electronic Communications Privacy Act.**

In Count I of his complaint, Shefts claims he is entitled to relief under the federal Electronic Communications Privacy Act because Petrakis and Huffman "intentionally intercept[ed] SMS text messages."  Shefts' argument is flawed because at the time Petrakis and Huffman reviewed the SMS text messages, they were "stored" communications.  Once stored, text messages are beyond the point that they can be "intercepted" within the meaning of the law.

In 1986, Congress passed the Electronic Communications Privacy Act ("ECPA") "to afford privacy protection to electronic communications."  Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 874 (9th Cir. 2002).  Title I of the ECPA amended the federal Wiretap Act, which previously addressed the interception of only wire and oral communications, to include the interception of emails and text messages.  Id.  Title II of the ECPA created the Stored Communications Act, which was designed to address access to "stored" wire, emails and text messages.  Id.

The intersection of the ECPA and the Stored Communications Act has become "a complex, often convoluted, area of the law" because the ECPA was written prior to the advent of many modern methods of electronic communication, such as the internet, email messages, and SMS text messages.  Konop, 302 F.3d at 874.  For this reason, courts have struggled to analyze the problems involving modern technology within the statutory confines of the ECPA.  Id.  As a result, until Congress brings these statutes in line with modern technology, case law has become increasingly important to clarify the intention and appropriate application of these statutes.  *See* id.

The ECPA applies to emails and text messages while they are being transferred, and the Stored Communications Act involves emails and text messages after they are put into storage.  *See* Burnnell v. Motion Picture Ass'n of America, 567 F.Supp.2d 1148, 1152 (C.D.Cal. 2007).  Therefore, "[a]n electronic communication cannot be simultaneously actionable under both the [ECPA] and the [Stored Communications Act]."  Id.

The ECPA provides civil liability, 18 U.S.C. § 2520, for any person who "intentionally intercepts . . . any electronic communication."  18 U.S.C. § 2511.  An "interception" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  "Standing alone, this definition would seem to suggest that an individual 'intercepts' an electronic communication merely by 'acquiring' its contents, regardless of when or under what circumstances the acquisition occurs."  Konop, 302 F.3d at 876.  "Courts, however, have clarified that Congress intended a narrower definition of 'intercept' with regard to electronic communications."  Id.

An interception can occur only while the electronic message is being transmitted. Konop, 302 F.3d at 878.  In other words, an electronic message can only be intercepted during "flight."  United States v. Steiger, 318 F.3d 1039, 1050 (11th Cir. 2003).

In Global Policy Partners, LLC v. Yessin, 686 F.Supp.2d 631 (E.D.Va. 2009), the court provided the following comparison to aid in the understanding of an interception under the ECPA:

> In American football, a ball can only be intercepted when it is "in flight."  Once a pass receiver on the offensive team has caught the ball, the window for interception has closed, and defenders can only hope to force a fumble.  In essentially the same way, a qualifying "intercept" under the [ECPA] can only occur where an [electronic] communication is accessed at some point between the time the communication is sent and the time it is received by the destination server, at which point it becomes a "stored communication" within the meaning of the [Stored Communications Act].

Id. at 638.  "[T]here is only a narrow window during which an [electronic message] interception may occur-the seconds or milliseconds before which a newly composed message is saved to any temporary location following a send command."  Steiger, 318 F.3d at 1050 (quoting White, Jarrod J., E-Mail @ Work.com: Employer Monitoring of Employee E-Mail, 48 Ala.L.Rev. 1079, 1083 (1997)).  In fact, the window during which an electronic communication can be intercepted is so narrow under the provisions of the ECPA that interception "is virtually impossible."  Id. (quoting White, 48 Ala.L.Rev. at 1083).

For example, the court considered whether the acquisition of electronic data acquired through the installation of a Trojan Horse virus on the plaintiff's computer was an interception within the meaning of the ECPA in U.S. v. Steiger, 318 F.3d 1039 (11th Cir. 2003).  There, the Trojan Horse virus allowed an individual to access and download information on the defendant's personal computer.  Id. at 1050.  Prior to trial, the defendant sought to have the information obtained via the Trojan Horse excluded from evidence under the ECPA, which prohibits the

introduction of evidence obtained in violation of its provisions.  Id. at 1044.  The district court allowed introduction of the evidence, id., and the defendant appealed, claiming that the Trojan Horse virus constituted an interception.  Id. at 1046.  However, the appellate court found that there was nothing to suggest that the information "was obtained through contemporaneous acquisition of electronic information while in flight."  Id. at 1050.  "Rather, the evidence shows that the source used a Trojan Horse virus that enabled him to access and download information *stored* on [the defendant's] personal computer."  Id. (emphasis added).  As such, the court held, "this conduct does not constitute an interception of electronic communications in violation of the [ECPA]."  Id.

Similarly, the court found the copying of an email from storage on a server was not an interception under the ECPA in Bunnell v. Motion Picture Association of America, 567 F.Supp.2d 1148 (C.D.Cal. 2007).  There, the defendant configured the plaintiff's server software to forward the plaintiff's incoming and outgoing email messages to an anonymous email account [like the "dummy account" challenged by Shefts in his motion].  Id. at 1150.  In other words, all of the plaintiff's email messages were copied from the email server and forwarded to the anonymous dummy account created by the defendant.  Id.  The plaintiff claimed that the copying of the message occurred simultaneously with the sending and receiving of his email messages and constituted an interception in violation of the ECPA.  Id. at 1151.  However, the court disagreed, noting that "[i]f the emails had not been stored on the server, [the defendant] would not have acquired copies of them."  Id. at 1153.  The defendant "could have received the forwarded messages in milliseconds or days, it makes no difference.  Under the [ECPA, the defendant's] receipt of the messages does not constitute an interception."  Id. at 1154.

Shefts' allegations indicate that the acquisition of his SMS text messages occurred *after* the initial transmission of those text messages, a process like the acquisition of data in <u>Steiger</u> and forwarding of emails in <u>Bunnell</u>.  As recited by Shefts, by connecting his Blackberry to Access2Go's BES server, his SMS text messages were automatically "logged" or recorded on the server.  See Shefts' Memorandum [# 48], p. 20, where Shefts recites:

> The logging of SMS text messages is completed through the wireless synchronization of the SMS database of the Blackberry device.  Once BES/SMS auditing/logging/synchronization is enabled, the wireless synchronization of the SMS message database of the Blackberry occurs automatically. . ..

Shefts' own recital makes clear that his SMS text messages, once sent or received, were stored in his Blackberry's database.  Once Shefts "synchronized" his Blackberry to the Access2Go BES server, the text messages stored in the Blackberry database were logged or recorded on Access2Go's server, and it was the text messages stored on that system that were monitored.  As such, there was no "interception" of Shefts' SMS text messages.  Whether the recipient had received the message at the time of the synchronization is irrelevant.  *See* <u>Steve Jackson Games, Inc. v. U.S. Secret Service</u>, 36 F.3d 457 (5th Cir. 1994) (holding that a message that has been sent to an electronic bulletin board but not yet retrieved or read by the intended recipient was not an interception).

In the only case cited by Shefts on this issue, <u>Global Policy Partners, LLC v. Yessin</u>, 686 F.Supp.2d 631 (E.D.Va. 2009), the court found that accessing email messages on a server did not constitute an interception under the ECPA.  There, co-managers of a limited liability company became divided over the management of the company, and the plaintiff, one of the co-managers, brought a lawsuit alleging that the defendant, another co-manager, intercepted her emails in violation of the ECPA.  <u>Id.</u> at 634.  The plaintiff alleged that the defendant obtained her password and reviewed her messages by logging into her account and reviewing the messages on

25

the company's email server.  Id.  However, the court held that the plaintiff's claim under the

ECPA was improper because the messages were reviewed in a stored state on the email server.

Id. at 638.  In other words, because the messages had reached the email server at the time they

were reviewed, there could not have been an interception under the ECPA.  Id. at 639.  As such,

the court dismissed the plaintiff's claim.  Id.

The claim that Petrakis and Huffman intercepted messages logged on Access2Go's BES

server is similar to the "interception" said to have taken place in Yessin.  In Yessin, the

defendant reviewed email messages that had already been sent by the plaintiff and were sitting in

a stored state on the email server.  Similarly, the messages that Shefts alleges Petrakis and

Huffman reviewed were sitting in a stored state on Access2Go's BES server.  By this time, the

messages had reached their destination (on the server) and were no longer capable of being

intercepted.  As such, there was no "interception" within the meaning of the ECPA.  Shefts'

Motion for Summary Judgment on Count I should therefore be denied.

**B.    Summary judgment should be denied on Count III because Petrakis did not directly access Shefts' Yahoo email account, because the federal Stored Communications Act exempts Petrakis' actions as a person authorized by Access2Go to monitor emails stored on the company's information system, and because Petrakis reasonably believed he had a responsibility to monitor Shefts' emails.**

Shefts claims he is entitled to relief under the federal Stored Communications Act

because Petrakis accessed Shefts' Yahoo email messages [Section E(III) of Shefts'

Memorandum of Law], and created a "dummy account" to review Shefts' Access2Go email

messages [Section E(IV) of his Memorandum of Law].  Shefts' argument is flawed because

Petrakis never directly accessed Shefts' Yahoo email account, and because he was authorized by

Access2Go to monitor emails stored on the company's information system.  As a person

authorized by Access2Go to monitor Shefts' emails, Petrakis' actions are exempt from the Stored

Communications Act [see 18 U.S.C. § 2701(c)(17), which specifically exempts from liability "the person or entity providing a wire or electronic communication service"].

The Stored Communications Act provides civil liability for "whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided . . . and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . .."  18 U.S.C. § 2701(a). Congress enacted the Stored Communications Act to protect "personal and proprietary information from the mounting threat of computer hackers 'deliberately gaining access to, and sometimes tampering with, electronic or wire communications' by means of electronic trespass." Devine v. Kapasi, 2010 WL 2293461 (N.D.Ill. June 7, 2010) (quoting S.Rep. No. 99-541, at 3 (1986), *reprinted in* 1986 U.S.C. C.A.N. 3555, at 3557).  Courts have declared that determining whether there was unauthorized access under the Stored Communications Act is akin to determining whether there was trespass to property.  *See* Theofel v. Farey-Jones, 359 F.3d 1066, 1072-73 (9th Cir. 2004)).

Emphasizing the trespass analogy, the Stored Communications Act recognizes a broad exemption for "conduct authorized by the person or entity providing a wire or electronic communications service."   18 U.S.C. § 2701(c)(1).   More specifically, the Stored Communications Act provides that "[a] defendant who is a provider of electronic communication service is immune from liability . . .."  Ideal Aerosmith, Inc. v. Acutronic USA, Inc., 2007 WL 4394447, at *6 (E.D.Penn. 2007).

Numerous courts have found that employers which provide their employees with "the ability to send or receive electronic communications" are "person[s] or entit[ies] providing a wire or electronic communications service" for purposes of the exemption. *See, e.g.*, Fraser v.

Nationwide Mut. Ins. Co., 352 F.3d 107, 115 (3d Cir. 2003) (insurance company which administered email system for its agents was a provider); United States v. Grady, 2010 WL 441513, at *6 (E.D.Mo. Feb. 4, 2010) (employer providing email service exempt from Stored Communications Act); Freedom Calls Foundation v. Bukstel, 2006 WL 845509, at *27 (E.D.N.Y. 2006) (foundation a provider of service); Bohach v. City of Reno, 932 F.Supp. 1232, 1237 (D.Nev. 1996) (city is the provider of electronic communications service to police department since police department's terminals, computer and software enable them to send or receive electronic communications).

In Fraser, the Third Circuit held that an employer which provided email service to its employees was exempt from liability under Stored Communications Act when it searched and retrieved from its system emails sent and received by its employee.  Fraser, 352 F.3d at 115. There, the employer began to monitor the plaintiff's email messages when it became concerned that the plaintiff might be revealing company secrets to its competitors.  Id. at 110.  Specifically, the employer "searched its main file server - on which all of [the plaintiff's] e-mail was logged - for any email to or from [the plaintiff] that showed . . . improper behavior."  Id.  After the plaintiff was terminated, he brought suit alleging that the employer violated the Stored Communications Act by monitoring his email messages.  Id. at 114.  The district court granted summary judgment for the defendant.  Id. at 111.  On appeal, the Third Circuit affirmed summary judgment as to the plaintiff's Stored Communications Act claim, holding that "because [the plaintiff's] email was stored on [the defendant's] system (which [the defendant] administered), its search of that email falls within [the provider's] exception to [the Stored Communication Act]."  Id. at 112.

Shefts' allegations are based on a misunderstanding of the manner in which information was obtained by Petrakis.  Shefts alleges that Petrakis used a "keylogger" to learn the password to Shefts' Yahoo email account, and that Petrakis then used that password to log into Shefts' Yahoo email account to obtain email messages.  This is simply not the case.  As already noted, Shefts' Blackberry and Access2Go computer were both connected to an Access2Go server which recorded the emails and text messages sent to or from those devices.  When Shefts accessed his Access2Go email messages on his Blackberry or Access2Go computer, it was the recording of the contents of those messages on Access2Go's information system that Petrakis could monitor and print.  The fact that Petrakis did not log into the Yahoo server to access Shefts' email account is evidenced not only by his own testimony, but also by that of Jason Gossett, a computer forensic expert.  Beyond Petrakis' own denial of Shefts' accusation, Gossett's opinion is that the email in question was not printed directly from Shefts' Yahoo email account.  See paragraph 40 of Part II (B).

Under the proper understanding of how Shefts' emails were monitored, Petrakis is exempt from liability under the Stored Communications Act because he was acting on behalf of Access2Go, the provider of the communications system on which Shefts' email messages were stored.  Petrakis did not "hack" into a server and obtain information by way of trespass, as is the situation addressed by the Stored Communications Act.  Rather, as "security liaison" for the Access2Go Board of Directors, Petrakis had access to the information stored on Access2Go's electronic communications system.  Because all of the information Petrakis accessed was stored "by the person or entity providing [the] . . . electronic communications service," he is exempt from liability under the Stored Communications Act.  See paragraphs 3 through 10 of Part II (B).

Petrakis is further protected by the business judgment rule.  *See* Seidel v. Byron, 405 B.R. 277, 290 (N.D.Ill. 2009) (citing In re Abbott Laboratories Derivative Shareholders Litig., 325 F.3d 795, 806 (7th Cir. 2003)); Ferris Elevator Co., Inc. v. Neffco, Inc., 285 Ill. App. 3d 350, 354, 674 N.E.2d 449 (3d Dist. 1996) ("The business judgment rule is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interests of the corporation.").  Petrakis was acting in good faith, on the presumption he was authorized to access Access2Go's information system to monitor Shefts' messages.  See paragraphs 2 through 13 of Part II (B).

Specifically, Petrakis became concerned that Shefts was sexually harassing Access2Go employees and that Shefts was sharing confidential information with unauthorized individuals. For these reasons, Petrakis determined, as he had to, that Shefts' messages should be monitored in an effort to protect the company from potential liability and damages.  See Broccoli v. Echostar Comm. Corp., 229 F.R.D. 506 (D. Md. 2005) (imposing sanctions for an employer's failure to preserve emails after receiving notice that one of its employees was accused of sexually harassing a co-worker).  Also see Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Sec., LLC, 685 F.Supp.2d 456 (S.D.N.Y. 2010) (explaining the duty of a company to collect and preserve electronic information within the company's possession, custody, or control when litigation is reasonably anticipated).

The decision to monitor Shefts' emails and text messages was made in the scope of Petrakis' authority to protect Access2Go from potential liability and to collect and preserve information in anticipation of litigation.  Because the actions of Petrakis, as the "security liaison" to the Access2Go Board of Directors, are protected by the business judgment rule, Shefts cannot show that Petrakis lacked the requisite authority to monitor his messages.  *See* Seidel, 405 B.R.

at 290.  For all these reasons, Shefts' Motion for Summary Judgment against Petrakis on Count III should be denied.

C.      **Summary judgment should be denied on Count II because the Illinois eavesdropping act is an unconstitutional exercise of government power, and was not, in any case, violated because Petrakis did not directly access Shefts' Yahoo email account, and because emails and text messages monitored by Petrakis and Huffman were not private or recorded surreptitiously.**

Shefts claims he is entitled to relief under the Illinois eavesdropping act because Petrakis and Huffman "intercept[ed] SMS text messages" and accessed his Yahoo and Access2Go email messages.

**1. The Illinois eavesdropping act is void because its core provisions violate the free speech clause of the First Amendment.**

The Illinois eavesdropping act is unconstitutional because it criminalizes and provides civil liability for free speech activities that are protected by the First Amendment.  Specifically, the Illinois eavesdropping act is unconstitutional because it violates an individual's First Amendment right to make audio recordings of government activity.  *See, e.g.,* Blackstone v. State of Alabama, 30 F.3d 117 (11th Cir. 1994) (striking down a ban on a civilian's use of a tape recorder to document the meetings of a government body); Dorfman v. Meiszner, 430 F.2d 558 (7th Cir. 1970) (striking down on First Amendment grounds a ban on radio broadcasting in and around Chicago's federal courthouse, including in the surrounding plaza and sidewalks and the interior lobby and non-courtroom floors); and Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999) (upholding a damages award against a police officer who falsely arrested a civilian for using a video/audio camera inside a publicly accessible area of a government building to record a conversation between government officials after the close of an open meeting).  Also note that the Illinois eavesdropping act is currently being challenged as unconstitutional in a case before

the United States District Court for the Northern District of Illinois [Case No. 1:10-cv-05235], and a case before the Circuit Court of Cook County, Illinois [Case No. 10-CR-4601].

Because a core provision of the Illinois eavesdropping act is unconstitutional, the entire act is void.  *See* <u>Best v. Taylor Mach. Works</u>, 179 Ill.2d 367, 460-67, 689 N.E.2d 1057 (1997) (holding that the entire Illinois Civil Justice Reform Amendments of 1995 was void because the unconstitutional portions could not be severed from the remainder of the act without doing violence to the legislative intent in passing the act).

> **2.  Without regard for its unconstitutionality, Shefts cannot claim a violation of the Illinois eavesdropping act because Petrakis did not directly access Shefts' Yahoo email account, and because the email and text messages accessed by Petrakis and Huffman were not private or recorded surreptitiously.**

The Illinois eavesdropping act provides that "[a] person commits eavesdropping when he . . . [k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or part of any conversation or intercepts, retains, or transcribes electronic communication . . .."  720 ILCS 5/14-2.  Effective in 2000, the Illinois legislature added the language prohibiting electronic communications from being intercepted, recorded or transcribed.  P.A. 91-657, § 5, eff. Jan. 1, 2000.  The language was added in response to a problem with street gangs in Cook County who were cloning cell phones to determine which gang members were working as informants for the police.  Waltmire, Eric R., *When Are Internet Communications Not "Electronic Communications" Under the Illinois Eavesdropping* Statute, 20 DCBA Brief 32, 34 (2007) (citing 91st Ill.Gen.Assem., S.Trans. May 14, 1999 at 19).  The amendment added the following definition of "electronic communication" to the eavesdropping act:

> Any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, where the sending and receiving parties intend the electronic communication to be private and the interception, recording, or transcription of the electronic communication is

accomplished by a device in a surreptitious manner contrary to the provisions of this Article. Electronic communication does not include any communication from a tracking device.

720 ILCS 5/14-1(e) (emphasis added).   Note that for a communication to qualify as an "electronic communication" under the eavesdropping act (1) both the sending and receiving parties must intend for the electronic communication to be private, and (2) the communication must be recorded in a surreptitious manner.  Id.

### a)  Petrakis did not directly access Shefts' Yahoo email account.

The fact that Petrakis did not log directly into Shefts' Yahoo email account is evidenced by his own testimony [see paragraphs 40 and 41 of Part II E)], and by the testimony of Jason Gossett, a computer forensic expert [see paragraph 40 of Part II (E)].

### b)  Shefts' emails and text messages were not private.

Under the first of the requirements for a violation of the Illinois eavesdropping act, both the sending and receiving parties must intend for the conversation to be private.  People v. Gariano, 366 Ill.App.3d 379, 385, 852 N.E.2d 344 (1st Dist. 2006).  In determining whether a party reasonably intended for a conversation to be private, Illinois courts look to cases brought under the Fourth Amendment right of privacy.  See People v. Beardsley, 115 Ill.2d 47, 55, 503 N.E.2d 346 (1986) (other grounds superseded by statute recognized by People v. Nestrock, 316 Ill.App.3d 1, 735 N.E.2d 1101 (2d Dist. 2000)); People v. Ceja, 204 Ill.2d 332, 349, 789 N.E.2d 1228 (2003).

### i)  No claim of privacy can be made for communications sent and received on equipment connected to Access2Go's information systems.

In Smyth v. Pillsbury Company, 914 F.Supp. 97 (E.D.Penn. 1996), the court considered whether an employee had a reasonable expectation of privacy in his email communications. There, the plaintiff was terminated from employment by the defendant for sending inappropriate

email messages over the defendant's email system from the plaintiff's home computer.  Id. at 98.

The plaintiff claimed that he had a reasonable expectation of privacy in the email messages

because the defendant assured its employees "that email communications could not be

intercepted and used by [the] defendant against its employees as ground for termination or

reprimand."  Id.  However, the court found that, despite these assurances, the plaintiff did not

have an expectation of privacy in his email messages.  Id. at 101.  Specifically, the court stated:

> Once plaintiff communicated the alleged unprofessional comments to a second
> person (his supervisor) over an e-mail system which was apparently utilized by
> the entire company, any reasonable expectation of privacy was lost. Significantly,
> the defendant did not require plaintiff, as in the case of a urinalysis or personal
> property search to disclose any personal information about himself. Rather,
> plaintiff voluntarily communicated the alleged unprofessional comments over the
> company e-mail system. We find no privacy interests in such communications.

Id.  Based on this reasoning, the court dismissed the plaintiff's claim because he had no

expectation of privacy in email messages sent over the company's server.  Id.

Shefts likewise had no reasonable expectation that his messages would be private.  As

noted by the Smyth court, an individual loses all expectations of privacy in messages sent over a

communication device that is connected to a company's servers.  And in this case, Shefts should

be viewed in a light more stringent than that of an ordinary person, but should instead be viewed

as a sophisticated businessman in the telecommunications industry.  See paragraph 26 of Part II

(E).  Shefts cannot claim that he did not know his messages were recorded on the very kind of

information systems that he founded a company to serve.  See paragraph 1 of Part II (A).  Also

see City of Ontario, California v. Quon, 130 S.Ct. 2619, 2631 (2010) (finding that a law

enforcement officer "should have known that his actions were likely to come under legal

scrutiny, and that this might entail an analysis of his on-the-job communications," and that "a

reasonable employee would be aware that sound management principles might require the audit

of [text] messages to determine whether the pager was being appropriately used").  Because Shefts cannot reasonably make a privacy claim for communications sent and received by him on equipment connected to Access2Go's information systems, those communications do not fall within the protection of the Illinois eavesdropping act.

Note too that where an expectation of privacy does exist, an individual can lose any expectation of privacy if he consents to surveillance of the communications.  Ceja, 204 Ill.2d at 349.  Consent can be either express or implied.  Id.  Consent exists when a person's behavior manifests acquiescence or a comparative voluntary concession of his or her otherwise protected rights.  Id.  Implied consent is conferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance.  Id.

For example, the court in Commonwealth v. Proetto, 771 A.2d 823 (Penn. 2001), held that an individual consents to the recording of his message by the very act of sending the message over the internet.  Specifically, the court noted that:

> Any reasonably intelligent person, savvy enough to be using the Internet, however, would be aware of the fact that messages are received in a recorded format, by their very nature, and can be downloaded or printed by the party receiving the message. By the very act of sending a communication over the Internet, the party expressly consents to the recording of the message.

Id. at 829.  The court continued by offering the following analogy to leaving a voice message:

> Sending an e-mail or chat-room communication is analogous to leaving a message on an answering machine. The sender knows that by the nature of sending the communication a record of the communication, including the substance of the communication, is made and can be downloaded, printed, saved, or, in some cases, if not deleted by the receiver, will remain on the receiver's system. Accordingly, by the act of forwarding an e-mail or communication via the Internet, the sender expressly consents by conduct to the recording of the message.

Id. at 830.  Based on this reasoning, the court held that "[b]ecause [the recipient] received the e-mail messages and could forward them to anyone, [the plaintiff] had no reasonable expectation of privacy in them.  Accordingly, there was no violation of his constitutional rights."  Id. at 831.

By sending emails and SMS text messages over a communication device connected to an Access2Go server, Shefts consented to the recording of those messages and cannot claim an expectation that those messages were private.  See paragraphs 21 through 26 of Part II (E); also see Shefts' Memorandum [# 48], page 20.  This consent, by way of sending the messages over communication devices connected to Access2Go's information system, destroys Shefts' claim of privacy.

Specifically, Shefts consented to the recording of his emails and text messages upon "activation" of his handheld Blackberry messaging device with Access2Go's BES server.  "Activation" of the Blackberry on the BES server is the process by which the Blackberry begins to synchronize with the server.  In order to activate his Blackberry, Shefts requested that Huffman, who had "administrative" rights to manage and monitor Access2Go's BES server, connected his Blackberry to the server.  After being connected, Shefts' Blackberry constantly synchronized itself with Access2Go's BES server and recorded the contents of the emails and text messages sent or recorded by the Blackberry.  By Shefts' request that Huffman connect his Blackberry to Access2Go's BES server, he consented to have his communications stored on the server and monitored by Petrakis and by Huffman, as the server's administrator.

**ii)  No claim of privacy can be made for communications that are subject to a litigation hold.**

Shefts cannot claim a privacy interest in his emails and text messages because he had a duty to protect the information in anticipation of, and disclose the information during, litigation.  Numerous courts have held that an individual has a duty to preserve data on a BlackBerry where

litigation is reasonably anticipated.  *See* <u>Southeastern Mech. Serv. v. Brody</u>, 657 F.Supp.2d 1293, 1301-02 (M.D.Fla. 2009) (imposing sanctions on employee who deleted data from his Blackberry after having notice of claims against him); accord <u>ACS Consultant Co., Inc. v. Williams</u>, 2006 WL 897559, at *8-9 (E.D.Mich. April 6, 2006); and <u>Charles Schwab & Co., Inc. v. Karpiak</u>, 2007 WL 136743, at *3 (E.D.Pa. Jan. 12, 2007).  Likewise, Shefts had a duty to obtain and preserve the data stored on his BlackBerry, including the text messages and email messages, when he received notice of the legal claims made by Petrakis, Morgan and Tandeski. See paragraph 14 of Part II (E).

Similarly, Shefts cannot claim a privacy interest in the email and text messages recorded on Access2Go's information system because Access2Go itself had a duty to obtain and protect the information in anticipation of litigation.  See <u>Pension Committee of University of Montreal Pension Plan v. Banc of America</u>, 685 F.Supp.2d 456, 484 (S.D. N.Y. 2010), where the court held that a company was grossly negligent in failing to conduct *its own* search of its employees' computers for information that may be relevant to anticipated litigation (instead, the company allowed the employees to search the computers they used).  Additionally, the court held that a company was negligent in failing to secure information on its employee's palm pilot.  <u>Id.</u> at 492.

Likewise, Access2Go was required, once litigation was contemplated against Shefts, to preserve the very data in which Shefts is now claiming a privacy interest.  To accomplish this, Access2Go, through Petrakis, the Board's liaison for security, was required to obtain and preserve the information that was within its possession, custody or control, including the information stored on its servers, Shefts' computer, and Shefts' BlackBerry.

### iii) No claim of privacy can be made for communications monitored in response to evidence of workplace misconduct.

The U.S. Supreme Court's decision in <u>City of Ontario, California v. Quon</u>, 130 S.Ct. 2619 (2010), underscores the legitimacy of the actions taken by Petrakis and by Huffman, at his direction, to monitor Shefts' emails and text messages..  In <u>Quon</u>, the Court held that a public employer appropriately monitored the text messages of one of its employees. The employer did so to determine whether the messaging system was being used for work-related purposes.  <u>Quon</u>, 130 S.Ct. at 2626.  The search ultimately revealed that the employee was using the messaging system to send sexually explicit messages.  <u>Id.</u>  Although the Court assumed, *arguendo*, that the employee had a reasonable expectation of privacy in the text messages, the Court noted that "a reasonable employee would be aware that sound management principles might require the audit of messages to determine whether the pager was being appropriately used."  <u>Id.</u> at 2631.  As such, the court determined that the employee "likely had only a limited privacy expectation . . .." <u>Id.</u>

Even assuming the employee in <u>Quon</u> had a privacy expectation in the text messages, the Court held that the employer's search of the text messages was appropriate because it "was motivated by a legitimate work-related purpose, and because it was not excessive in scope . . .." <u>Quon</u>, 130 S.Ct. at 2632.  Specifically, the Court noted that the "'special needs' of the workplace justify" a search, despite the employee's privacy interests, for the "investigation of work-related misconduct."  <u>Id.</u> at 2630 (quoting <u>O'Connor  v. Ortega</u>, 480 U.S. 709, 725-26, 107 S.Ct. 1492 (1987)).  Because the employer reasonably believed that the text messaging system was being used for non-work related purposes, and because the scope of the search was reasonable, the Court held that the employer did not violate the employee's Fourth Amendment rights.  <u>Id.</u> at

2632.  Additionally, the Court stated that "the search would be 'regarded as reasonable and normal in the private-employer context.'"  Id. at 2633 (quoting O'Connor, 480 U.S. at 732).

Like in Quon, even assuming Shefts had a privacy interest in his text and email messages, the monitoring conduct by Petrakis, and by Huffman at his direction, was justified by the special needs of the workplace.  In other words, any privacy interest Shefts may have had in his emails and text messages was trumped by the special need to investigate Shefts' work-related misconduct.

First, Petrakis reasonably believed that Shefts was engaged in workplace misconduct, and that the monitoring of Shefts' email and text messages was necessary to investigate Shefts' activities.  See paragraphs 2 through 13 of Part II (E).  Secondly, this monitoring was not excessively intrusive, as Petrakis did not directly access Shefts' Yahoo email account [see paragraphs 40 and 41 of Part II (E)], and limited his monitoring to those emails and text messages stored on an Access2Go server [see paragraphs 58 and 60 of Part II (A)].  As such, Shefts cannot claim a privacy interest in the emails and text messages monitored by Petrakis and Huffman.

### c)  The manner by which Petrakis and Huffman monitored Shefts' emails and text messages was not surreptitious.

In order to constitute a violation of the Illinois eavesdropping act, communications must be recorded in a surreptitious manner.  "When a user knows their messages are being recorded by the very nature of the internet communication, that recording cannot be considered surreptitious."  Waltmire, Eric R., *When Are Internet Communications Not "Electronic Communications" Under the Illinois Eavesdropping* Statute, 20 DCBA Brief 32, 37-38 (2007).

As already demonstrated, the very nature of sending and receiving emails and text messages over devices connected to a company's information system raises the specter that these

39

communications will be recorded in the process of being sent or received.  And as a sophisticated businessman in the telecommunications industry, Shefts cannot credibly claim that his emails and text messages were recorded surreptitiously, as required by the eavesdropping act.  See the further discussion of this point at Part III (C) (2) (b) (i) of this Response.

Beyond this point, Shefts has acknowledged that the emails and text messages sent over devices connected to Access2Go's information system are not private.  This is demonstrated not only by his own statements [see paragraph 11 of Part II (E)], but also by his demand that Access2Go give him access to "corporate records," which he claims to include emails and text messages recorded on Access2Go's information system [see paragraph 27 of Part II (E)].  This acknowledgment, that Access2Go's information system records communications sent over devices connected to it, serves as further evidence that Shefts knew the system's recording capacity.

For all these reasons, Shefts' Motion for Summary Judgment on Count II against Petrakis and Huffman should be denied.

## IV.  Conclusion

This Court should deny Shefts' Motion for Summary Judgment, as each of his claims are insufficient:

1.   Shefts cannot recover under the federal Electronic Communications Privacy Act because neither Petrakis nor Huffman "intercepted" a text message sent or received by Shefts.

2.  Shefts cannot recover under the federal Stored Communications Act because Petrakis did not directly access Shefts' Yahoo email account, and because he was authorized to monitor the emails recorded on Access2Go's information system, and reasonably believed he had the responsibility to do so.

40

3.    Shefts cannot recover under the Illinois eavesdropping act because the act is unconstitutional, because Petrakis did not, in any case, directly access Shefts' Yahoo email account, and because the emails and text messages monitored by Petrakis and Huffman were not private or recorded surreptitiously.

For these reasons, Shefts' Motion for Summary Judgment should be denied.

Davis & Campbell L.L.C.


By:      /s/ J. Reed Roesler_____
         J. Reed Roesler
         Davis & Campbell L.L.C.
         401 Main Street, Suite 1600
         Peoria, IL 61602
         Tele: (309) 673-1681
         Fax: (309) 673-1690
         jrroesler@dcamplaw.com

00025417.DOC

41

**CERTIFICATE OF COMPLIANCE PURSUANT TO**
**CENTRAL DISTRICT OF ILLINOIS LOCAL RULE 7.1**

Pursuant to Local Rule 7.1(D) of the Rules of the United States District Court, Central District of Illinois, the undersigned hereby certifies that an analysis of Part III of the foregoing Response using the document information program of Microsoft Word yields the following results:

|  |  |
|---|---|
| Words: | 6,222 |
| Characters: | 40,251 (with spaces) |

The Response is therefore in compliance with the volume type limitation of Local Rule 7.1(D).

Date: September 7, 2010                    By:      /s/ J. Reed Roesler_____

                                                    J. Reed Roesler
                                                    Davis & Campbell L.L.C.
                                                    401 Main Street, Suite 1600
                                                    Peoria, IL 61602
                                                    Tele: (309) 673-1681
                                                    Fax: (309) 673-1690
                                                    jrroesler@dcamplaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| JAMISON J. SHEFTS, an Individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 CV 1104 |
| **v.** | ) | |
| | ) | |
| JOHN PETRAKIS, an Individual, | ) | |
| KEVIN MORGAN, an Individual, | ) | |
| and HEIDI HUFFMAN, an | ) | |
| Individual, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I certify that on September 7, 2010, the foregoing Response of John Petrakis to Motion for Summary Judgment on Counts I, II and III of Complaint, and of Heidi Huffman on Counts I and III of Complaint was electronically filed with the Clerk of the Court using the CM/ECF System upon:

Lane G. Alster
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
lalster@emrslaw.com
*Attorney for Plaintiff*

Robert M Riffle
Elias, Riffle, Meginnes & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
rriffle@emrslaw.com
*Attorney for Plaintiff*

George Mueller
Mueller Anderson PC
609 Aetna Road
Ottawa, IL 61350
George@muelleranderson.com

/s/ J. Reed Roesler
J. Reed Roesler
Davis & Campbell L.L.C.
401 Main Street, Suite 1600
Peoria, IL 61602
Tele: (309) 673-1681
Fax: (309) 673-1690
jrroesler@dcamplaw.com

00025417.DOC