E-FILED
Thursday, 09 December, 2010 12:37:58 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| JAMISON J. SHEFTS, *an individual* )<br><br>Plaintiff, )<br><br>v. )<br> )<br>JOHN PETRAKIS, *an individual*, )<br>KEVIN MORGAN, *an individual*, )<br>and HEIDI HUFFMAN, *an individual*, )<br> )<br>Defendants. ) | Case No.   10-cv-1104 |

# O R D E R  &  O P I N I O N

There are currently ten motions pending before the Court in this case. The motions can be characterized into two groups: 1) those dealing with the merits of Plaintiff's pleadings and claims, and 2) those dealing with the modification, termination, and enforcement of the Preliminary Injunction entered by Judge Mihm on May 6, 2010 (Doc. 37).  The instant Order and Opinion will dispose of all motions relating to Plaintiff's Motion for Summary Judgment against Defendants Petrakis and Huffman (Doc. 47) and Defendant Morgan's Motion to Strike Allegations Reciting Privileged Communications & Motion to Strike State Court Allegations, or, in the Alternative, to Stay Proceedings (Doc. 57).  All additional motions will be determined after a hearing set for January 4, 2011.

Before the Court in the instant matter are Plaintiff's Motion for Summary Judgment Against Heidi Huffman on Counts I and III and John Petrakis on

Counts I, II, and III of the First Amended Verified Complaint ("Motion for Summary Judgment") and Memorandum in Support (Docs. 47 & 48), Defendants Petrakis and Huffman's Response to Motion for Summary Judgment (Doc. 60), Plaintiff's Reply in Support of Motion for Summary Judgment (Doc. 65), Defendants' Motion to Strike New Argument Raised in Reply or, in the Alternative, to Fix Date for Surreply (Doc. 67), Plaintiff's Response in Opposition to Defendants' Motion to Strike New Argument Raised in Reply or, in the Alternative, to Fix Date for Surreply (Doc. 75), and Plaintiff's Motion for Leave to File Oversized Reply Brief in Support of Motion for Summary Judgment (Doc. 77). Also before the Court are Defendant Morgan's Motion to Strike Allegations Reciting Privileged Communications & Motion to Strike State Court Allegations or, in the Alternative, to Stay Proceedings ("Motion to Strike or Stay") and Memorandum in Support (Docs. 57 & 58), Plaintiff's Response in Opposition to Motion to Strike or Stay (Doc. 62), Defendant Morgan's Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law, Both in Reply to Shefts' Response Opposing Motion to Strike (Doc. 66), and Plaintiff's Response to Defendant Morgan's Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law (Doc. 76).

For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, Defendants' Motion to Strike New Argument Raised in Reply or Fix Date for Surreply is GRANTED and the June 2007 email is STRICKEN, Plaintiff's Motion for Leave to File Oversized Brief in Reply is GRANTED,

Defendant Morgan's Motion to Strike or Stay is GRANTED in part and Paragraphs 51-52 and 57-62 of the First Amended Verified Complaint are STRICKEN, Defendant Morgan's Motion to Stay is DENIED, and Defendant Morgan's Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law is DENIED.

### FACTUAL BACKGROUND[1]

Plaintiff is the founder of Access2Go, Inc., ("Access2Go") a telecommunications company. (Doc. 60 at 6). He served as its President and CEO through at least December 22, 2009.[2] (Doc. 60 at 6, 10). On January 1, 2006, pursuant to a Purchase Agreement, Defendants Morgan and Petrakis each became 30% owners of the Voting Stock in Access2Go. (Doc. 60 at 6). Plaintiff retained 30% himself, and the remaining 10% was owned by John Tandeski. (Doc. 48-2). These four men served as the Officers and Board of Directors ("Board") for Access2Go. (Doc. 48-2). At all relevant times, Plaintiff had three avenues through which he communicated electronically. (Doc. 60 at 6). These included: 1) his Access2Go Email Account, 2) his Yahoo! Email Account, and 3) his Blackberry handheld messaging service on which he could send and receive short message service ("SMS") text messages using his Verizon cellular phone

---

[1] These relevant background facts are drawn from the parties' respective statements of facts. Where the facts are disputed, this is noted. Most of the facts are disputed. All reasonable inferences have been drawn in favor of the non-movant.

[2] The parties dispute if, and when, Plaintiff was removed from his positions as President and CEO. According to Plaintiff, he remains in those positions today. (Doc. 48 at 3).

number, and send and receive emails from his Access2Go email account.  (Doc. 60 at 6).

As of June 2008, Petrakis, Morgan, and Tandeski had concerns that Plaintiff was sexually harassing Access2Go employees and violating his fiduciary duties.[3] (Doc. 60 at 16).  On June 18, 2008, Petrakis was appointed by the Access2Go Board to serve as the Board's liaison of security.[4]  (Doc. 60 at 16). On June 24, 2008, Petrakis purchased "SpectorPro" monitoring software.[5]  (Doc. 60 at 7).  Petrakis subsequently had Shawn Patton install the software onto Access2Go employee's computers, including the computer used by Plaintiff. (Docs. 48 at 7 & 60 at 7).  He also had Patton set up a "dummy account" to route all emails sent or received by Plaintiff using his Access2Go email account to Petrakis.  (Docs. 48 at 7 & 60 at 12).  Finally, Heidi Huffman, the Director of Finance, worked with Patton to update Access2Go's BES software to allow for the logging of text messages sent or received from any Blackberry that was registered to the BES server.  (Doc. 60 at 12).

---

[3] Plaintiff, of course, denies that he was sexually harassing any employees or violating any fiduciary duties.  (Doc. 65 at 7).

[4] According to Petrakis and Huffman, this position carried with it "the affirmative responsibility under Access2Go's new Employee Manual to monitor the emails and text messages of Access2Go employees, officers, and directors in order to safeguard company resources. (Doc. 60 at 16).  Plaintiff denies such affirmative responsibilities were entailed in the position.  (Doc. 65 at 8).

[5] While neither party provides the date of purchase in their briefs, the Court has determined that the SpectorPro was purchased on June 24 based upon the email attached to Shawn Patton's Affidavit, which shows an invoice for purchase on June 24, 2008.  (Doc. 48-8 at 10).

On July 2, 2008, the Board ratified the adoption of an employee manual that had been created by Tandeski ("Employee Manual").  (Doc. 60 at 7).  The following language appears on page 22 of the Employee Manual:

> "The Company owns the rights to all data and files in any computer, network, or other information system used in the Company.  The Company also reserves the right to monitor electronic mail messages (including personal/private/instant messaging systems) and their content, as well as any and all use of the Internet and of computer equipment used to create, view, or access e-mail and Internet content."[6]

(Doc. 60 at 17).  Section 6.7 of the Employee Manual goes on to state that "No employee may access another employee's computer, computer files, or electronic mail messages without prior authorization from the Board of Directors." (Doc. 48 at 6).[7]  Since the adoption of the Manual, the Board has never voted to authorize an employee to access another employee's computer.   (Doc. 48 at 7).[8]

---

[6]Petrakis and Huffman state that this was a pre-existing right. (Doc. 60 at 17). Plaintiff, however, disputes that Access2Go ever had any policy where electronic mail messages, their content or any use of the Internet or computer equipment would be considered anything other than private (Doc. 65 at 8).  The Court notes that the Manual itself does not bring much clarity to the dispute.  In the Welcome section, the Manual states that "These provisions supersede all existing policies and practices . . ." but a few sentences later provides: "This manual sets forth the current policies and practices of our company."  (Doc. 19 at 4).

[7] Petrakis and Huffman admit that this is the language in the manual, but argue with Plaintiff's interpretation of its meaning.   According to Petrakis and Huffman, the monitoring limitation did not apply to the shareholders/Directors of Access2Go, who were referred to in the Employee Manual as "managing partners."  (Doc. 60 at 17).

[8] Petrakis and Huffman do not deny this fact, however they maintain that Petrakis' appointment as security liaison on June 18, 2008 was an appointment under the Employee Manual to safeguard company resources via the monitoring of emails and text messages of Access2Go employees.  (Doc. 60 at 12).

Nevertheless, according to Petrakis and Huffman, Plaintiff stated that he knew Petrakis could now monitor his emails and text messages.  (Doc. 60 at 18).[9]

On April 21, 2010, Plaintiff filed a Verified Complaint against Defendant Petrakis alleging violations of the Federal Wire and Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511 and 2520, the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Illinois Eavesdropping Statute 702 Ill. Comp. Stat. § 5/14. (Doc. 1).     At the same time, Plaintiff filed an *ex parte* motion seeking a temporary restraining order against Petrakis and an *ex parte* motion seeking the seizure of various computers at Defendant's offices.  (Docs. 5 & 7).  On April 27, 2010, after three *ex parte* hearings, Judge Mihm entered a Temporary Restraining Order and Order for Seizure and Impoundment of Computers ("TRO").  (Doc. 10).  The TRO enjoined Petrakis "and anyone acting in concert with him" from intercepting any of Plaintiff's "electronic communications," and from destroying or hiding any documents or records related to any prior interception of electronic communications.  (Doc. 10 at 1-2).  The TRO also ordered the seizure and impoundment of computers used by Plaintiff, Petrakis, and Huffman, which was to be effectuated on the morning of April 29, 2010. (Doc. 10 at 2-3).

After the computers were seized on the morning of April 29, 2010, the parties came before Judge Mihm for a hearing.  Although the TRO was to expire at the time of the hearing, in order to give Defendants an adequate opportunity

---

[9] Plaintiff denies ever making such a statement. (Doc. 65 at 8).

to prepare for argument, the parties agreed to have Plaintiff's forensic examiner replicate the computer hard drives, but to refrain from analyzing the replicated images until the Court ruled on whether or not to grant a Preliminary Injunction.  (Doc. 79-5 at 17-18).   The parties were given until May 6, 2010 to prepare their arguments for the hearing.  (Doc. 79-5).  However, on the morning of the hearing, Defendant's counsel stated that the Defendant had no objection to allowing Plaintiff to analyze the images of the replicated hard drives subject to certain conditions and limitations, in order to allow the matter to quickly proceed to a determination on the merits.  (Doc. 78-3 at 3-4).  Accordingly, Judge Mihm allowed the parties to confer regarding the conditions and limitations on Plaintiff's analysis of the hard drive images, and, once the parties reached an agreement, Judge Mihm approved it and entered an order placing it into effect. (Doc. 78-3 at 10).

The Agreed Order for Preliminary Injunction (Doc. 37) adopted the TRO's prohibition on Defendants' monitoring or intercepting any of Plaintiffs' electronic communications.   In addition, the Injunction allowed for Plaintiff to obtain imaging of three more computer hard drives, including the new hard drive on Petrakis' laptop computer and the previous hard drive to that computer which had recently been replaced.   (Doc. 37 at ¶¶ 5-7).   Finally, the Injunction established the scope and process whereby Plaintiff could analyze the replicated hard drives.  Plaintiff's forensic expert, James Feehan, was given permission to access the imaged hard drives in order to 1) review all electronic

communications sent to or by Plaintiff which were on any of the hard drives, 2) log the existence of any other electronic communications that appeared to be intercepted, without copying or reading them, and 3) look for evidence of spyware or other indications of interception.  (Doc. 37 at ¶ 8(a)-(c)).  Feehan was not allowed to read, review, or log any other communications between the computer users and third parties other than Plaintiff, and he was instructed to share with the parties only information of a type listed in the previous sentence. (Doc. 37 at ¶ 8(d)-(f)).  Finally, Feehan was to make a copy of all the imaged hard drives to deliver to Petrakis, and to store the original imaged hard drives in a secure location.  (Doc. 37 at ¶ 8(i)).[10]

Upon analysis of the hard drives, Feehan discovered that SpectorPro software was installed on Plaintiff's computer.  (Doc. 60 at 7).  On the laptop used by Petrakis, Feehan found a file titled "recovered text.xls" which was a Microsoft excel spreadsheet containing text messages sent and received by Plaintiff between July 2008 and March 2009.   (Doc. 60 at 8). Feehan also discovered excel spreadsheets containing text messages sent and received by Plaintiff between July 2008 and March 2009 on the laptop computer used by Huffman. (Doc. 48 at 10-11).[11]   Petrakis admits that he read and reviewed emails sent and received by Plaintiff on his Access2Go email account and SMS

---

[10] The original Preliminary Injunction required that Petrakis be allowed to have a qualified representative present during all of Feehan's analyses, however pursuant to the parties agreement on May 19, this requirement was struck in favor of delivering a copy of the hard drives to the Defendant.  (Doc. 40).

[11] While Petrakis and Huffman deny that these files contained "intercepted" emails or text messages, they do not deny the existence of the spreadsheets on Huffman's computer.  (Doc. 60 at 13).

text messages sent and received by Plaintiff on his Blackberry device. (Doc. 60 at 10). He also admits that SpectorPro Software was installed on Plaintiff's computer. (Doc. 60 at 10). Finally, Huffman admits that she viewed and read emails sent and received by Plaintiff from his Access2Go email account. (Doc. 60 at 10).

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS PETRAKIS AND HUFFMAN AS TO COUNTS I, II, AND III

## I.    Procedural History

On July 21, 2010 Plaintiff filed a Motion for Summary Judgment against Defendant Petrakis as to Counts I, II, and III and against Defendant Huffman as to Counts I and III of the First Amended Verified Complaint. (Doc. 47). On September 7, 2010 Petrakis and Huffman filed their Response, (Doc. 60), and on September 29, Plaintiff filed his Reply. (Doc. 65).[12] On October 1, 2010, Petrakis and Huffman filed a Motion to Strike New Argument Raised in Reply or, in the Alternative to Fix Date for Surreply (Doc. 67), to which Plaintiff

---

[12] The Argument section of the Reply brief is nearly 23 double-spaced pages in length. (Doc. 65 at 9-31). Local Rule 7.1(D)(5) provides that the Argument section of a Reply brief shall not exceed 5 double-spaced pages in length. In addition, Local Rule 7.1(D)(3)(b) provides that the Reply must be limited to new matters raised in the response and must not restate arguments already raised in the motion. On October 21, 2010, in connection with its Response to Petrakis and Huffman's Motion to Strike Reply, Plaintiff sought post-filing leave to file an oversized reply brief. (Doc. 77). The Court notes that such a motion should have been filed *prior* to the filing of a brief that exceeded the allowed length by over 15 pages, and that a large portion of the reply merely restates arguments raised in the original Motion for Summary Judgment. However, because the Reply brings necessary clarity to the issues, in the interests of justice Plaintiff's Motion will be GRANTED. However, as will be discussed below, the June 2007 email attached thereto is STRICKEN as it raises a new argument not put forward in Plaintiff's Motion for Summary Judgment.

responded on October 21, 2010 (Doc. 75).  Petrakis and Huffman argued that Plaintiff's Reply shifted focus from the June 30, 2008 e-mail to one sent on June 29, 2007, and that they had a right to respond to this new argument.

Plaintiff contends that this was not a new argument, but merely a response to Petrakis and Huffman's assertion that any and all monitoring of Plaintiff's communications was authorized by Petrakis' appointment as security liaison in June 2008.   The Court disagrees.   In its Motion for Summary Judgment Plaintiff focused exclusively on Petrakis and Huffman's use of BES Software, the "dummy account," and SpectorPro spyware to monitor and access Plaintiff's communications.  All of these actions took place in or around June of 2008.  Accordingly, Plaintiff's reference to the June 2007 email raises new issues which were not addressed in his Motion for Summary Judgment.[13]   Therefore, Petrakis and Huffman's Motion to Strike is GRANTED and the June 2007 email is STRICKEN and will not be considered at this time.

## II.   Legal Standard

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party.  *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*,

---

[13] The Court further notes that although Plaintiff attached this email to its Reply, it does not refer to it once in the oversized argument section of its Reply brief.

565 F.3d 365, 368 (7th Cir. 2009).  All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record.  *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).  The court draws only reasonable inferences.  *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment.  Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001).  Mere conclusory allegations are not enough, the non-movant must "come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material question." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Furthermore, "self-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are 'without factual support in the record.'" *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (*quoting Albiero v. City of Kankakee*, 246 F.3d 927 (7th Cir. 2001). However, a self-serving affidavit supported by facts in the record can create a genuine issue of material fact.  *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108

11

F.3d 789, 796 (7th Cir. 1997).  At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

### III.   Discussion

#### a.  Count I: ECPA

Plaintiff's first argument in his Motion for Summary Judgment is that summary judgment should be granted against Petrakis and Huffman as to Count I of his First Amended Verified Complaint because both Defendants violated the ECPA by intentionally intercepting SMS text messages from his Blackberry without his authorization.  (Doc. 48 at 16-17).  The ECPA was passed by Congress in 1986 in order to "afford privacy protection to electronic communications." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002).  Title I of the ECPA amended the federal Wiretap Act to "address the interception of electronic communications."  *Id.* (internal quotations omitted). Title II created the Stored Communications Act (SCA) which addressed access to stored electronic communications.  *Id.*

In their briefs, the parties appear to agree that there are no issues of material fact with regards to whether or not Petrakis and Huffman's monitoring of Plaintiff's SMS text messages violated the ECPA, and that the only question is whether their actions constitute an "intercept." (Doc. 48 at 17-21; Doc. 60 at 21-26; Doc. 65 at 9-16).  However, it appears to the Court that the parties'

arguments are aimed at two very distinct actions.  Plaintiff's argument is focused on the moment the BES software acquired his SMS text messages and logged them onto the Access2Go server.  (Doc. 48 at 20) (" . . . an interception is occurring each time a text message is logged.'").[14]  Petrakis and Huffman, on the other hand, focus on whether an "intercept" occurred at the moment that they accessed those SMS text messages that were already logged on the Access2Go server.  (Doc. 60 at 26).  ("[T]he messages that [Plaintiff] alleges Petrakis and Huffman reviewed were sitting in a stored state on Access2Go's BES server. By this time the messages had reached their destination (on the server) and were no longer capable of being intercepted.").

Based upon the undisputed facts concerning how the BES server functioned to log Plaintiff's text messages, the Court finds that an "intercept" under the ECPA occurred when the BES software acquired and logged Plaintiff's text messages. *See United States v. Szymuszkiewicz*, --- F.3d ---, 2010 WL 3503506 (7th Cir. Sept. 9, 2010) (holding that there is no timing requirement with regards to an "interception" under the ECPA).[15]  This finding alone, however, does not allow for summary judgment to be entered in favor of Plaintiff because there is also a question of whether Plaintiff consented to the logging of

---

[14] Plaintiff's position is further evidenced by the Second Supplemental Affidavit of James Feehan which he attached to his Reply brief.  In that Affidavit, Feehan describes the process through which BES software acquires and logs SMS text messages.  (Doc. 65-C at 2-3).

[15] The Seventh Circuit announced this decision on September 9, 2010 after Plaintiff's Motion and Petrakis and Huffman's Response had already been filed. The decision effectively departs from other circuits' interpretation of the ECPA, making the parties' arguments, which are based upon those other circuit decisions, largely irrelevant.

his text messages by the BES server.[16] Section 2511(2)(d) of Chapter 18 of the United States Code provides that "[i]t shall not be unlawful under this chapter for a person . . . to intercept a . . . electronic communication . . . where one of the parties to the communication has given prior consent to such interception." Consent under this provision need not be explicit, it can also be implied. *Williams v. Poulos*, 11 F.3d 271, 281 (1st Cir. 1993). "Implied consent is 'consent in fact' which is inferred from surrounding circumstances indicating that the party *knowingly* agreed to the surveillance." *Id.* (emphasis in original).

Based upon the undisputed facts, Plaintiff was involved with the purchase and installation of the BES server, knew that Huffman had "administrative rights" for the BES server, knew that emails sent on his Blackberry device would be stored on the Access2Go network via the BES server, and requested that his Blackberry device be reconnected to the BES server at various points. (Doc. 65 at 6-7).[17] Accordingly, there is no dispute that Plaintiff consented to have his Blackberry device connected to the BES server and that this entailed consent to have his Access2Go emails sent and received on the Blackberry device stored on the Access2Go network. *See United States v. Haldeman*, 559 F.2d 31, 105 (D.C.

---

[16] The Court finds this argument implicit in Defendant's Response focusing on the moment of access to the text messages rather than their logging, in addition to their statement of facts in which they allege that Plaintiff knew that the BES server would log his text messages.

[17] It is also undisputed that Plaintiff has since requested the production of his emails and text messages in a pending state court case. However, this only proves that Plaintiff is now aware of the fact that Defendants were logging his text messages, and has no bearing upon whether or not he had knowledge or gave consent at the time.

Cir. 1976) (finding that party consented to the recording of his conversations by requesting the installation of the recording device).

However, "knowledge of the *capability* of monitoring alone cannot be considered implied consent." *Deal v. Spears*, 980 F.2d 1153, 1157 (8th Cir. 1992) (emphasis in original). Further, consent can be limited based upon the "subtleties and permutations inherent in a particular set of facts." *Griggs-Ryan v. Smith*, 904 F.2d 112, 119 (1st Cir. 1990). Thus the question remains whether, in addition to the logging of his emails sent on his Blackberry device, Plaintiff also consented to the logging of his text messages. While the Seventh Circuit has not had much occasion to discuss the implied consent exception to the ECPA, its applicability has been found in other circuits to hinge on whether the plaintiff had notice of the fact that his communications would be monitored. *See United States v. Workman*, 80 F.3d 688, 693 (2d Cir. 1996) (holding that a prisoner who had been informed via a posted notice that all telephone conversations were subject to monitoring, as well as a handbook describing the prison's monitoring program had impliedly consented to the monitoring of his phone calls); *Spears*, 980 F.2d at 1157 (holding that employee did not impliedly consent to the monitoring of her phone calls when her employer only told her that it might monitor phone calls and had an extension of her phone line in their home); *Griggs-Ryan*, 904 F.2d at 118 (holding that plaintiff had impliedly consented to the monitoring of his phone calls when he had been told on a number of occasions that all incoming calls would be monitored).

Here, Petrakis and Huffman assert that Plaintiff knew that his text messages could be logged and stored because Plaintiff was a "sophisticated businessman in the telecommunications industry." (Doc. 60 at 21). Plaintiff disputes that he ever had such knowledge. (Doc. 65 at 7). However, the Court need not rely on either of these allegations because the Employee Manual makes clear that Plaintiff's electronic communications on Company equipment are subject to archiving at all times. The Manual states, in relevant part, "Employees must be aware that the electronic mail messages sent and received on Company equipment are not private and are subject to viewing, downloading . . . and archiving by Company officials at all times." (Doc. 19 at 22).[18] The Manual also defines "electronic mail messages" as including "personal/private/instant messaging systems." (Doc. 19 at 22). Viewing all evidence on the record in a light most favorable to the non-moving party, Plaintiff's Blackberry device was a piece of Company equipment,[19] and thus this provision in the Employee Manual, in addition to his decision to connect his Blackberry to the Access2Go BES server which he knew could log communications sent from his Blackberry device, provided him with notice that all of his messages could be archived. As such, the Court finds that when it views all evidence in a light most favorable to the non-moving party, Plaintiff

---

[18] Further, as will be discussed below, the Court finds that this provision granted Petrakis authority to monitor communications despite the Manual's subsequent sentence limiting employee access to other employees electronic mail messages.
[19] Petrakis and Huffman allege that Plaintiff sought and received reimbursement from Access2Go for all charges associated with the use of his Blackberry device (Doc. 60 at 10), and that Plaintiff arranged for the purchase and installation of the BES server via Access2Go. (Doc. 60 at 20).

consented to the logging of his text messages and thus is not entitled to judgment as a matter of law.   Accordingly, Plaintiff's Motion for Summary Judgment against Petrakis and Huffman as to Count I of his First Amended Verified Complaint is DENIED.

## IV.  Count II:  Illinois Eavesdropping Statute

Plaintiff also seeks summary judgment against Petrakis and Huffman as to Count II of his First Amended Verified Complaint, which alleges violations of the Illinois Eavesdropping Statute.  According to Plaintiff, Petrakis violated the statute by knowingly and intentionally using the BES software to intercept communications between Plaintiff and third parties via Plaintiff's Blackberry handheld device.  (Doc. 48 at 28).  Further, Plaintiff argues that Petrakis and Huffman violated the statute by knowingly and intentionally using the "dummy account" and SpectorPro spyware to obtain electronic communications between Plaintiff and third parties via Plaintiff's Access2Go Email Account and Yahoo! Email Account.  (Doc. 48 at 28).

The Illinois Eavesdropping Statute, 720 ILL. COMP. STAT. § 5/14-1 et. seq. provides that "[a] person commits eavesdropping when he [k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or part of any conversation or intercepts, retains, or transcribes electronic communication . . . "  720 ILL. COMP. STAT. § 5/14-2(a)(1).  The statute defines an "eavesdropping device" as "any device capable of being used to . . . intercept, retain, or transcribe electronic communications whether such . . .

communication is conducted in person, by telephone, or by any other means." §
5/14-1(a).  An "electronic communication" is "any transfer of signs, signals,
writing, images, sounds, data, or intelligence of any nature transmitted in whole
or part by a wire, radio, pager, computer, electromagnetic, photo electronic or
photo optical system, where the sending and receiving parties intend the
electronic communication to be private and the interception, recording, or
transcription of the electronic communication is accomplished by a device in a
surreptitious manner . . ." § 5/14-1(e).

Plaintiff claims that Petrakis violated the Illinois Eavesdropping Statute
by using his computers, and the software thereon, as eavesdropping devices to
intercept and/or retain emails sent and received by Plaintiff using his Yahoo!
Email Account, Access2Go Email Account, and Blackberry.  (Doc. 48 at 29).
Petrakis and Huffman counter that the Statute was not violated because
Plaintiff did not expect his emails and text messages to be private, and further
the manner in which they monitored his emails and text messages was not
"surreptitious" in nature.  (Doc. 60 at 32).[20]

---

[20] Petrakis and Huffman also argue that the Illinois Eavesdropping Statute is
void as unconstitutional.  They make only a conclusory argument that the
Statute is unconstitutional because it violates an individual's First Amendment
right to make audio recordings of government activity.  (Doc. 60 at 31).  While
the constitutionality of the statute with regards to the monitoring of government
activity may be pending in other courts, no court has yet found this to be the
case.  Further, Petrakis and Huffman are not being accused of monitoring any
government communications, only the private communications of Plaintiff.
Petrakis and Huffman do not have standing to challenge the Statute as it might
be applied to others in different circumstances.  *See People v. Falbe*, 727 N.E.2d
200, 206 (Ill. 2000).  Nor do Petrakis and Huffman argue that the Statute is
facially invalid as overbroad or unconstitutional in every application.  *See City of*

Under the terms of the Illinois Eavesdropping Statute, in order for a communication to constitute a protected "electronic communication," both the sending and receiving parties must intend it to be private under circumstances justifying such expectation.  § 5/14-1(e); *People v. Beardsley*, 503 N.E.2d 346, 350 (Ill. 1986), *People v. Gariano*, 852 N.E.2d 344, 348-49 (Ill. App. Ct. 2006).[21] Further, an individual can "impliedly consent" to the monitoring of his communications for purposes of the Eavesdropping Statute.  *People v. Ceja*, 789 N.E.2d 1228, 1239 (Ill. 2003).  "The circumstances relevant to an implication of consent will vary from case to case, but will ordinarily include language or acts that tend to prove that a party knows of, or assents to, encroachments on the routine expectation that [communications] are private."  *Id.* at 1241.

Here, Petrakis and Huffman argue that Plaintiff could not have had a reasonable expectation of privacy in his communications sent and received by him on equipment connected to Access2Go's information systems.[22]  They base

---

*Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984).  Because this is not a case about a private individual's monitoring of government activity, and Petrakis and Huffman have not made a facial attack on the Statute's validity, the Court will not consider Petrakis and Huffman's claims that the Statute is unconstitutional under the First Amendment.

[21] Petrakis and Huffman argue that in determining whether a party has a reasonable expectation of privacy in their communications, Illinois courts look to cases brought under the Fourth Amendment right of privacy.  (Doc. 60 at 33). While the court in *Beardsley* did look at a Fourth Amendment case for guidance, it emphatically stated "We emphasize that we are not holding that the limitations on ones' conduct imposed by section 14-2 of our eavesdropping statute are coextensive with those imposed on governmental action by the Fourth Amendment."  *Beardsley*, 503 N.E.2d at 351.

[22] Petrakis and Huffman further state that they did not directly access Plaintiff's Yahoo! Email account such that the only activity monitored was activity performed on the Access2Go Network and equipment.  (Doc. 60 at 29).

this argument on a decision by the United States District Court for the Eastern District of Pennsylvania, which held that for purposes of the common law tort of intrusion upon seclusion, a party does not have a reasonable expectation of privacy in email communications made over a company email system, even if he has been assured by management that the emails will not be monitored. *Smyth v. Pillsbury Co.*, 914 F.Supp. 98, 101 (E.D. Pa. 1996). While there is no case on point with regards to the Illinois Eavesdropping Statute, other courts, as well as the Seventh Circuit, have held, in other contexts, that a party's expectation of privacy in messages sent and received on company equipment or over a company network hinge on a variety of factors, including whether or not the company has an applicable policy on point. *See Muick v. Glenayre Electronics*, 280 F.3d 741, 743 (7th Cir. 2002) ("Not that there can't be a right of privacy . . . in employer-owned equipment furnished to an employee for use in his place of employment . . . [b]ut [the employer] had announced that it could inspect the laptops that it furnished for the use of its employees, and this destroyed any reasonable expectation of privacy [the employee] might have had.").

Accordingly, whether Plaintiff had a reasonable expectation of privacy in the communications he sent and received on the Access2Go network depends upon whether Access2Go had a policy in place regarding the monitoring of such communications, as well as whether Plaintiff was aware that Petrakis or others at Access2Go may be monitoring his activities.

As discussed above, the Access2Go Employee Manual dictated that all communications sent and received on Access2Go equipment were subject to monitoring by Company officials.  (Doc. 19 at 22).  Plaintiff argues that while the Manual allowed for the monitoring of communications if the Board of Directors, of which he was a part, authorized it, the Board never did so.  Accordingly, Plaintiff claims he had an even higher expectation of privacy because he knew that no such authorization had been given.  (Doc. 65 at 29-30).

Plaintiff's argument fails for two reasons.  First, while the Employee Manual states that "[n]o employee may access another employee's computer . . . without prior authorization from the Board of Directors," this did not foreclose the managing partners from doing so.  Throughout the Employee Manual, a distinction is drawn between employees and managing partners (also referred to as managers, Company officials, and members of management team).[23]   (Doc. 19).  This distinction is even drawn in the provision at issue, as it states that *employees* must be aware that communications are subject to monitoring by *Company officials* at all times, and then that no *employee* may access such communications without prior approval.  (Doc. 19 at 22).  Accordingly, the Court

---

[23] For example, in Section 1.3, the Manual directs that "[i]f *employees* have concerns, they are strongly encouraged to voice these concerns . . . to one of the *members of management*"; Section 1.4: "[t]he *employee* who receives a complaint should attempt to resolve the complaint . . . or immediately refer the complaining party to a *member of the management team*"; Section 7.6: "[n]o *employee* has the authority to enter into a contract . . . without the written approval of a *managing partner*" and "[a]ny financial commitment of funds by *employees* shall be approved by two *members of management*." (Doc. 19, emphases added).

does not find that the Manual required prior approval of the Board for Petrakis to monitor electronic communications.

In addition, even if such prior approval was necessary, which the Court finds that it was not, Petrakis was given such authority when he was appointed by the Board as "security liaison" under the terms of the new Employee Manual. This appointment took place on June 18, 2008, approximately two weeks before the Manual went into effect. (Doc. 60 at 11).  As described in Section 6.6 of the Employee Manual, Petrakis was "responsible for the establishment of an adequate system of internal control that is designed to prevent and detect errors or irregularities that may lead to fraudulent activities, and designed to safeguard company resources." (Doc. 19 at 21).  The establishment of methods to monitor electronic communications on company equipment would be such a system of internal control.   Accordingly, the Court finds that Petrakis was authorized under the terms of the Employee Manual to monitor Plaintiff's activity.

Because Plaintiff was aware of the terms of the Employee Manual, as well as the appointment of Petrakis as "security liaison," the Court finds that he did not have a reasonable expectation of privacy in his communications after the Manual went into effect.[24]   Therefore, Plaintiff's Motion for Summary Judgment

---

[24] Petrakis and Huffman also argue that Plaintiff did not have a privacy interest in his communications due to a litigation hold and based upon the "special needs of the workplace." (Doc. 60 at 36-39).  While the presence of a litigation hold may have necessitated the need to preserve information, it would not have justified Petrakis and Huffman's review of Plaintiff's communications, and therefore this argument fails to raise a genuine issue of material fact.  With

against Petrakis and Huffman as to Count II of his First Amended Verified Complaint is DENIED.

## V.    Count III:  SCA

Finally, Plaintiff seeks summary judgment against Petrakis as to Count III of the First Amended Verified Complaint, which alleges violations of the Stored Communications Act.   The SCA creates a cause of action when any person "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system."   18 U.S.C. § 2701(a).  Such authorization can be given by the entity providing the electronic communications service.  For purposes of § 2701, an entity providing an electronic communications service includes a private employer that provides email service to its employees.  *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 115 (3d Cir. 2003); *see also Devine v. Kapasi*, --- F.Supp.2d. ---, 2010 WL 2293461, *4 (N.D. Ill. June 7, 2010) (relying on *Fraser* to hold that § 2701 applies to private employers, even when they do not provide electronic communications service to the public).

---

regards to the argument that the search was justified by the "special needs of the workplace," the Court finds that a genuine issue of material fact would exist concerning whether Plaintiff's actions justified a belief of workplace misconduct and whether Petrakis directly accessed Plaintiff's Yahoo email account.  The Court emphasizes that it is not holding that such an argument would or would not win as a matter of law, Petrakis and Huffman have not made such motion and thus the Court need not rule on it at this time.

The parties do not dispute that the text messages and emails monitored by Petrakis are "electronic communications" under the SCA, that Petrakis intentionally accessed them, or that Access2Go is an entity providing an electronic communications service. Therefore, the only question is whether Petrakis was authorized by Plaintiff or Access2Go to access and monitor Plaintiff's communications. As discussed above, Petrakis was authorized under the Employee Manual to access and monitor Plaintiff's communications. Accordingly, Plaintiff's Motion for Summary Judgment against Petrakis as to Count III of his First Amended Verified Complaint is DENIED.

### DEFENDANT MORGAN'S MOTION TO STRIKE OR STAY

On August 23, 2010, Defendant Morgan, who is not subject to the Motion for Summary Judgment filed by Plaintiff, filed a Motion seeking to strike allegations reciting privileged communications and allegations relating to state court proceedings pursuant to Federal Rule 12(f), or, in the alternative, to stay the current proceedings pursuant to the *Colorado River* doctrine pending the outcome of the parties' state court dispute. (Doc. 57). Following Plaintiff's Response, Defendant Morgan filed a Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law, Both in Reply to Shefts' Response Opposing Motion to Strike (Doc. 66). Plaintiff does not oppose this motion, however because the Court finds that it has no relevance to the issues before it, Defendant Morgan's Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law is DENIED. For the following

reasons, Defendant Morgan's Motion to Strike or Stay is GRANTED in part, and DENIED in part.   It is GRANTED with respect to his Motion to Strike paragraphs 51-52 and 57-62, and it is DENIED with respect to his Motion to Strike paragraphs 50 and 53-56 and his Motion to Stay.

## I.     Motion to Strike Paragraphs 50 Through 62

Pursuant to Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."   Courts generally only strike matter if "it is clear that it can have no possible bearing on the subject matter of the litigation" and the moving party is prejudiced by its inclusion.   *Anderson v. Bd. of Educ. Of City of Chicago*, 169 F.Supp.2d 864, 867-68 (N.D. Ill. 2001).   "Prejudice results when the matter complained of has the effect of confusing the issues."   *Id.*

Defendant Morgan seeks to strike paragraphs 50 through 56 of Plaintiff's Verified Complaint, entitled "Destruction of Access2Go Documentation" and paragraphs 57 through 62 entitled "Failure to Comply with Discovery Order in Underlying Lawsuit."   (Doc. 58 at 6).   According to Morgan, the allegations in these paragraphs have nothing to do with the elements of Plaintiff's claims, but only serve to make "scandalous, prejudicial attacks on Morgan's character." (Doc. 58 at 6).   In addition, Morgan alleges that the inclusion of paragraphs 57 through 62 may result in this Court and the state court being called upon to rule on the same issues, which would create "an incentive to race to the jurisdiction which is most likely to grant [Plaintiff]'s requests." (Doc. 56 at 7).

In paragraphs 51 and 52, Plaintiff alleges that counsel for Petrakis, Morgan, and Tandeski in the state court lawsuit instructed them that a litigation hold should be placed on all Access2Go records. (Doc. 38 ¶¶ 51-52), In paragraphs 50 and 53 through 56, Plaintiff alleges that nevertheless, in the fall of 2009 Petrakis, with Morgan's authorization, shredded various Access2Go records, and, after transferring computer records to memory sticks, deleted data from Access2Go's computers. (Doc. 38 ¶¶ 50-56). In response to Morgan's Motion to Strike, Plaintiff claims that these allegations are relevant because they served as the basis for the entering of the TRO and Preliminary Injunction. (Doc. 62 at 14). Further, Plaintiff argues that they remain relevant because Defendants destroyed evidence that was directly at issue in this case. (Doc. 62 at 15). In light of the problems that Plaintiff's agent James Feehan is having in recovering data from Defendant Petrakis' Old Hard Drive due to damage to that computer, the Court finds that the alleged destruction of evidence may still have some relevance to this case.[25] As such, paragraphs 50 and 53-56 are not immaterial as they continue to have a possible bearing on the subject matter of this litigation. Accordingly, with respect to paragraphs 50 and 53-56, Morgan's Motion to Strike is DENIED.

The same cannot be said, however, for paragraphs 51-52 and 57-62 of Plaintiff's Complaint. In paragraphs 51-52, Plaintiff alleges that counsel for

---

[25] According to Plaintiff, Feehan cannot recover all the data on the Old Hard Drive due to pre-existing damage. This is the subject of a currently pending Motion to Modify the Preliminary Injunction (Doc. 37), which will be ruled upon after the Court hears arguments on Defendants Motion for Sanctions (Doc. 70) on January 4, 2011.

Petrakis, Morgan, and Tandeski in the state court lawsuit instructed Petrakis and Morgan that a litigation hold should be placed on all Access2Go records ("Litigation Hold Communications").   (Doc. 38 ¶¶ 51-52).   Whether or not a litigation hold existed for purposes of the state court lawsuit has no bearing upon whether evidence relevant to this case was destroyed.   Further, the inclusion of these allegations may confuse the issues that are being litigated in this Court and the state court.[26]   Because the Litigation Hold Communications are immaterial to the instant action and their inclusion may cause a conflict with the parties' pending state court action, they are STRICKEN.

Likewise, paragraphs 57-62 contain allegations that Defendants failed to comply with discovery requests and court orders in the parties' state court proceedings.   The Court does not find that these matters have any relevance to Plaintiff's claims in this Court that Defendants' illegally intercepted and monitored his electronic communications.   Further, they may confuse the issues in this case with those separately proceeding in state court.   For these reasons, paragraphs 57-62 are STRICKEN.

## II.   Motion to Stay Proceedings

Finally, Morgan has also requested, in the event this Court determines not to strike Paragraphs 50-62 of Plaintiff's Complaint, that it enter an order

---

[26] This conclusion is highlighted by Morgan's corresponding Motion to Strike paragraphs 51-52 based upon attorney-client privilege.  If the Court were to rule on that motion on the basis of attorney-client privilege in the underlying state court lawsuit, it would, on the basis of very limited facts before it, make a ruling that may be more relevant to that case.  Because the Court is striking these allegations as immaterial, it need not rule on whether they are subject to the attorney-client privilege.

staying this proceeding until the conclusion of the state court action. (Doc. 58 at 8). While this Court has stricken Paragraphs 51-52 and 57-62, it has not stricken all of Morgan's requested paragraphs and thus it will consider this request. Morgan argues that a stay should be entered because, pursuant to the *Colorado River* doctrine, it involves substantially the same parties, facts, and legal issues as the one currently proceeding in state court, and that exceptional circumstances exist warranting a stay. (Doc. 58 at 8).

Under the *Colorado River* doctrine, as established by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), a district court must undertake a two-step inquiry when determining whether or not to stay federal proceedings. *Tryer v. City of South Beloit,* 456 F.3d 744, 751 (7th Cir. 2006). "First, the court must determine whether the concurrent state and federal actions are actually parallel. Then, once it is established that the suits are parallel, the court must consider a number of non-exclusive factors that might demonstrate the existence of exceptional circumstances." *Id.* (internal quotation marks and citations omitted). In making this determination, the Court keeps in mind the Supreme Court's direction that any decision to postpone the exercise of its jurisdiction is "an extraordinary and narrow exception" to its duty to adjudicate the controversies before it. *Colorado River*, 424 U.S. at 813.

Because the Court finds that the immediate action and the concurrent state court action are not actually parallel, it need not consider whether

exceptional circumstances exist which warrant a stay. "An action in federal court is parallel to a state court action 'when substantially all the same parties are contemporaneously litigating substantially the same issues' in both forums." *C & G Technologies, Inc. v. Southern Medical Imaging, LLC*, 4:09-cv-56, 2010 WL 2773212, at *3 (S.D. Ind. July 12, 2010) (quoting *Clark v. Lacy*, 376 F.3d 682, 685 (7th Cir. 2004). Further, there must be "a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Lumen Const., Inc. v. Brant Const. Co.*, 780 F.2d 691, 695 (7th Cir. 1985).

Here, the state court action is a sole cause of action for injunctive relief relating to alleged improper expenditures by Petrakis and Morgan in their capacity as stockholders, directors, and employees of Access2Go. (Doc. 62 at 16). On the other hand, the instant suit is alleging the improper interception and monitoring of electronic communications in violation of state and federal statutes. While the parties to the two suits are substantially the same, and both arise out of an apparently bad relationship between Plaintiff and Defendants, the factual and legal issues are not.[27] Further, there is no likelihood that the state court's determination of Plaintiff's state court claim would dispose of his allegations that Defendants improperly monitored his electronic communications. Because the instant lawsuit and Plaintiff's state lawsuit against Defendants are not parallel, Morgan's Motion to Stay is DENIED.

---

[27] While Morgan's motion to strike paragraphs 51-52 based upon attorney-client privilege would call upon this Court and the state court to likely rule on the same legal issue, because the Court has already found that these allegations are stricken as immaterial, this legal overlap is no longer a concern.

CONCLUSION

For the foregoing reasons, Defendants' Motion to Strike New Argument Raised in Reply or Fix a Date for Surreply is GRANTED (Doc. 67) and the June 2007 email is STRICKEN, Plaintiff's Motion for Leave to File Oversized Brief in Reply (Doc. 77) is GRANTED, and Plaintiff's Motion for Summary Judgment (Doc. 47) is DENIED.  In addition, Defendant Morgan's Motion to File Affidavit of Tim Bertschy, Along with Shefts' State Court Memorandum of Law (Doc. 66) is DENIED, Defendant Morgan's Motion to Strike (Doc. 57) is GRANTED in part and Paragraphs 51-52 and 57-62 of the First Amended Verified Complaint are STRICKEN, and Defendant Morgan's Motion to Stay (Doc. 57) is DENIED.  IT IS SO ORDERED.


Entered this 8th day of December, 2010.


                                          s/ Joe B. McDade
                              ———————————————————
                                       JOE BILLY McDADE
                              United States Senior District Judge