**E-FILED**
Tuesday, 29 November, 2011  03:09:39 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JAMISON J. SHEFTS, *an individual,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  10-cv-1104 |
| | ) | |
| JOHN PETRAKIS, *an individual,* | ) | |
| KEVIN MORGAN, *an individual,* | ) | |
| HEIDI HUFFMAN, *an individual,* and | ) | |
| ACCESS2GO, INC., *an Illinois* | ) | |
| *corporation,* | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendants' Motion for Summary Judgment.[1] (Doc. 152). The Motion is fully briefed and ready for decision. For the reasons stated below, Defendants' Motion for Summary Judgment is granted in part and denied in part.

In his Amended Complaint, Plaintiff raises four counts against Defendants, all related to their monitoring of his electronic communications. Count I alleges that Defendants violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, by intercepting Plaintiff's emails on his personal Yahoo email account, both his emails and text messages on his Blackberry device, and electronic

---

[1]   Also ready for disposition are Plaintiff's Motion for Summary Judgment against John Petrakis as to Count III (Doc. 187), Defendants' Motion for Leave to File Third-Party Complaint for Contribution (Doc. 181), Defendants' Motion for Leave to File a Reply in support of their Motion for Leave to File Third-Party Complaint for Contribution (Doc. 192), and Plaintiff's Motion to File Affidavit of John Tandeski Under Seal (Doc. 206). These have been decided in a separate Order & Opinion, also issued on this date.

communications on his computer at Access2Go. Counts II, III, and IV rely on the same conduct to charge Defendants with violation of the Illinois Eavesdropping Statute, 720 ILL. COMP. STAT. § 5/14-1 *et seq*., the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, respectively. Defendants now seek summary judgment in their favor on all four counts of the Amended Complaint.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the Court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The Court draws only reasonable inferences. *Id.*

It is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)). Once the movant has met its burden of showing the Court that there are no genuine issues of material fact, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on

which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## BACKGROUND[2]

Access2Go is a Peoria, Illinois-based telecommunications company. From January 1, 2000 to January 1, 2006, Plaintiff owned 100% of the voting stock in Access2Go and was the sole member of its Board of Directors. (Doc. 170, Ex. A ("Shefts Aff.") ¶¶ 3-6). Access2Go provides its employees with an electronic communications system of computers, servers, email accounts, and software. (Doc. 152, Ex. A ("Petrakis Aff.") at ¶¶ 1-2). Between January 1, 2000 and January 1, 2006, Access2Go granted its employees the right to communicate confidentially using the company's electronic communications system: no individual had the authority to monitor or access communications on the Access2Go system, and no one had the authority to monitor the computer usage of officers, directors, employees, or agents on the Access2Go server without express authorization from

---

[2]     These background facts are drawn from the parties' respective statements of material facts, and are undisputed unless otherwise indicated. Facts that are immaterial to the disposition of the Motion for Summary Judgment are excluded.

the individual to be monitored.[3] (Shefts Aff. at ¶ 26-27; Doc. 170, Ex. B ("Tandeski Aff.") at ¶ 8; Doc. 170, Ex. C ("Hamilton Aff.") at ¶ 6-7; Doc. 170, Ex. D ("Buttrum Aff.") at ¶ 3-4).

---

[3]      Defendants dispute this, both on the basis that Plaintiff's evidence does not show that the Board of Directors implemented this policy, and on the basis that Plaintiff has conceded that the policy only applied to prevent "employees" from accessing one another's communications. (Doc. 180 at 5-7). As for the first contention, the affidavits offered by Plaintiff are sufficient to create a genuine issue of fact as to this issue (which must be resolved in Plaintiff's favor at the summary judgment stage). As Defendants argue in their briefs, corporate law allows for Boards of Directors to take or allow action on behalf of corporations by implied authorization as well as by express action. The fact that Plaintiff did not formally vote, as the single director, to implement this policy does not prove, as a matter of law, that it was not the policy of the company.

As to the second point, Defendants claim that Plaintiff's use of the word "employee" in his interrogatories proves that he has "conceded" that Access2Go's policy protecting communications on its system did not apply to directors and shareholders. (Doc. 180 at 6-7, 9). Plaintiff maintains that the policy applied to all persons associated with Access2Go; the reasonable inference is that the word "employee" was meant to encompass all those who worked at Access2Go, including directors and shareholders. Defendants also claim that Access2Go "would not have [had] a policy regarding the authority of one shareholder/director to access, review, monitor and intercept the electronic communications of another shareholder/director," and so dispute Plaintiff's assertion that, prior to January 1, 2006, Access2Go did not authorize shareholders/directors to access one another's communications. On the contrary, it is a reasonable inference, as discussed above, that Access2Go's policy applied to all those associated with the company, especially considering Plaintiff's attestation that he, as sole shareholder and director until 2006, was also both limited and protected by the policy.

On Plaintiff's earlier Motion for Summary Judgment, the Court, viewing the inferences in Defendants' favor, read two terms of the Manual in an arguably inconsistent manner: the Court held that Plaintiff was subject to the Manual's provision that put "employees" on notice that their communications could be monitored, but that Petrakis and Morgan were "company officials" not subject to the requirement that employees receive Board approval before accessing other employees' email accounts. (Doc. 84). In their instant Motion, Defendants argue for this inconsistent interpretation: they want Plaintiff to be an "employee" for purposes of the Manual's warning that employees' communications were subject to monitoring, but also a shareholder/director/managing partner for the purpose of their argument that the Manual's restriction on employees' monitoring of other employees' communications did not apply to monitoring of shareholders'/directors'/managing partners' communications by fellow

During the time period relevant to this suit, the Access2Go system included a "BES" server, which enabled Blackberry devices, including Plaintiff's, to be connected to the Access2Go communications system. (Petrakis Aff. at ¶¶ 2). Plaintiff was not reimbursed for his Blackberry device during the dates relevant to this suit.[4] (Shefts Aff. at ¶¶18-24). Plaintiff sent and received emails relevant to this suit via the email account provided to him by Access2Go, as well as via a personal web-based Yahoo email account.[5] He used the Blackberry device to access his

shareholders/directors/managing partners. This sort of internal inconsistency must be recognized and resolved in Plaintiff's favor when disposing of Defendants' Motion for Summary Judgment. Plaintiff, Petrakis, and Morgan held comparable positions to one another, so they must all be considered "employees" under the Manual, or all shareholders/directors/managing partners, and the Manual's terms must be read consistently. It is unreasonable to assume either that Plaintiff was an "employee" under the Manual but Petrakis and Morgan were not, or that they all were "employees" under the notice provision but not under the Board-authorization requirement. It is a reasonable inference that all personnel were subject to both the notice and the restriction, and that "company officials" in the Manual was meant to refer to individuals who had been specifically authorized by the Board to access employees' communications.

[4]     Defendants assert that Plaintiff was reimbursed for the device, but Plaintiff indicates that this reimbursement occurred in June 2010, after the instant suit was filed. (Petrakis Aff. at ¶ 3; Shefts Aff. at ¶ 23). The June 2010 date is confirmed by the date found on the "Expense Report" filed by Defendants. (Petrakis Aff., Ex. 1). Viewing the facts in the light most favorable to Plaintiff, it appears that this reimbursement was made only in an effort to bolster Defendants' argument that Plaintiff's communications on the Blackberry device were not subject to privacy protections. The reimbursement is thus not relevant to the characterization of the Blackberry's use during the time period at issue. Defendants argue, though, that the Blackberry is subject to no stricter protection than the Access2Go email, because Plaintiff connected it to the Access2Go server, knowing that the server would record his communications as it did his Access2Go email. The Court need not decide this issue, though, as even assuming that the Blackberry was only entitled to the same protections as the Access2Go email account, summary judgment in Defendants' favor would be inappropriate.

[5]     Both parties gloss over the question of the Yahoo email account, lumping it together with the Access2Go email and Blackberry text messages, though the Yahoo

Access2Go email account, and to send and receive text messages. (Shefts Aff. at ¶¶ 9-16).

On January 1, 2006, Plaintiff sold shares of Access2Go to Defendants Petrakis and Morgan, as well as John Tandeski. (Petrakis Aff. at ¶ 4). Plaintiff, Petrakis, and Morgan each owned 30% of the stock, and Tandeski owned 10%. (Petrakis Aff. at ¶ 4). These men constituted the four-member Board of Directors for Access2Go, with each having one vote. (Petrakis Aff. at ¶¶ 4-5; Shefts Aff. at ¶ 8). The Board of Directors has never taken a vote that specifically authorized the monitoring of or access to employees' electronic communications by the individual Defendants, and has also never voted to disavow the monitoring undertaken by Defendants. (Petrakis Aff. at ¶¶ 6-7, 16; Shefts Aff. ¶ 34; Tandeski Aff. ¶ 7). Plaintiff and Tandeski have always opposed the monitoring of Plaintiff's communications by Defendants. (Shefts Aff. at ¶ 49; Tandeski Aff. at ¶ 6).

On June 18, 2008, the Access2Go Board of Directors met, and appointed Petrakis the "Board liaison for security and employee issues per the new employee manual." (Doc. 60, Ex. 1 at 11). On July 2, 2008, the Board of Directors ratified the Employee Manual. (Shefts Aff. at ¶ 40). As part of the "Theft and Fraudulent Activities Policy," the Employee Manual provides that "[t]he Board of Directors through John Petrakis, who will act as employee liaison to the board, is responsible

---

email was not provided by Access2Go. The only linkage was the Plaintiff seems to have used Access2Go's computers to log into his Yahoo account, but the parties have not briefed the question of whether that is sufficient to place the Yahoo account in the same category as the Access2Go account or the text messages. It seems that the Yahoo email would be subject to a higher level of protection from intrusions by Defendants than that afforded the Access2Go email account, or perhaps even Plaintiff's text messages. As the Court here denies summary judgment on other grounds, it need not address the issue further at this time.

for the establishment of an adequate system of internal control that is designed to prevent and detect errors or irregularities that may lead to fraudulent activities, and designed to safeguard company resources." (Doc. 170, Ex. 1 of Ex. B ("Employee Manual") at 21). "Fraudulent transactions," to which the section is addressed, "may include but are not limited to: misappropriation of company funds, theft of Access2Go's property, or falsification of records or reports." (Employee Manual at 20). The Manual also provides that "For the purpose of this policy, fraud shall be defined as: The intentional deception by an individual or individuals, either internal or external to Access2Go, which could result in a tangible or intangible benefit to themselves, others, or Access2Go, or could cause detriment to others or Access2Go." (Employee Manual at 20).[6]

Between 2000 and early 2006, Janice Hamilton was the office manager and administrator for Access2Go, and had the ability to access employee passwords, files, directories, data and communications on the Access2Go communications system, but did not have authorization to do so.[7] (Hamilton Aff. at ¶ 10, 13).

---

[6]     In their discussion of Petrakis' "liaison" position, Defendants cite to the Court's earlier decision on Plaintiff's Motion for Summary Judgment, in which the Court found that the Manual "did not foreclose the managing partners from" accessing an "employee's computer…without prior authorization from the Board of Directors." (Doc. 84 at 21-22). Defendants' reliance on this holding is misplaced, for two reasons: first, the Court there was denying *Plaintiff's* Motion for Summary Judgment, and thus had to view the evidence in the light most favorable to Defendants – here the situation is reversed – and second, the fact that the Manual did not "foreclose" the partners from accessing employees' computers does not show, as a matter of law, that the partners were actually *authorized* to do so.

[7]     Defendants characterize this asserted fact as "disputed," but do not cite any evidence to the contrary. The evidence they cite concerns Huffman's abilities and rights as "administrator," and does not undermine the statement of Hamilton's abilities and rights.

7

Defendant Huffman was an employee of Access2Go, who was, after January 1, 2006, able to access all aspects of Access2Go's communications system, though she did not have unlimited authorization to utilize this access.[8] (Doc. 152, Ex. B ("Huffman Aff.") at ¶¶ 1-2; Shefts Aff. at ¶ 47). Sometime after January 1, 2006, Petrakis and Huffman (with Morgan's approval[9]), reviewed emails and texts sent and received by Plaintiff on the Access2Go communication system. (Petrakis Aff. at ¶ 11). All accessing, reviewing, monitoring, and interception of Plaintiff's communications by Defendants used Access2Go's equipment. (Doc. 143 at 4). The parties have been vague about when Defendants began monitoring Plaintiff's communications, but the Court has determined that the earliest evidence of monitoring on record is from April 24, 2007: on that date, Tandeski received an email from Petrakis that contained a message Petrakis had obtained from Plaintiff's Access2Go email account.[10] (Tandeski Aff. at ¶ 4; Tandeski Aff., Ex. 2). In addition, Shawn Patton, a Systems Engineer at Integrated Computer Resources, who

---

[8]     The parties do not appear to dispute that Huffman's relevant actions were taken only at Petrakis' and/or Morgan's direction, and so when the Court refers to "Defendants'" actions, it refers to actions taken either by Petrakis or Morgan, or by Huffman acting at their direction.

[9]     Defendants do not explicitly admit that Morgan approved Petrakis and Huffman's actions, but it is essential to their argument that they were authorized to monitor and access Plaintiff's communications by virtue of Petrakis' and Morgan's combined one-half of the votes on the Board of Directors and 60% of Access2Go's shares. Without Morgan's participation, there is no argument for such authority prior to the implementation of the Employee Manual in July 2008, and the Court must therefore make the reasonable inference that Morgan knew and approved of the monitoring from the beginning.

[10]     Into his message to Tandeski, it appears that Petrakis pasted an email he had sent to Morgan, which, in turn, contained text appearing to be copied from a message between Plaintiff and a person uninvolved in this case. (Tandeski Aff. at ¶ 4; Tandeski Aff., Ex. 2).

provides computer services to Access2Go, has attested that, prior to the spring or summer of 2008, at Petrakis' direction he created a "dummy account" to receive a copy of Plaintiff's Access2Go emails; Petrakis and Huffman both had access to this "dummy account." (Doc. 170, Ex. F ("Patton Aff.") at ¶¶ 2-3, 10-11). In the spring or summer of 2008, he was instructed to set up the Access2Go server to allow Petrakis to access Access2Go employee email accounts, including Plaintiff's. (Patton Aff. at ¶¶ 11).

Sometime after July 2, 2008, Morgan reviewed emails sent and received by Plaintiff on his Access2Go email account, which were stored on a flash-memory device.[11] (Petrakis Aff.; Huffman Aff.; (Doc. 152, Ex. C ("Morgan Aff."))). This flash-memory device contained an electronic copy of the data residing on Access2Go's email server, and did not process data or have any communication capabilities.[12] (Petrakis Aff.; Huffman Aff.; Morgan Aff.).

Plaintiff did not suspect that his Access2Go email account was being monitored until late August 2008, and did not suspect that his Yahoo email or

---

[11]   Plaintiff labels this statement as "disputed," but cites as support for his dispute paragraphs of his affidavit that indicate his lack of consent to any monitoring; they do not give any reason to doubt that Morgan conducted the review Defendants describe. (Shefts Aff. ¶¶ 53-57).

[12]   Again, Plaintiff labels this statement as "disputed," but cites as support for his dispute paragraphs of his affidavit that indicate his lack of consent to any monitoring; they do not give any reason to doubt Defendants' characterization of the flash-memory device used by Morgan. (Shefts Aff. ¶¶ 53-57).

Blackberry text messages were being monitored during the relevant period.[13] (Shefts Aff. at ¶ 43)

## DISCUSSION

Defendants claim that they should be granted summary judgment against Plaintiff as to the entirety of his Amended Complaint, making four arguments in support of their Motion: (1) Defendants did not violate the ECPA because Plaintiff consented to any interception of his communications, (2) Defendants did not violate the Illinois Eavesdropping Act because Plaintiff had no expectation of privacy in his communications, (3) Defendants did not violate the SCA because they had the authority to access the servers on which Plaintiffs' communications were stored,[14]

---

[13]    Defendants assert that Plaintiff "knew" that his communications were being monitored "[s]ince January 1, 2006," and cite to emails in which he made statements supposedly indicating this knowledge. However, none of these emails prove what Defendants claim, especially when viewed in the light most favorable to Plaintiff: (1) the September 22, 2008 email exchange indicates that Plaintiff once gave Petrakis access to his account, but does not show that he expected or knew that Petrakis would take this one-time authorization to be unlimited; (2) the April 14, 2009 email appears to indicate that Morgan was "copied" on the voicemails and emails, not that Morgan was obtaining these from Plaintiffs' inboxes; and (3) the October 7, 2009 email shows either that Morgan was "copied" on the customer service-related emails or that Plaintiff gave Morgan a limited, one-time authorization to access his email to resolve the customer-service problem. (Petrakis Aff., Ex. 2; Doc. 152, Ex. C ("Morgan Aff."), Exs. 1 & 2).

The issue of whether "constructive" knowledge of the monitoring can be attributed to Plaintiff is a legal question, and is discussed further below.

[14]    Plaintiff previously moved for summary judgment on the first three counts of his Amended Complaint, which the Court denied on December 8, 2010. (Doc. 84). *Shefts v. Petrakis*, 758 F.Supp.2d 620 (C.D. Ill. 2010). Issues that would be dispositive of each of these three counts in the instant Motion for Summary Judgment were decided for the purposes of that Order & Opinion: the Court held that "Plaintiff consented to the logging of his [email and] text messages" (Doc. 84 at 14-17), and that Plaintiff did not have a reasonable expectation of privacy in his communications on Access2Go equipment because the Employee "Manual did not require the prior approval of the Board for Petrakis to monitor electronic

and (4) Defendants did not violate the federal CFAA both because they had the authority to access the servers on which Plaintiffs' communications were stored and because Plaintiff did not suffer a $5,000 loss within the terms of the statute as a result of any violation. (Doc. 152 at 2-3). Defendant Morgan also asserts additional bases for summary judgment in his favor, which are discussed further below. (Doc. 152 at 3).

## I.     Count I: Electronic Communications Privacy Act

The ECPA provides that, with certain exceptions, "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" can be held civilly liable. 18 U.S.C. § 2511(1)(a). Defendants argue that they did not violate the ECPA in intercepting Plaintiff's communications (assuming for the sake of the motion that they did "intercept" the communications within the meaning of the ECPA) because he "expressly" consented to any such interception by virtue of his use of the Access2Go electronic communication system. Plaintiff asserts that he did not consent, arguing that his use of the Access2Go electronic communication

---

communications" and because Petrakis was given any necessary approval by the Board when he was appointed to the position of "security liaison" (Doc. 84 at 20-24).

As explained above, at the summary judgment stage, all factual disputes and reasonable inferences must be viewed in the light most favorable to the non-moving party. The parties seem to realize, and the Court reiterates, that the previous rulings on these issues were made on that basis and are not directly transferrable to a ruling on the instant Motion for Summary Judgment. The previous Order only determined that, viewing the facts and inferences in Defendants' favor, Plaintiff was not entitled to summary judgment on these three counts. Now, the Court must determine whether, viewing the facts and inferences in Plaintiff's favor, Defendants are entitled to summary judgment.

system cannot be construed as consent to monitoring by either Access2Go or the individual Defendants.

## A. Implied consent when using employer's communication system

Here, Defendants rely on caselaw they argue establishes that, as a matter of law, "an employee has no reasonable expectation of privacy in [communications sent using a company's electronic communication system] and consents to the recording and review of those messages." (Doc. 152 at 9 (citing *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 09-4567 RBK KMW, 2011 WL 900096, at *10 (D. N.J. Mar. 15, 2011); *Smyth v. Pillsbury Co.*, 914 F.Supp. 97, 101 (E.D. Penn. 1996); *Commonwealth v. Proetto*, 771 A.2d 823, 829-30 (Penn. 2001))).[15] Plaintiff, on

---

[15]    Defendants also assert that, because Plaintiff's messages were sent using Access2Go's electronic communication system, they are not his property, "but are 'merely an inherent part of the office environment," so Access2Go had an unfettered right to monitor them. (Doc. 152 at 10 (quoting *McLaren v. Microsoft Corp.*, 05-97-00824-CV, 1999 WL 339015, at *4 (Tex. App. May 28, 1999); citing *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 115 (3d Cir. 2003)). Neither *McLaren* nor *Fraser* stand for the proposition that emails sent over an employer's email system are automatically excluded from protection under § 2511. In *McLaren*, an unpublished, nonprecedential opinion by the Court of Appeals of Texas, applying Texas state tort law on invasion of privacy, found that an employee did not have a "reasonable expectation of privacy" in his work email account, as the company provided the computer with which he accessed the email, and because all messages were "first transmitted over the network and were at some point accessible by a third-party." However, the court held that even if he had alleged more facts that would justify an expectation of privacy (which assumes that some set of facts *could* lead to an expectation of privacy), "a reasonable person would not consider Microsoft's interception of these communications to be a highly offensive invasion," because the employee had notified the employer that some of his emails were relevant to an investigation and because "the company's interest in preventing inappropriate and unprofessional comments, or even illegal activity, over its e-mail system would outweigh McLaren's claimed privacy interest in those communications." There is no such requirement that the invasion be "highly offensive" or any balancing test in § 2511, so the *McLaren* analysis is unhelpful to this case.

the other hand, argues that the question of consent cannot be resolved as a matter of law on the record currently before the Court. (Doc. 170 at 16-20).

The ECPA provides that "[i]t shall not be unlawful under this chapter for a person…to intercept a…electronic communication…where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(2). This consent can be either express or implied; but "[c]onsent under [this provision] is not to be cavalierly implied." *Abbott v. Village of Winthrop Harbor*, 953 F.Supp. 931, 944 (N.D. Ill. 1996) (quoting *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983) (emphasis in original)). "It would thwart this policy [of protection for individual privacy] if consent could routinely be implied from circumstances. Thus, knowledge of the *capability* of monitoring alone cannot be considered implied consent." *Id.*

Defendants argue for a *per se* rule that an employee using his employer's communication system necessarily gives his implied consent, as a matter of law, to monitoring of his communications on that system. In support of this argument, they cite to three cases: *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 09-4567 RBK KMW, 2011 WL 900096, at *10 (D. N.J. Mar. 15, 2011); *Smyth v. Pillsbury Co.*, 914 F.Supp. 97, 101 (E.D. Penn. 1996); and *Commonwealth v. Proetto*,

---

In *Fraser*, the Third Circuit, applying Title II of the ECPA (the instant count concerns Title III, Count III concerns Title II), held that a search by a company of its own email system fell within Title II's exception for "conduct authorized by the…entity providing a wire or electronic communications service." 352 F.3d at 114-15. No such exception appears in § 2511.

771 A.2d 823, 829-30 (Penn. 2001). Not only are these cases factually and legally distinguishable,[16] the *per se* rule that Defendants advocate is unsupportable.

Contrary to Defendants' argument, the caselaw in fact points out that implied consent can only be found where the party being monitored had actual notice of the monitoring, and Defendants point to no cases that are on point in

---

[16]     Defendant's argument on this point is cobbled together from a few select quotations taken out of context from these cases, and does not contain a fully fleshed-out legal analysis; these cases are not only not controlling authority for this Court, they are not persuasive authority, as they do not apply to the legal or factual scenario of this case. In *Smith*, the plaintiff complained that Microsoft, an email service provider, monitored messages sent by him to its customers, in violation of § 2511(1)(a). The Court granted summary judgment in Microsoft's favor on the basis of § 2511(2)(d), as Microsoft's customers, one of the parties to the communication, had *affirmatively* consented to "intercepting and filtering all of [their] email communications," because Microsoft had explicitly informed those customers that it would be monitoring the emails. Indeed, such monitoring was promoted as a positive feature of the email service, designed to reduce unwanted spam. The court's analysis did not turn solely on the fact that Microsoft owned the email system, as Defendants try to imply. 2011 WL 900096, *1, 10.

     *Smyth* was not even decided under § 2511, but rather posed the question of whether an employer's termination of an employee pursuant to information obtained while monitoring his email was a violation of public policy, and the court looked to the tort of "intrusion upon seclusion" as a statement of such policy. This tort requires an intrusion that is "substantial and highly offensive to a reasonable person," as opposed to § 2511, which does not require a "substantial and highly offensive" intrusion, but can be violated by any un-consented intrusion. 914 F.Supp. at 100-01. Moreover, the fundamental question in the case was whether the employee's termination for sending inappropriate emails fell into an exception that at-will employees can be terminated at any time – the court held that the employee's termination for sending inappropriate emails was not a violation of public policy, not that employers are immunized from § 2511 violations when employees are using a company communication system.

     Finally, in *Proetto*, the Pennsylvania superior court, applying the Pennsylvania Wiretap Act, held that emails automatically fell into the "prior consent" exception to the Pennsylvania Wiretap Act, as they are, by their very nature, "received in a recorded format." 771 A.2d at 829. The Court finds it untenable that no email could ever be afforded protection under § 2511, simply because the technology requires a certain amount of "recording" to take place. Defendants' argument based on the technological differences between telephones and email are discussed further below.

which a court has found that an employee's emails over the company email system are automatically excluded from protection. As noted above, "[c]onsent under title III is not to be cavalierly implied....[K]nowledge of the *capability* of monitoring alone cannot be considered implied consent." *Abbott*, 953 F.Supp. at 944 (quoting *Watkins*, 704 F.2d at 581 (emphasis in original)). *See also Deal v. Spears*, 980 F.2d 1153, 1157 (8th Cir. 1992) (same). The implied consent exception hinges on whether the plaintiff had actual notice of the fact that his communications would be monitored.

The mere fact that a plaintiff used an employer-provided communication system, without actual notice of monitoring, is not sufficient to imply consent as a matter of law under the ECPA. In *Deal*, for instance, the employer installed an extension of its phone line into the plaintiff employee's home and told her that it might monitor her calls on that line; the employer then argued that her subsequent use of its phone line and knowledge that it might monitor her calls constituted consent under the ECPA. 980 F.2d at 1156-57. The Eighth Circuit rejected this argument, noting various reasons the employee did not have actual notice: the employer did not tell the employee that it was *actually* monitoring the phone, the employer anticipated the employee's unawareness of the monitoring, and though she knew that the employer sometimes picked up the extension to listen (as opposed to using the recording device attached to the phone line), she knew when that was happening because she could hear the "click" of the other extension being picked up. *Id*. at 1157. In *Williams v. Poulos*, the First Circuit held that, although the plaintiff CEO had been informed by the employer that it would be monitoring all employee phone calls, he had not impliedly consented because the employer had not informed

him of the manner it would monitor calls and had not specifically informed him that it was monitoring *his* calls. 11 F.3d 271, 281-82 (1st Cir. 1993).

*Deal* and *Williams* both show that use of an employer-owned communication system, even if the employee knows that the employer *could* or *might* monitor communications, does not constitute consent, as a matter of law, to monitoring in all cases. Moreover, in *City of Ontario, Cal. v. Quon*, as Defendants themselves point out, the Supreme Court *left open* exactly the question Defendants now ask the Court to answer in the negative, as a matter of law: "whether an employee has a reasonable expectation of privacy in communications sent using an employer-provided electronic communication system."[17] (Doc. 180 at 24 (citing 130 S.Ct. 2619, 2629-30 (2010))). The Supreme Court noted that the employer's policies would be important to determining whether employees' expectations of privacy were reasonable, but did not find that an employee using an employer's communication

---

[17]     The application of *Quon* and other "reasonable expectation of privacy" cases to § 2511 ignores the doubts expressed by two district courts in Illinois that the Fourth Amendment's standard is directly transferrable to § 2511 cases, and opining that § 2511 appears to be more protective than the Fourth Amendment. *Matter of John Doe Trader No. One*, 722 F.Supp. 419, 428 (N.D. Ill. 1989) ("We are not so sure that the consent clause of § 2511(2)(c) is simply a codification of the 'reasonable expectation of privacy' test of *United States v. White*, as the *Grandbouche* court thought. If it is more than that, and a conscious consent is required, the record before us is inadequate to establish that Doe consciously consented to the agent's listening to his conversations with third persons."); *Jandak v. Village of Brookfield*, 520 F.Supp. 815, 820 n. 5 (C.D. Ill. 1981) ("a 'reasonable expectation of privacy' is not required to bring an action for interception of wire communications" under § 2511). This Court agrees that the protections afforded by privacy statutes are not necessarily limited to the minimums guaranteed by the Fourth Amendment, but, even assuming that the Fourth Amendment standard is applicable in § 2511 cases, Defendants have failed to establish that the *per se* rule they advocate is appropriate.

system necessarily has no reasonable expectation of privacy, such that he has impliedly consented to monitoring.

## B.   Distinction between telephones and email

Defendants also argue that the distinction between the technologies underlying telephones and email is legally significant, such that email can never be protected under § 2511, at least when it is sent using an employer's communication system, because, unlike phone calls, emails are "inherently" recorded when they are stored on the email provider's servers, so senders and receivers of email have no reasonable expectation of privacy against monitoring by the provider of the email system.[18] (Doc. 180 at 24-25). Defendants rely on this argument in their attempt to distinguish *Williams*, and presumably would use it against *Deal*, as well. If the Supreme Court was wary in *Quon* of "risk[ing] error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear," neither will this Court reach out to create such a rule. Indeed, the Sixth Circuit has recently expressed the view that "[g]iven the fundamental

---

[18]   Though Defendants do not make it clear, it appears that this argument would also apply to the monitoring of Plaintiffs' text messages as well, as text messages are also transmitted and stored by a third party, the telephone service provider.

The argument, though, "proves too much," as the rationale would justify *any* surveillance of email – all email, whether on an employer's system or a personal email service (*i.e.*, Gmail or Yahoo), passes through a third party's hands and is stored on the servers of the service provider. Under Defendants' characterization of *Proetto*, *Smith*, and *McLaren*, email users always "consent" to the recording of their messages and thus cannot expect any privacy protections whatsoever. This interpretation cannot be resolved with the purpose of the ECPA, as amended in 1986, specifically to protect email. *See United States v. Hux*, 940 F.2d 314, 316 (8th Cir. 1991) (overruled on other grounds by *United States v. Davis*, 978 F.2d 415 (8th Cir. 1992)) ("The legislative history [of the ECPA] lists many of the new telecommunications and computer technologies covered by the amendments including electronic mail….")

similarities between email and traditional forms of communication, it would defy common sense to afford emails lesser Fourth Amendment protection" than that given to telephone calls or tangible mail. *United States v. Warshak*, 631 F.3d 266, 285-86 (6th Cir. 2010) (citing *Quon*, 130 S.Ct. at 2631; *United States v. Forrester*, 512 F.3d 500, 511 (9th Cir.2008); Patricia L. Bellia & Susan Freiwald, *Fourth Amendment Protection for Stored E–Mail*, 2008 U. CHI. LEGAL F. 121, 135 (2008)). Even more importantly, in *United States v. Szymuszkiewicz*, the Seventh Circuit interpreted § 2511 to apply to email, and did not indicate any belief that the inherently "recorded" nature of email constituted consent to interception. 622 F.3d 701 (7th Cir. 2010). The court in fact discussed, and rejected, the defendant's argument that his email interceptions did not fall within the ECPA because "the 'device' used to intercept a communication must differ from the device the intended audience uses to receive the message," which is similar to Defendants' attempt to distinguish *Williams* on the basis that a telephone wiretap uses an extrinsic technology, while email interception merely uses the technology inherent in email. *Id.* at 707 ("we don't see any need to search for a device that is different from, or not integral to, the legitimate communication").

## C.    Implied consent because of Access2Go's policies

The next issue is whether the policies of Access2Go provided sufficient notice to Plaintiff to imply his consent to monitoring as a matter of law. Again, the answer must be no. Defendants assert that such notice can be found in the authority that they claim they had to monitor Plaintiff's communications. Plaintiff, on the other hand, argues that he had no such notice, and that Defendants did not in fact have

the authority they claim, either by unwritten or written policy. Defendants attempt to focus the Court's attention on their supposed authority to undertake monitoring, but the real question under § 2511 is whether Plaintiff had notice of monitoring sufficient to constitute implied consent.[19] The Court agrees that, at least for purposes of the instant Motion for Summary Judgment, Defendants' claimed authority to monitor Plaintiff's communications did not constitute notice sufficient to imply consent to monitoring.

As for the period before the Employee Manual was implemented, between 2000 and July 2008, Plaintiff argues that Access2Go's unwritten privacy policies provided employees with protection against the monitoring of their electronic communications. Defendants counter that there was no such unwritten privacy policy,[20] and that they had the authority to monitor Plaintiff's communications on behalf of Access2Go. As noted above, Plaintiff has put on sufficient evidence of Access2Go's policy during that period for the Court to find, for the purposes of summary judgment, that the company had a policy protecting all its personnel's communications from monitoring absent express consent from the subject of the monitoring. The question is whether Plaintiff's consent to monitoring can be implied from Access2Go's policies – as the cases show, consent can only be implied where there is actual notice that communications would be monitored. Where Access2Go

---

[19]    "Authority" will become much more pertinent when discussing Count III, below.

[20]    Insofar as Defendants claim the absence of a policy as implying consent to monitoring, the argument does not hold up in light of the caselaw requiring actual notice, not merely the absence of contrary notice, in order to imply consent.

had the sort of policy Plaintiff alleges, the Court cannot find that there was actual notice of monitoring sufficient to imply consent.

The Court also finds that it cannot imply consent by Plaintiff to have his communications monitored by Access2Go after June 18, 2008 by virtue of the Employee Manual's provisions. First, the Employee Manual itself does not provide actual notice that is sufficient to imply consent to monitoring. Pertinent provisions of the Manual state that Access2Go "reserves the right to monitor electronic mail messages (including personal/private/instant messaging systems) and their content," that "[e]mployees must be aware that the electronic mail messages sent and received using Company equipment are not private and are subject to viewing, downloading, inspection, release, and archiving by Company officials at all times," and that "electronic mail is subject at all times to monitoring." (Doc. 170, Ex. 1 of Ex. B at 22). However, these generic statements are no more notice than that given to the plaintiffs in *Deal* and *Williams*; the Court thus cannot say, as a matter of law, that they constituted sufficient actual notice that Plaintiff's communications were to be monitored such that his consent under § 2511 can be implied.

Not only does the Manual not constitute actual notice sufficient to imply consent, for purposes of summary judgment, for Access2Go to monitor Plaintiff's communications as required by *Deal* and *Williams*, but it provides, as argued by Plaintiff, a basis for believing that he would have explicit notice prior to any monitoring. The Manual provides that "[n]o employee may access another employee's computer, computer files, or electronic mail messages without prior authorization from the Board of Directors." (Doc. 170, Ex. 1 of Ex. B at 22).

Defendants argue that this restriction did not apply to them because they were not "employees" under the terms of the Manual, but, viewing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find that the restriction did apply to them, or that, at least, Plaintiff reasonably believed that it did apply and that his communications would thus not be monitored without him having (as an officer and employee of Access2Go) prior explicit notice such that he could not have consented in fact.[21] The existence of this restriction contributes to the Court's finding of a genuine issue of material fact as to whether Plaintiff knowingly consented to the monitoring of his messages, even after the implementation of the Employee Manual.

Genuine issues of material fact thus preclude this Court from finding, as a matter of law, that Plaintiff consented to the monitoring of his electronic communications by Defendants, and so the Court must deny Defendants' Motion for Summary Judgment as to Count I.

## II.    Count II: Illinois Eavesdropping Statute

The Illinois Eavesdropping Statute, 720 ILL COMP. STAT. § 5/14-1 *et. seq.* provides that "[a] person commits eavesdropping when he [k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or part of any conversation or intercepts, retains, or transcribes electronic communication…" 720 ILL. COMP. STAT. § 5/14-2(a)(1). Under the terms of the

---

[21]    It is true that three Board members could have approved, even without Plaintiff's assent, to allow monitoring, but they could not have held a meeting to do so without Plaintiff having had notice of such an action under the Bylaws. (Bylaws at 4). They also did not take "informal action" without his participation, as such action would require his signature on a written consent. (Bylaws at 5).

Illinois Eavesdropping Statute, in order for a communication to constitute a protected "electronic communication," both the sending and receiving parties must intend it to be private under circumstances justifying such expectation.[22] § 5/14-1(e); *People v. Beardsley*, 503 N.E.2d 346, 350 (Ill. 1986), *People v. Gariano*, 852 N.E.2d 344, 348-49 (Ill. App. Ct. 2006).

The Illinois courts apply a "reasonable expectation of privacy" analysis to determine whether the circumstances of a communication justify parties' expectations of privacy. *Hurst v. Board of Fire and Police Com'n*, 952 N.E.2d 1246, 1251 (Ill. App. Ct. 2011). In *Hurst*, the plaintiff employee used employer-owned computers to view pornography, and claimed that his employer violated the Illinois Eavesdropping Statute by monitoring his viewing. The Illinois Appellate Court looked to the terms of the employer's policy manual, which provided that the computers were to be used for work purposes only and that employees were not to use them "in any manner that would tend to discredit" the employer, and informed employees that "messages sent on the [computers] were 'retrievable.'" *Id*. As the employee knew of the terms of the manual, the circumstances of his computer use

---

[22]     Further, an individual can "impliedly consent" to the monitoring of his communications for purposes of the Eavesdropping Statute. *People v. Ceja*, 789 N.E.2d 1228, 1239 (Ill. 2003). "The circumstances relevant to an implication of consent will vary from case to case, but will ordinarily include language or acts that tend to prove that a party knows of, or assents to, encroachments on the routine expectation that [communications] are private." *Id*. at 1241. As applied to the instant case, the question of whether the circumstances justify an expectation of privacy appears to be more relevant than the closely-related question of whether consent can be implied from the circumstances.

did not justify an expectation of privacy and no violation of the Illinois Eavesdropping Statute occurred.[23] *Id*.

Under *Hurst*, it therefore appears that the content of the employer's policies is a key consideration in determining whether communications over an employer-provided communication system are protected under the Illinois Eavesdropping Statute. The *Hurst* court does not appear to go so far as the *Deal* or *Williams* courts in requiring actual notice of monitoring to the employee; the Illinois Eavesdropping Statute thus seems to be somewhat less protective of such communications than is § 2511. If a company has a policy that notifies employees that their communications could be monitored, the employees' communications are not protected. For the period from 2000 to June 18, 2008, as discussed above, there is a genuine issue of fact as to the content of Access2Go's policies regarding the privacy of employees' electronic messages, and so the Court cannot, under *Hurst*, hold that the circumstances of Plaintiff's electronic communications during that period did not justify a reasonable expectation of privacy as a matter of law. Construing the facts in the light most favorable to Plaintiff, the Court finds that not only did Access2Go's policy not warn employees that their communications could be monitored, it actually provided a measure of protection for their communications.

The question is more difficult for the period following the implementation of the Employee Manual in July 2008, since the manual does provide the same kind of

---

[23] The Court notes that the Illinois Appellate Court in *Hurst* did not apply any version of a rule that communications on an employer-owned system were necessarily excluded from privacy protection. Defendant argues for this *per se* rule in its argument under the Illinois Eavesdropping Statute as well as under § 2511, but it appears to be equally inapplicable to the state statute.

notice to employees as did the policy manual in *Hurst*: it provides that Access2Go "reserves the right to monitor electronic mail messages (including personal/private/instant messaging systems) and their content," that "[e]mployees must be aware that the electronic mail messages sent and received using Company equipment are not private and are subject to viewing, downloading, inspection, release, and archiving by Company officials at all times," and that "electronic mail is subject at all times to monitoring." (Doc. 170, Ex. 1 of Ex. B at 22). The sticking point is that it also limits the circumstances under which "employees" can access other employees' communications – such access requires "prior authorization from the Board of Directors." (Doc. 170, Ex. 1 of Ex. B at 22). As discussed above, viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff reasonably believed, and a jury could reasonably find, that this restriction applied to any monitoring of his communications and therefore reasonably expected that his communications were private so long as the Board did not act to allow anyone to monitor them, which action he would have had notice of under the Access2Go Bylaws. (Doc. 170, Ex. 1 of Ex. A ("Bylaws") at 4-5). Defendants' Motion for Summary Judgment must be denied as to Count II.

## III.   Count III: Stored Communications Act

The SCA, also referred to as Title II of the ECPA, creates a cause of action when any person "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains…access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C.

§ 2701(a). Authorization to access a "facility" can be given by the entity providing the electronic communications service, which includes a private employer that provides email service to its employees – Access2Go itself thus had the right to authorize access to Plaintiff's Access2Go email account. 18 U.S.C. § 2701(c)(1); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 115 (3d Cir. 2003); *Devine v. Kapasi*, 729 F.Supp.2d 1024, 1028 (N.D. Ill. 2010) (relying on *Fraser* to hold that § 2701 applies to private employers, even when they do not provide electronic communications service to the public). The question under § 2701 is thus whether Access2Go authorized the individual Defendants to access Plaintiff's communications on its behalf.[24]

Defendants Petrakis and Morgan first claim inherent authority to individually determine who was authorized to access the Access2Go email system, but this argument must be defeated on summary judgment by Plaintiff's evidence that Access2Go's initial policy was that no one, including officers, directors, or shareholders, had the right to access individuals' communications via the Access2Go system. Under this policy as shown by Plaintiff, which was not affirmatively altered by the Board until the Employee Manual was implemented, none of the individual Defendants could have had the inherent authority they claim.

---

[24]  The SCA also has makes an exception for access that is authorized by the user, but the parties cite no cases specifically arising under the SCA; they instead repeat the arguments they made regarding consent and "reasonable expectation of privacy" under the ECPA. The Court therefore adopts, for purposes of the instant Motion for Summary Judgment, its foregoing consent analysis under the ECPA to find that Plaintiff did not consent to Defendants' accessing his electronic communications.

Defendants hang much of their argument on Defendant Huffman's, and later Defendants Petrakis' and Morgan's, technological capability to access the entirety of Access2Go's communication system. (Doc. 152 at 15). However, it is patently obvious that merely being "capable" of accessing the communications does not necessarily carry with it the authority to access them; as she attests, Janice Hamilton had the ability to access the communication system between 2000 and 2006, but not the authority. Moreover, the Employee Manual's provision that employees were not to access one another's computer, computer files, or email messages without Board approval necessarily implies that employees might be *able* to access these things without being *allowed* to do so. It might be one inference on these facts that the Board did give such authorization to Huffman when it gave her the capability, but it is not the only reasonable inference. Defendants themselves note that Huffman, who apparently had access to the entirety of the communications system, could only exercise this access "at the direction of her superiors." (Doc. 152 at 15). It is thus not the case that the *ability* to access the communications necessarily carries with it the *authority* to access them. *See Penrose Computer Marketgroup, Inc. v. Camin*, 682 F.Supp.2d 202, 210 (N.D.N.Y. 2010) (citing *Educational Testing Service v. Stanley H. Kaplan, Educational Center, Ltd.*, 965 F.Supp. 731, 740 (D. Md. 1997)) ("Accepting, arguendo, that Defendant had full access to the Plaintiff's computer system, this does not support the conclusion that Defendant had authorization to access another employee's email account."). Defendants still must show that they had the authority from Access2Go to access the communications.

Defendants argue that the law of corporations permitted them to conduct the monitoring of Plaintiff that they undertook. They rely on the fact that Defendants Petrakis and Morgan controlled two of the four votes on the Board of Directors, and argue that they could therefore direct the policies and management of Access2Go. However, the Board never took a vote on the issue of monitoring or approved it in writing as provided by the Bylaws.[25] (Bylaws at 4-5). Without such action, it does not matter what two members of the Board, even if they constituted half of the votes, decided between themselves to do.[26]

Defendants also argue that they had such authority from Access2Go because the Board of Directors did not disavow their actions. They argue that Access2Go

---

[25]    Defendants Petrakis and Morgan also point to the fact that, after January 1, 2006, they together owned a majority of Access2Go stock. However, the law of corporations and the Access2Go Bylaws are clear that it is the Board that acts for a corporation, not the owners of a majority of the shares. (Bylaws at 3). In addition, there is no evidence that this issue was ever voted on at a shareholders' meeting or approved in writing as provided by the Access2Go Bylaws. (Bylaws at 1-3).

[26]    Another of Defendants' arguments on this point is that Plaintiff voluntarily relinquished his portion of control of Access2Go in March 2006, such that Petrakis and Morgan were able to independently control the company, but Plaintiff's Surreply points to the existence of a genuine issue of fact on this question such that the Court need not discuss the applicable law in depth. (Doc. 198). He argues that the evidence on which Defendants rely for this argument (testimony from his deposition in a suit by Tandeski against Morgan and Petrakis, to which Plaintiff is not a party) is inadmissible, but also points out that, even if it were admitted, it does not indicate that he voluntarily relinquished control of the company at that time; the Court agrees that, even if the deposition is admissible, in context, the testimony does not prove the "voluntary relinquishment" Defendants claim. Moreover, Plaintiff's affidavit clarifies this point (and would be admissible because it does not contradict the previous deposition testimony). (Doc. 198, Ex. A at 65-66; Doc. 198, Ex. B at ¶¶ 6 & 8). Even assuming that "voluntary relinquishment" of Plaintiff's position would somehow authorize Defendants to independently control Access2Go, there is a genuine issue of material fact as to whether Plaintiff voluntarily relinquished control, and the Court therefore cannot base a grant of summary judgment on that argument.

never "disavowed the actions taken by Petrakis or Morgan with respect to Shefts'
electronic communications," and that their authority to act was thus implied. (Doc.
180 at 23 (citing *Joy v. Ditto, Inc.*, 356 Ill. 348, 357-58 (Ill. 1934); *McCormick v.
Unity Co.*, 142 Ill.App. 159, 172 (Ill. App. Ct. 1908)). It is true that where a Board of
Directors allows individuals "to control and conduct the affairs of the company,
without protest or objection, the law presumes that all of them knew of and
acquiesced in what was done, and treats such acquiescence as equivalent to formal
authority." *McCormick*, 142 Ill.App. at 172 (citing *Martin v. Webb*, 110 U. S. 7
(1884); *Smith v. Smith*, 62 Ill. 493, 496 (1872); 1 MORAWETZ ON PRIVATE
CORPORATIONS § 538; TAYLOR ON PRIVATE CORPORATIONS (3rd Ed.) § 237; 4
THOMPSON ON CORPORATIONS 4883).

However, the Board must have actual or constructive knowledge of the
individuals' actions in order for them to be attributable to the corporation. 2
FLETCHER CYC. CORP. § 454. *See also* 13 ILL. LAW AND PRAC. CORPORATIONS § 245
("corporation must have knowledge or notice of the facts before it can be said to
ratify a previously unauthorized transaction"); 13 ILL. LAW AND PRAC.
CORPORATIONS § 247 ("the mere silence of the corporation or its failure to repudiate
an unauthorized transaction will not amount to a ratification thereof where the
corporation had not, and was not chargeable with, knowledge of the facts"). Here, it
is debatable whether "the Board" had such knowledge, as Defendants fail to put on
evidence that more Board members than Petrakis and Morgan knew about their
monitoring activities. The Court finds it difficult to attribute constructive
knowledge to "the Board," as an entity, where the actions taken were *against* one of

the Board members by two other members, without the actual approval of the fourth member, Tandeski. This is especially true were the only evidence that Tandeski had any notice of the monitoring is an April 24, 2007 email from Petrakis containing text apparently lifted from one of the Plaintiff's personal emails. (Tandeski Aff. at ¶ 4; Tandeski Aff., Ex. 2). It is questionable whether Tandeski even "knew" from the email that Defendants were monitoring Plaintiff's communications, as it is not obvious from the email how Petrakis obtained that text. This is insufficient to attribute constructive knowledge to the Board on Defendants' Motion for Summary Judgment: all that has been shown is that Petrakis and Morgan knew of the monitoring, and they did not have the power, without a third Board member's knowledge or acquiescence, to take action on the company's behalf. There are thus genuine issues of material fact that preclude a finding that the Board acquiesced to or ratified Defendants' actions.[27]

As of July 2008, Defendants assert an additional basis for their supposed authority to monitor Plaintiff's communications: the Board's adoption of the Employee Manual changing Access2Go's policies regarding monitoring of employee communications and the appointment of Petrakis as "employee liaison," which they argue carried with it authorization from the Board for Petrakis to monitor Plaintiff's communications on behalf of the company. For purposes of Defendants' Motion for Summary Judgment, the Manual does not by itself authorize Defendants to monitor employees' or others' communications; it in fact places limits on their

---

[27]   As explained in the Order & Opinion on Plaintiff's second Motion for Summary judgment, there is also a genuine issue of material fact as to whether the Board "ratified" Defendants' actions by suspending Plaintiff on September 9, 2008.

right to do so.[28] The Manual explicitly provides that "[n]o employee may access another employee's computer, computer files, or electronic mail messages without prior authorization from the Board of Directors." (Employee Manual at 22).

Viewing the evidence in the light most favorable to Plaintiff, the Court also finds that Petrakis' "liaison" position did not grant him the authority to monitor Plaintiff's communications. Petrakis' appointment by the Board to this position was described by the language "per the new employee manual," which demonstrates that his powers were limited to those described in the Manual. (Doc. 60, Ex. 1 at 11). The Manual, in turn, addresses the position to the "establish[ing] an adequate system of internal control that is designed to prevent and detect errors or irregularities that may lead to fraudulent activities, and designed to safeguard company resources." (Employee Manual at 21). Defendants appear to hang their argument on the "safeguard[ing] company resources" goal, claiming that this entitled Petrakis to monitor Plaintiff's communications in order to address his suspicions that Plaintiff was sexually harassing employees, as illegal harassment

---

[28]     In their discussion of Petrakis' "liaison" position, Defendants cite to the Court's earlier decision on Plaintiff's Motion for Summary Judgment, in which the Court found that the Manual "did not foreclose the managing partners from" accessing an "employee's computer…without prior authorization from the Board of Directors." (Doc. 84 at 21-22). Defendants' reliance on this holding is misplaced, for two reasons: first, the Court there was denying *Plaintiff's* Motion for Summary Judgment, and thus had to view the evidence in the light most favorable to Defendants – here the situation is reversed – and second, the fact that the Manual did not "foreclose" the partners from accessing employees' computers does not show, as a matter of law, that the partners were affirmatively *authorized* to do so. Likewise, the Court's earlier finding that the "liaison" position constituted authorization for Petrakis to access Plaintiff's communications was made drawing the inferences in Defendants' favor, and thus cannot be relied on for the instant determination, in which the procedural posture is reversed.

could potentially expose Access2Go to legal liability that would consume Access2Go's resources.

The Court, however, does not find that this chain of reasoning is sufficient to imply a grant of authority to Petrakis to monitor Plaintiff's communications when the provision is viewed in context. The position is described under the "Theft and Fraudulent Activities Policy" section of the Manual. "Fraudulent transactions" "may include but are not limited to: misappropriation of company funds, theft of Access2Go's property, or falsification of records or reports." (Employee Manual at 20). The Manual also provides that "[f]or the purpose of this policy, fraud shall be defined as: The intentional *deception* by an individual or individuals, either internal or external to Access2Go, which could result in a tangible or intangible benefit to themselves, others, or Access2Go, or could cause detriment to others or Access2Go." (Employee Manual at 20) (emphasis added). These definitions of the harms to which the section is addressed do not include anything related to the investigation of potential sexual harassment or similar liability; they concern, instead, typical definitions of fraud: misappropriation, theft, falsification, and deception. It would have been easy and logical to include a provision allowing Petrakis to take any necessary actions to investigate potential violations of federal and state discrimination and harassment law, but the Manual does not include that language. For the purposes of Defendants' Motion for Summary Judgment, the Court finds that the Manual thus does not provide Petrakis with authorization to monitor Plaintiff's communication, since he was not doing so to prevent or investigate

misappropriation, theft, falsification, or deception. Summary judgment for Defendants on Count III must be denied.

## IV.   Count IV: Computer Fraud and Abuse Act

In order for Plaintiff to recover in a civil action under the Computer Fraud and Abuse Act, he must show that a violation of the CFAA caused "loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value."[29] 18 U.S.C. § 1030 (c)(4)(a)(1) & (g). The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Plaintiff claims that he can meet this requirement, because he incurred costs in excess of $53,500 as part of a "damage assessment." (Doc. 170 at 36). These costs were incurred "[i]n order to determine the extent of Defendants' monitoring of his electronic communications." (Doc. 170 at 36). Specifically, Plaintiff hired James Feehan to conduct analyses of certain computers and hard drives, and hired Kroll Ontrack, Inc., to reconstruct the "Old Hard Drive" because it was "used by Petrakis and contained information relevant to Shefts' investigation of Defendants' violations." (Doc. 170 at 36).

---

[29]    "[T]he modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals; physical injury to any person; a threat to public health or safety; [or] damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security" can also support a claim under the CFAA, but none of these are alleged by Plaintiff in this case. 18 U.S.C. § 1030 (c)(4)(a)(1) & (g)

These are not the type of losses contemplated by the CFAA, as interpreted by other District Courts of this Circuit.[30] In *Von Holdt v. A-1 Tool Corp.*, the Northern District of Illinois held that expenditures "to conduct a forensic computer examination-i.e. 'damage assessment' under the CFAA-to determine the scope of [the defendant's] unauthorized intrusion into its computer system and whether that intrusion resulted in the impairment or harm to any of Plaintiffs' files or data" were not of the type required to sustain an action under the CFAA. 714 F.Supp.2d 863, 875 (N.D. Ill. 2010) (quoting *Mintel v. Neergheen*, 08 C 3939, 2010 WL 145786, *10 (N.D. Ill. Jan. 12, 2010)). *Von Holdt* and *Mintel* hold that the expenses for an investigation are only recoverable where that investigation "follow[s] a violation that *caused impairment or unavailability of data or interruption of service.*" *Id.* (quoting *Mintel*, 2010 WL 145786, *10) (emphasis by *Von Holdt* court). "[C]osts that are not related to computer impairment or computer damages are not cognizable 'losses' under the CFAA." *Mintel*, 2010 WL 145786, *10 (citing *Cassetica Software, Inc. v. Computer Sciences Corp.*, 09 C 0003, 2009 WL 1703015, at *4 (N.D. Ill. June 18, 2009); *SKF USA, Inc. v. Bjerkness*, 636 F.Supp.2d 696, 721 (N.D. Ill. 2009); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Intern. Inc.*, 616 F.Supp.2d 805, 811-12 (N.D. Ill. 2009)).

As Plaintiff does not cite any computer impairment or damage, he cannot recover for the expenses he incurred in investigating the extent of Defendants'

---

[30]     The Court notes that these decisions are those of our fellow District Courts, and so are not controlling. However, Plaintiff does not cite any contrary cases, nor provide any argument or analysis to undermine Defendants' argument on this point. The Court will therefore follow its fellow District Courts' reasonable interpretation of the CFAA.

monitoring of his communications. The Court agrees with Defendants that Plaintiff did not suffer the $5,000 loss necessary to sustain a claim under the CFAA, and so summary judgment in Defendants' favor must be granted on Count IV.

## V.   Defendant Morgan's additional arguments for summary judgment in his favor

Defendant Morgan also asserts that he is entitled to summary judgment as to each of the counts of Plaintiff's Amended Complaint. His arguments are all based in the fact that his review of Plaintiff's communications utilized a flash-memory device, and took place after the implementation of the Manual. Plaintiff responds that Morgan acted with Petrakis to direct the monitoring of his communications, and cannot avoid liability simply because he did not personally undertake the initial steps of monitoring.[31] As the Court has already determined that Plaintiff's alleged losses are not sufficient to support his CFAA claim, Morgan's arguments as to the CFAA need not be discussed; Morgan is granted summary judgment on that claim along with the other Defendants.

---

[31]    Plaintiff also asserts that Morgan was reviewing his email communications prior to 2008, citing a June 30, 2007 email from Morgan to Petrakis in support. (Doc. 170 at 29 (citing Shefts Aff., Ex. 2). Setting aside the fact that this email is included as an exhibit to his affidavit, but that the affidavit does not mention the email so as to authenticate it, the email does not show that Morgan himself was reviewing Plaintiff's emails within the purview of the relevant statutes at that time. The June 30, 2007 email is a response from Morgan to Petrakis in reply to *Petrakis'* forwarding of an email exchange between Plaintiff and Tandeski. Petrakis sent a copy of Plaintiff's email conversation to Morgan; this exhibit does not show that *Morgan* asked him to do so or was otherwise involved with the allegedly unlawful monitoring. It would be incredible for a person to be held liable as a wiretapper or eavesdropper for simply receiving, without more affirmative involvement, an email that someone else unlawfully obtained and forwarded to them. Even if, as is discussed further below, Morgan was affirmatively involved in Petrakis' and Huffman's monitoring, this exhibit does not help to show any liability on his part.

Morgan's first argument is that he did not violate the ECPA because his review of Plaintiff's communications used a flash-memory device, so he did not "intercept" Plaintiff's communications within the terms of the ECPA. (Doc. 152 at 10-11). Under the cases cited by Defendants, a party does not "intercept" a communication if he only views it after it has been transmitted and is stored. *United States v. Szymuszkiewicz*, 622 F.3d 701, 705-06 (7th Cir. 2010); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113-14 (3rd Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877-79 (9th Cir. 2002). According to the undisputed facts outlined above, Morgan's only review of Plaintiff's communications took place after they were loaded onto a flash-memory device.

Plaintiff does not dispute Defendants' argument that Morgan did not actually "intercept" his communications, but argues that Morgan "intentionally…procure[d] [Petrakis and Huffman] to intercept" his communications, and is thus liable under § 2511(1)(a). (Doc. 170 at 28). As Plaintiff points out, "the entire premise of [Defendants'] defense is that Petrakis and Morgan, acting together, could monitor Shefts' communications." (Doc. 170 at 28). Neither party cites any specific evidence that Morgan ordered Petrakis and Huffman to begin monitoring Plaintiff's communications, but the thrust of Defendants' arguments for summary judgment is that Morgan and Petrakis together controlled half of the votes on the Board of Directors and 60% of Access2Go stock, and that this control legitimized the monitoring of which Plaintiff complains – they thus necessarily concede that Morgan knew and approved of the monitoring from its beginning. Given this

concession, the Court cannot conclude that Morgan did not "intentionally…procure [Petrakis and Huffman] to intercept" his communications under § 2511(1)(a).

As for Count II, Morgan argues that he is not liable under the Illinois Eavesdropping Statute because he did not review Plaintiff's communications until after the Employee Manual destroyed any expectation of privacy Plaintiff had. (Doc. 152 at 13. As discussed above, the Employee Manual did not defeat Plaintiff's expectation of privacy in his communications; indeed, it arguably enhanced his expectation of privacy. Thus, Morgan cannot escape liability under the Illinois Eavesdropping Statute merely because his review of Plaintiff's communications took place after the Manual was adopted.

Under the SCA, Morgan makes two arguments in an attempt to escape liability. The first is that Petrakis directed him to review Plaintiff's communications, which gave him authorization to do so. (Doc. 152 at 16-17). As discussed above, Petrakis was not authorized by Access2Go to monitor Plaintiff's communications, so he could not independently grant such authority to Morgan.

The second argument is that Morgan only reviewed Plaintiff's emails while they were in "post-transmission storage," which he claims is outside the scope of the SCA. (Doc. 152 at 17). The SCA protects communications in "electronic storage," which includes "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(B).[32] Here, the messages were loaded by Petrakis onto the flash drive from

---

[32]     As explained more fully in this Court's Order & Opinion denying Plaintiff's second Motion for Summary Judgment, when communications are stored on an

the Access2Go server, in order to allow Morgan to view them. The cited cases do not appear to directly answer the question of whether messages moved by someone other than the recipient onto a flash drive directly from the communication provider's server, for the purpose of facilitating unauthorized access, are covered by the SCA. The Court doubts, though, that the flash drive itself constituted "any storage of such communication *by an electronic communication service,*" as required by the statute, but was rather storage by whoever downloaded the data onto it. Therefore, the Court must find that the flash drive did not constitute "storage of such communication *by* an electronic communication service," and thus was not itself protected by the SCA. If the extent of Morgan's involvement with the monitoring was reading the contents of the flash drive, the Court doubts that he could be held liable.[33]

However, Plaintiff argues that, under Defendants' theory of the case, they have implicitly admitted that Morgan worked in concert with Petrakis to cause the access of Plaintiff's communications, and that Morgan is thus liable through an agency or conspiracy theory. *See* 16 AM. JUR. 2D CONSPIRACY § 51; 3 AM. JUR. 2D

---

email provider's server they are protected from unauthorized access under the SCA, whether they are intermediate or post-transmission.

[33]     The Court notes, however, that if Morgan himself downloaded the data from the server (where it was in "backup storage") to the flash drive, he would have "accessed" the protected communications in "backup storage." The fact that he did not *read* them until they had been loaded onto the flash drive would be immaterial – if that were all that were required to avoid SCA liability, the statute would be a nullity, as all "hackers" would merely download the information they seek prior to reading or using it. Moreover, as explained in the Court's Order & Opinion on Plaintiff's second Motion for Summary Judgment, merely "entering" the server, even without reading or copying any communications, can constitute "access" under the SCA. However, no evidence has been presented that it was Morgan who accessed the backup storage on the Access2Go server.

AGENCY § 264. One of Defendants' arguments under the SCA, that Petrakis had the authority to access Plaintiff's messages because he and Morgan together controlled half the votes on the Board and 60% of the stock, does necessarily imply that Morgan directed or assented to Petrakis and Huffman accessing Plaintiff's communications and can thus be liable for it. Therefore, the Court cannot grant summary judgment to Morgan on this count.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 152) is GRANTED IN PART AND DENIED IN PART. Summary Judgment is GRANTED in Defendants' favor as to Count IV of Plaintiff's Amended Complaint, and DENIED as to Counts I, II, and III.

IT IS SO ORDERED.


Entered this <u>29th</u> day of November, 2011.


　　　　　　　　　　　　　　　s/ Joe B. McDade
　　　　　　　　　　　　　　　JOE BILLY McDADE
　　　　　　　　　　　　United States Senior District Judge