# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JAMISON J. SHEFTS, *an individual*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   10-cv-1104 |
| | ) | |
| JOHN PETRAKIS, *an individual*, | ) | |
| KEVIN MORGAN, *an individual*, | ) | |
| HEIDI HUFFMAN, *an individual*, and | ) | |
| ACCESS2GO, INC., *an Illinois* | ) | |
| *corporation*, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 187), Defendants' Motion for Leave to File Third-Party Complaint for Contribution (Doc. 181), Defendants' Motion for Leave to File a Reply in support of their Motion for Leave to File Third-Party Complaint for Contribution (Doc. 192), and Plaintiff's Motion to File Affidavit of John Tandeski Under Seal (Doc. 206). The Motions are fully briefed and ready for decision. Defendants do not object to Plaintiff's Motion to File Affidavit of John Tandeski Under Seal, and so it will be granted. (Doc. 206). For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, Defendants' Motion for Leave to File Third-Party Complaint for Contribution is granted, and Defendants' Motion for Leave to File a Reply in support of their Motion for Leave to File Third-Party Complaint for Contribution is granted.

In his Amended Complaint, Plaintiff raises four counts against Defendants, all related to their monitoring of his electronic communications. Count I alleges that Defendants violated the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, by intercepting Plaintiff's emails on his personal Yahoo email account, both his emails and text messages on his Blackberry device, and electronic communications on his computer at Access2Go. Counts II, III, and IV rely on the same conduct to charge Defendants with violation of the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. § 5/14-1 *et seq.*, the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, respectively.

In its recent order on Defendants' Motion for Summary Judgment as to all counts of Plaintiff's Amended Complaint, the Court granted summary judgment in all Defendants' favor on Count IV, and denied summary judgment as to the first three counts. In December 2010, the Court also denied Plaintiff's first Motion for Summary Judgment against Defendants Petrakis and Huffman as to Counts I, II, and III. (Doc. 84). Plaintiff's argument under Count I was that Petrakis and Huffman violated the ECPA by intercepting his text messages; the Court found that, viewing the evidence in the light most favorable to Defendants, Plaintiff had consented to the "logging" of his text messages. (Doc. 84 at 16-17). Under Count II, Plaintiff argued that Petrakis and Huffman violated the Illinois Eavesdropping Statute by obtaining Plaintiff's communications on his Blackberry device, his Access2Go email account, and his Yahoo email account. The Court found, viewing the evidence in the light most favorable to Defendants, Plaintiff had no reasonable

expectation of privacy in his communications made via Access2Go's equipment because the Manual gave him sufficient notice of monitoring, and because Petrakis had been authorized by the Manual to access his communications. (Doc. 84 at 20-23). Finally, as to Plaintiff's allegation in Count III that Petrakis and Huffman had violated the SCA by accessing Plaintiff's communications, the Court relied on its finding that Petrakis was authorized to do so under the Manual. (Doc. 84 at 24). For the purposes of that Motion, the parties agreed that Plaintiff's communications were "electronic communications" under the SCA. (Doc. 84 at 24). Each of the Court's determinations as to Plaintiff's first Motion for Summary Judgment relied on the terms of the Employee Manual, which went into effect on July 2, 2008; Plaintiff's instant Motion concerns only Count III, and only the time period prior to the implementation of the Manual.

PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff argues that summary judgment should be granted in his favor, against Defendant Petrakis, on Count III of his Amended Complaint, based on Petrakis' alleged access to his communications prior to June 18, 2008.

## I.      Legal Standard

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d

3

365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the Court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The Court draws only reasonable inferences. *Id.*

It is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)). Once the movant has met its burden of showing the Court that there are no genuine issues of material fact, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## II.   Background[1]

During the time period relevant to this Motion, Plaintiff, Petrakis, and Kevin Morgan each owned 30% of the shares of Access2Go, with John Tandeski owning

---

[1]     These background facts are drawn from the parties' respective statements of material facts, and are undisputed unless otherwise indicated. Facts that are immaterial to the disposition of the Motion for Summary Judgment are excluded.

the remaining 10%; each of these men held one of the four positions on the Board of Directors. (Amended Complaint ¶ 4; Answer ¶ 4; Doc. 152 ¶ 8). During that period, Access2Go provided an email system to its personnel, including Plaintiff. (Doc. 152, Ex. A at ¶¶ 1-2; Doc. 205, Ex. A at ¶ 7). Emails sent using the Access2Go system were stored on its servers. (Doc. 60, Ex. 1 ¶ 29). Plaintiff used the software program Outlook to read his Access2Go email on his computer at Access2Go. (Shefts Aff. at ¶ 20). Also during the relevant period, there was no policy addressing access to emails sent or received via the Access2Go email system.[2] Access2Go is an Illinois corporation, and is governed by its own Bylaws.

In response to his suspicion that Plaintiff was using the Access2Go email system to sexually harass female Access2Go employees, Petrakis directed Shawn Patton of Integrated Computer Resources to create a copy of Plaintiff's Access2Go email account from the Access2Go server, and to store the copy on his laptop computer.[3] (Doc. 200, Ex. A at ¶ 5). On September 9, 2008, the Access2Go Board

---

[2]   Plaintiff asserts that there was an unwritten policy "respect[ing] the privacy rights of individuals who communicated with third parties utilizing the Access2Go communications system," supporting his claim with citations to his own and other Access2Go personnel's affidavits (Doc. 187, Ex. A at ¶ 33; Doc. 187, Ex. B at ¶ 11; Doc. 187, Ex. C at ¶ 6; Doc. 187, Ex. D at ¶ 4), but Petrakis points to evidence of a dispute over this fact: Plaintiff's affidavit from April 27, 2010 stating that there was no policy. (Doc. 17 at ¶ 8). Drawing the inferences in Petrakis' favor, the Court must conclude that there was no policy covering access to Access2Go personnel emails during this period.

[3]   As support for his argument that he was justified in monitoring Plaintiff's email, Petrakis submitted as an exhibit to his affidavit a disc containing several pornographic video clips allegedly sent by Plaintiff to female Access2Go employees. (Doc. 200, Ex. 4 of Ex. A). In response, Plaintiff included with his Reply printouts of offensive emails that Petrakis allegedly sent to co-workers. (Doc. 205, Exs 1-2 of Ex. D). The Court finds that these submissions were unnecessary, highly inappropriate, and an insult to the dignity of the Court. To the extent Petrakis needed to support

suspended Plaintiff, noting that "1) Shefts advised employees not to sign a non-compete non-disclosure agreement required by Access2Go; 2) Shefts sent confidential information to unauthorized individuals; 3) Shefts sexually harassed Access2Go employees; 4) Shefts made demeaning comments about other Access2Go directors/shareholders to third parties; and 5) Shefts sent confidential information to Access2Go competitors." (Doc. 60, Ex. 7 of Ex. A).

## III.   Discussion

The SCA, also referred to as Title II of the ECPA, creates a cause of action when any person "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains…access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). Plaintiff argues that the undisputed facts prove that Petrakis violated the SCA by accessing his Access2Go email account between January 1, 2006 and June 18, 2008. Petrakis opposes Plaintiff's claim, arguing that he neither accessed an electronic communication within the terms of the SCA, but that if he did, he had authorization from either Access2Go or Plaintiff.

---

his alleged suspicion that Plaintiff was sexually harassing co-workers, a simple statement, supported by affidavits, that such emails were sent would have been sufficient; it was unnecessary to subject the Court to the video clips themselves. Moreover, the issue of justification for the monitoring, if even relevant, would concern the reason for Petrakis' suspicion (complaints from female employees) prior to the monitoring, not the results of the monitoring. It is elementary that the justification for a search arises antecedent to the search; a search cannot be justified after the fact by its results. Likewise, Plaintiff's submission of the offensive emails allegedly sent by Petrakis was unnecessary to the Court's determination to any points of law at issue in this case. The Court will not be persuaded by such attempts at character assassination, and the parties are warned to refrain from submitting irrelevant and offensive material in the future.

**A.**    **Access to a wire or electronic communication while it is in electronic storage**

The SCA protects communications from being "accessed" by someone without authorization while they are in "electronic storage," which includes "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(B). Petrakis makes two arguments to show that he did not "access" Plaintiff's communications within the meaning of the SCA prior to June 18, 2008: (1) he did not monitor or access Plaintiff's communications prior to that date, and (2) even if he did monitor or access them, he did not do so while they were in "electronic storage" within the protection of the SCA. (Doc. 200 at 35-38).

**1.**    **"Access"**

Petrakis has admitted that "[s]ometime after January 1, 2006, [he] began to review emails and text messages sent and received by Shefts that were stored on Access2Go's electronic communication system." (Doc. 152, Ex. A (Petrakis Affidavit) ¶ 11). Petrakis now claims that Plaintiff cannot prove that this admitted accession took place prior to June 18, 2008, but Plaintiff has three pieces of evidence that he argues prove that there is no genuine issue of fact as to that question: two emails and the result of a forensic analysis of Petrakis' hard drive by James Feehan.

Petrakis sent an email on April 24, 2007 to Morgan, and one on June 30, 2007 to Morgan and Petrakis; each of these contains text that Plaintiff claims Petrakis "copied" from Plaintiff's emails and "pasted" into the ones he sent. In order to have been able to do this, Plaintiff argues that Petrakis must have accessed his

email account. Petrakis very carefully words his response to this evidence: he states that Plaintiff

> offers no evidence supporting the conclusion that the emails were "copied and pasted" by Petrakis, nor does Shefts offer any evidence of the means by which those emails were allegedly accessed in violation of the SCA. Instead, the undisputed evidence is that Petrakis did not acquire the April 24 or June 30, 2007 emails communications by accessing the Access2Go email account used by Shefts.

(Doc. 200 at 36). Similarly, in his response to Plaintiff's statement of undisputed material facts, Petrakis raises the possibility that he received the emails "through express authorization by Shefts to access the communication, as an eventual recipient of the email communication, or other means." (Doc. 200 at 14). He attests in his affidavit that he "did not obtain [the emails] by accessing the Access2Go email account used by Shefts." (Doc. 200, Ex. A at ¶¶ 3-4). The Court must view the facts in the light most favorable to Petrakis, and draw all reasonable inferences in his favor. Here, Plaintiff does not affirmatively prove that Petrakis obtained the text from his emails by directly accessing the Access2Go email account, and it is not unreasonable to suggest that he received them in another way, such as through another, unidentified person who forwarded them to him (although Petrakis' careful avoidance of any explanation of how he obtained them is odd). Therefore, for purposes of the instant motion for summary judgment, the Court cannot rely on these two emails to hold that Petrakis did access Plaintiff's email account.

Plaintiff's other piece of evidence is the result of a forensic analysis of Petrakis' laptop hard drive by Mr. Feehan, which Plaintiff asserts proves that Petrakis accessed a copy of his Access2Go email account on June 16, 2008. Mr. Feehan attests that he examined the hard drive from a laptop used by Petrakis, and

found that a copy of Plaintiff's Access2Go email account had been placed upon it on June 16, 2008, and that this copy had been opened later that day.[4] (Doc. 187, Ex. E at ¶¶ 20-21). Petrakis has admitted that he instructed Shawn Patton to create a copy of Plaintiff's Access2Go emails, but he attests that he did not open that copy during the time period at issue in the instant Motion for Summary Judgment. (Doc. 200 at ¶¶ 5-6). Drawing all reasonable inferences in Petrakis' favor, the Court must conclude that Petrakis did not himself open the copy of Plaintiff's account on his laptop.

The conclusion that he did not open this file, though, does not close the inquiry. The SCA prohibits "accessing" a "facility through which an electronic communication service is provided." § 2701(a). Relying on both the language of the statute and persuasive authority interpreting it, the Court finds that it is not required that a defendant open or read a communication in order to be in violation of § 2701. In *United States v. Smith*, the Ninth Circuit discussed the definition of the term "access" in the context of the SCA, as read together with the Wiretap Act. The *Smith* court held that "[t]he word 'intercept' entails actually acquiring the *contents* of a communication, whereas the word 'access' merely involves *being in position to acquire the contents* of a communication." 155 F.3d 1051, 1058 (9th Cir. 1998) (emphasis added). As applied to the *Smith* facts,

> [The defendant] might have violated the Stored Communications Act's prohibition on "access[ing]" by *simply making unauthorized use of [the user's] voicemail password and roaming about [the provider's] automated voicemail system*, even had she never recorded or otherwise

---

[4]     Mr. Feehan used the term "accessed," but as that word is a term of art in the context of this case, the Court will refrain from using it unless it has specifically determined that an "access" within the meaning of the SCA took place.

> "intercepted" the contents of any given message. Once she retrieved and recorded [the relevant] message, however, she crossed the line between the Stored Communications Act and the Wiretap Act and violated the latter's prohibition on "intercept[ion]."

*Id*. (emphasis added). The court specifically noted that "[o]ne assuredly can access a communications facility—such as a company voicemail system—without listening to or recording any of the messages stored within that facility." *Id*. at 1059 ( "language of § 2701 refers broadly to accessing a communications 'facility,' [while] § 2515 refers more pointedly to intercepting the 'wire…communication' itself"). Even assuming that Petrakis did not read any of Plaintiff's emails within the copy created on his laptop, he, through Mr. Patton,[5] "accessed" the facility (the Access2Go server) where Plaintiff's communications were stored; he put himself "in position to acquire the contents of" Plaintiff's communications. As a matter of law, Petrakis "accessed" Plaintiff's email account by directing Mr. Patton to make a copy of it from the Access2Go server – it was his access of the Access2Go server, a "facility through which an electronic communication service is provided," that puts his actions within the terms of the SCA, not accessing the copy on Petrakis' hard drive. It is immaterial whether he actually opened or read the copy.

---

[5]    Though Petrakis did not personally undertake the technological steps to "access" the Access2Go server, he certainly, by his own admission, caused it to be "accessed" and copied. It would eviscerate the SCA to allow a defendant to escape liability merely by hiring a third party to access and copy stored communications.

### 2.     Access to communications while they are in protected "electronic storage"

Petrakis also argues that he did not access Plaintiff's communications within the terms of the SCA because the emails were in "post-transmission storage," not protected "electronic storage," when he accessed them.[6] (Doc. 200 at 35-38).

In support of this argument, Petrakis cites to *Fraser v. Nationwide Mut. Ins. Co.*, in which the Eastern District of Pennsylvania held that "[t]he phrase 'for purposes of backup protection of such communication' in the statutory definition makes clear that messages that are in post-transmission storage, after transmission is complete, are not covered by part (B) of the definition of 'electronic storage.'" 135 F. Supp. 2d 623, 636 (E.D. Pa. 2001). He argues that *Fraser* requires the Court to find that because the emails in question had been delivered to their intended recipients, they were not covered by the SCA, because they were in "post-transmission storage." This aspect of the *Fraser* district court's decision was not affirmed on appeal, however. On appeal, the Third Circuit expressed its doubt that the email there in question was not in "backup storage," and based its holding on the finding that the defendants were authorized to access the email. *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 (3rd Cir. 2003). Other courts have also rejected the Eastern District of Pennsylvania's "view as contrary to the plain language of the Act," and hold instead that the SCA "applies to backup storage

---

[6]     The SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17). The parties and the Court agree that (A) is inapplicable to this case.

*regardless of whether it is intermediate or post-transmission.*" *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075-76 (9th Cir. 2004) (emphasis added). The *Theofel* court explained that the *Fraser* district court's interpretation "drains subsection (B) of independent content because virtually any backup of a subsection (A) message will itself qualify as a message in temporary, intermediate storage."[7] *Id.* at 1069. The Court agrees that "backup storage," both in ordinary use and in context of § 2510(17), must be read to include post-transmission storage.

Petrakis also relies on *Thompson v. Ross*, in which the Western District of Pennsylvania found that emails accessed while stored on the hard drive of the plaintiff's computer were not subject to SCA protection, as "the electronic communication in question must have been stored by the electronic communication service itself, as opposed to the user of the service." 2:10-cv-479, 2010 WL 3896533, *4 (W.D. Pa. Sept. 30, 2010). *Thompson* explained that messages stored by the service provider are covered, while copies stored by the user are not. *Id.* at *4-6. *See also Bailey v. Bailey*, No. 07-11672, 2008 WL 324156, *6 (E.D.Mich. 2008) (citing *Theofel*, 359 F.3d at 1075) ("The plain language of the statute seems to include

---

[7]    Petrakis attempts to discredit the *Theofel* interpretation by citing to *United States v. Weaver*, in which the Central District of Illinois expressed some disagreement with *Theofel* as applied to the case before it, and found that emails stored on a web-based email provider's server were not in "backup storage," but this Court finds that *Weaver* is distinguishable. 636 F. Supp. 2d 769 (C.D. Ill. 2009). *Weaver* concerned emails that were stored *solely* on the web-based email provider's server; they were not downloaded onto a computer or other storage device, and so that storage could not be considered "backup storage." The *Weaver* court itself distinguished the *Theofel* decision on this basis. *Id.* at 772. The undisputed evidence here shows that Plaintiff utilized the Outlook program on his computer to view his Access2Go emails, which entails making a copy on his own computer in addition to the one in backup storage on the Access2Go server; this case is thus factually more like *Theofel* than *Weaver*.

emails received by the intended recipient where they remain stored by an electronic communication service."). This Court agrees that a plain reading of the statute requires the conclusion that when communications are stored on an email provider's server they are protected from unauthorized access under the SCA, but not when they are stored by the user himself. Here, as discussed above, Petrakis, through Mr. Patton, "accessed" stored communications *on the Access2Go server*, not Plaintiff's laptop or another device where Plaintiff was storing them, and so his actions were precisely within the purview of the SCA.

### B.    Authority

Authorization to access a "facility" can be given by the entity providing the electronic communications service, which includes a private employer that provides email service to its employees – it is unquestionable that Access2Go itself had the right to authorize access to Plaintiff's Access2Go email account. 18 U.S.C. § 2701(c)(1); *Fraser*, 352 F.3d at 115; *Devine v. Kapasi*, 729 F.Supp.2d 1024, 1028 (N.D. Ill. 2010) (relying on *Fraser* to hold that § 2701 applies to private employers, even when they do not provide electronic communications service to the public). The question is whether Access2Go authorized the Petrakis to access Plaintiff's communications on its behalf. Petrakis claims he was authorized by Access2Go, prior to June 18, 2008, to access Plaintiff's communications on its server because (1) he had implied authority from the Board of Directors to act as he saw fit in the corporation's best interests, and (2) he had express authority under the Access2Go Bylaws to act as a result of Plaintiff's relinquishment of his responsibilities as President of Access2Go. As the Court finds that there is a genuine issue of material

fact on the question of implied authority, it is unnecessary to discuss the argument for express authority.[8]

---

[8]     The Court also finds it unnecessary to fully discuss Petrakis' arguments on the question of whether Plaintiff consented to him accessing his Access2Go email account during this period, as they rely on the same legal arguments the Court rejected as a matter of law in its Order & Opinion on Defendants' Motion for Summary Judgment. Under § 2701(c)(2), it is not a violation of the SCA to access a communication if the user authorizes it; Petrakis argues that Plaintiff consented to him accessing Plaintiff's communications. (Doc. 43-45). The cases Petrakis cites in support are unhelpful to his position, though. Most of these cases were decided under different statutes, and none are controlling or persuasive authority as applied to the instant case: *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 09-4567 RBK KMW, 2011 WL 900096, at *10 (D. N.J. Mar. 15, 2011) (applying § 2511; finding that one of the parties to the communication had affirmatively consented to interception by email service provider); *Smyth v. Pillsbury Co.*, 914 F.Supp. 97, 101 (E.D. Penn. 1996) (applying state tort of intrusion upon seclusion); *Commonwealth v. Proetto*, 771 A.2d 823, 829-30 (Penn. 2001) (applying Pennsylvania Wiretap Act; relying also on distinction between email and telephone rejected by this Court); *McLaren v. Microsoft Corp.*, 05-97-00824-CV, 1999 WL 339015, at *4 (Tex. App. May 28, 1999) (applying state privacy tort law requiring "highly offensive invasion"). Only *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114-15 (3d Cir. 2003), and *Reichert v. Elizabethtown College*, No. Civ.A. 10-2248, 2011 WL 3438318, *5 (E.D. Pa. Aug. 5, 2011) were decided under the SCA, and they merely reiterate that an email service provider (here, Access2Go) is able to authorize access to communications via its email system, which is undisputed in this case, and which is discussed separately. In addition, Defendants rely on the technological distinction between telephone and email communications, which the Court also rejected as a matter of law in its Order & Opinion on Defendants' Motion for Summary Judgment. These cases are discussed more fully in the Court's Order & Opinion on Defendants' Motion for Summary Judgment. Petrakis cites *no* cases under § 2701's consent exception.

To the extent the § 2511 consent cases are applicable to consent under § 2701, the § 2511 cases establish that actual knowledge of monitoring is required; the mere absence, as here, of an employer privacy policy is insufficient to find consent. *Williams v. Poulos*, 11 F.3d 271, 281-82 (1st Cir. 1993). Petrakis' best argument would be that the lack of an employer privacy policy vitiates a reasonable expectation of privacy (as could potentially be implied from the Fourth Amendment case of *City of Ontario, Cal., v. Quon*, 130 S.Ct. 2619, 2629-30 (2010)), but where there is a separate body of law arising under the same statute, the Electronic Communications Privacy Act, the Court believes that the more-specific § 2511 precedent would apply. In any event, as the Court finds a genuine issue of material fact as to the question of whether the Board authorized Petrakis' actions by later ratification, this specific question need not be decided at this time.

There are two variations on the argument that Petrakis had implied authority to access Plaintiff's communications: he is protected from liability by virtue of Illinois' "business judgment rule," and the Board impliedly gave him authority either by failing to disavow or by later ratifying his conduct.[9]

Petrakis argues that he is protected from liability by the Illinois "'business judgment rule,' which presumes that corporate directors act in the best interests of the corporation, is intended to protect corporate directors from liability and generally comes into play when a cause of action is based upon *mismanagement* of the company." *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Cas. Co.*, 946 N.E.2d 895, 904 (Ill. App. 2011) (citations omitted) (emphasis added). The

---

Petrakis also argues that Plaintiff knew that he was accessing his email account, but continued to use it, thus indicating his implicit consent, citing to emails from Plaintiff on September 22, 2008, April 14, 2009, and October 7, 2009. (Doc. 200 at 31-32). Since these emails are each dated *after* the period in question in this Motion (January 1, 2006 through June 18, 2008), they cannot, as a matter of law, prove that Plaintiff impliedly consented to the accession by continuing to use the account after learning that Petrakis was accessing it – all they can show is that he found out about it later. Finally, Petrakis gestures toward an argument that Plaintiff did authorize him to access his email account, because Plaintiff, on a few occasions, told him to do so. (Doc. 200 at 31-32) Plaintiff has attested that these occasions constituted only limited, one-time authorizations; Petrakis has not presented any evidence to rebut Plaintiff's, and the Court finds that no reasonable jury could find those to have been across-the-board authorizations.

[9]    Petrakis also argues that he had the authority to access Plaintiff's communications merely because he was an officer, director, and shareholder of Access2Go and because there was no policy limiting his ability to do so. As noted above, drawing the inferences in Petrakis' favor, the Court must conclude that there was no policy restricting access to Access2Go personnel emails during this period. However, the absence of a policy restricting one's access does not necessarily imply authority to access; this is a question of law, and so the Court cannot make assumptions in favor of either party. As neither party has fully briefed the issue of the default rules for authority under the SCA, and because the Court denies summary judgment on other grounds, the Court will not reach out to decide this issue.

rule is designed to allow directors to act in good faith without fear of liability to shareholders for their management of the company in the event they make a mistake. It is plain, however, that such a rule cannot immunize a director who, acting for the benefit of his corporation, violates the law. *Davis v. Dyson*, 900 N.E.2d 698, 715-16 (Ill. App. Ct. 2008) (citing *Fields v. Sax*, 462 N.E.2d 983, 988 (Ill. 1984)) ("Illegality is one factor that can render directors unable to avail themselves of the protection of the business judgment rule."). Where, as here, it is alleged that a director behaved illegally and without authorization from the corporation, the business judgment rule is inapplicable. If Petrakis was authorized to act by Access2Go, he will escape liability without the application of the rule; if not, then he behaved illegally and cannot be immunized by his director status.

Petrakis primarily argues that because the Board did not disavow his actions, but rather relied on the results of Petrakis' accession of Plaintiff's communications to suspend Plaintiff from his position on September 9, 2008, he had implied authorization to access Plaintiff's communications. (Doc. 200 at 40-42 (citing *Joy v. Ditto, Inc.*, 356 Ill. 348, 357-58 (Ill. 1934); *McCormick v. Unity Co.*, 142 Ill. App. 159, 172 (Ill. App. Ct. 1908)).

In his argument for ratification, Petrakis relies on the Board's formal suspension of Plaintiff on September 9, 2008, apparently based on sexually harassing behavior and other acts against the company's interest by Plaintiff, which Petrakis alleges was revealed by evidence obtained from Plaintiff's email account. He argues that this action constituted acquiescence to the accession that was sufficient to imply Board authority – a "ratification" of his acts. Under Illinois law,

16

"[a] corporation may ratify the unauthorized acts of its officers and agents, and the subsequent ratification is ordinarily equivalent to previous authorization." 13 ILL. LAW AND PRAC. CORPORATIONS § 245. However, the "corporation must have knowledge or notice of the facts before it can be said to ratify a previously unauthorized transaction." *Id. See also* 13 ILL. LAW AND PRAC. CORPORATIONS § 247 ("the mere silence of the corporation or its failure to repudiate an unauthorized transaction will not amount to a ratification thereof where the corporation had not, and was not chargeable with, knowledge of the facts"). Plaintiff does not discuss the legal question of whether "ratification" can retroactively supply the authority needed to show an exception to § 2701, and so the Court will assume for the purposes of this Motion that it can.

It is unclear from Petrakis' submissions what the Board relied on in making this decision or what the Board knew about the source of that information; he refers only to "evidence" of wrongdoing. He cites his own affidavit and its exhibits, including minutes of the relevant Board meeting, but neither of these give any further clarity to the question of what information the Board heard and if the Board knew of the source of that information. (Doc. 60, Ex. 7 of Ex. A). If it did not know that the evidence he had was obtained by accessing the Access2Go email server, its suspension of Plaintiff cannot be considered a ratification of that act. If the Board relied on evidence produced by Petrakis' accession of the email account, and knew its source, then ratification can probably be implied such that Petrakis can be considered to have had authorization from Access2Go to access its email system.

As noted above, it is ultimately Plaintiff's burden to show that there are no genuine issues of material fact and that he is thus entitled to judgment as a matter of law.[10] Petrakis has raised a legal question that could defeat Plaintiff's motion for summary judgment if the evidence supports his position, but Plaintiff does not come forward with evidence or argument to rebut it. Petrakis has thus identified a potentially decisive issue on which Plaintiff has failed to show an absence of factual dispute. Therefore, a genuine issue of material fact remains that must defeat Plaintiff's instant Motion for Summary Judgment: did the Board have sufficient knowledge of Petrakis' accession of Plaintiff's email account for its action or inaction to constitute a ratification of the accession, if ratification can indeed retroactively grant authorization within the meaning of the SCA?

### DEFENDANTS' MOTIONS FOR LEAVE TO FILE THIRD-PARTY COMPLAINT FOR CONTRIBUTION & FOR LEAVE TO FILE A REPLY IN SUPPORT OF THEIR MOTION FOR LEAVE TO FILE THIRD-PARTY COMPLAINT FOR CONTRIBUTION

Plaintiff's Amended Complaint is against Petrakis, Morgan, Huffman, and Access2Go. Defendants moved on August 24, 2011 for leave to file a third-party complaint for contribution against John Tandeski, alleging that he "is or may be liable to Defendants for all or part of Shefts' claims against Defendants." (Doc. 181

---

[10]    It is true that the nonmoving party must come forward with affirmative evidence, but this burden is triggered only when the opposing party has shown evidence that there is no dispute of fact on an issue on which the nonmoving party bears the burden of proof. Moreover, it appears that under the SCA, it would be Plaintiff's burden to prove that the access was unauthorized, as the "without authorization" and "exceeds an authorization" terms are part of the definition of the wrongdoing itself, and authorized conduct is specifically listed an exception. 18 U.S.C. § 2701(a) & (c). "Authorization" is not positioned as an affirmative defense; lack of authorization is an element Plaintiff must prove. *See In re DoubleClick Inc. Privacy Litigation*, 154 F.Supp.2d 497, 507 (S.D. N.Y. 2001) ("it appears that § 2701(c) is a statutory exception"). Since Plaintiff has not offered evidence to rebut Petrakis' theory of authorization, summary judgment in his favor is inappropriate.

at 2). Plaintiff opposes this request, arguing that such a claim for contribution would be futile, since none of the statutes underlying his claims against Defendants allow for contribution. (Doc. 190). Defendants have also moved for leave to file a Reply brief in support of their Motion, to which Plaintiff has not responded in opposition.

## I.    Leave to File Reply Brief

Local Rule 7.1(B)(3) provides that reply briefs are not permitted to support motions other than motions for summary judgment, though the Court can of course grant a party leave to file a reply brief if it finds that one is necessary. Typically, reply briefs are permitted if the party opposing a motion has introduced new and unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion; the Court does not typically permit the moving party to file a reply in order to introduce new arguments or evidence that could have been included in the motion itself, or to re-hash the arguments made in the motion.

Defendants' Motion for Leave to File Third-Party Complaint is a very short document, with no attached Memorandum of Law, and cites only to Federal Rule of Civil Procedure 14(a). In his Response to the Motion for Leave to File Third-Party Complaint, Plaintiff asserts that none of the statutes underlying his Amended Complaint permit claims for contribution to be made. Defendants argue that they should be permitted to file their proposed reply brief in order to address Plaintiff's arguments as to the legal basis for their proposed contribution claim; they also state that Plaintiff's Response is "more akin to a motion to dismiss filed on behalf of

Tandeski." (Doc. 192 at 2). In essence, Defendants seek a second chance to submit the Memorandum of Law that should have been submitted with their Motion for Leave to File Third-Party Complaint.

Ordinarily, the Court would not be inclined to grant Defendants' Motion for Leave to File Reply Brief, as it can be construed either as supplementing the arguments made in the underlying motion, or as making new arguments in support. Defendants give no reason that their initial Motion for Leave to File Third-Party Complaint could not have included the legal analysis that their proposed Reply includes, and there is no reason that they should have assumed that Plaintiff would not challenge their right to file a claim for contribution – in short, it was not unexpected that they would have to support their request to seek contribution with more than a perfunctory citation to Rule 14(a). However, Plaintiff's Response does somewhat deviate from the ordinary Rule 14(a) analysis; the argument for prejudice and delay that it asserts arises from the alleged "futility" of the claim for contribution itself.[11] Therefore, it is the merits of the claim for contribution that are at issue; Plaintiff's Response thus raises "new" issues, and the Court would find an answer to those issues from Defendants to be helpful. Defendants are therefore permitted to file their Reply in support of the Motion for Leave to File their Third-Party Complaint.

---

[11]    Though "futility" is not typically the basis on which courts determine the propriety of claims for contribution, it does appear to have been used by some courts.

## II.     Leave to File Third-Party Complaint against John Tandeski

Under Federal Rule of Civil Procedure 14(a), "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." FED. R. CIV. P. 14(a). If the third-party complaint is to be filed more than 14 days after the defendants/third-party plaintiffs file their original answer, they must seek leave of the court to file it. *Id*. As Defendants filed their original answers over a year before the Motion for Leave to File Third-Party Complaint, they must have the Court's permission. As Defendants point out, courts typically consider the timeliness of the motion and reasons for delay when deciding whether to allow a third-party complaint for contribution. *Highlands Ins. Co. v. Lewis Rail Service Co.*, 10 F.3d 1247, 1251 (7th Cir. 1993) (citing *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992); *Albino v. Chicago*, 578 F.Supp. 1487, 1489 (N.D. Ill. 1983)).

Defendants assert that Tandeski "is or may be liable to Defendants for all or part of Shefts' claims against Defendants," and so including him in the instant case will "prevent multiplicity of actions and will further judicial economy." (Doc. 181 at 2). They also assert that Plaintiff will not be prejudiced, as the allegations of their claim against Tandeski arise out of the same events giving rise to Plaintiff's claims against Defendants, and because Plaintiff has already disclosed Tandeski as a witness and cannot therefore be surprised by the inclusion of his testimony in this case. (Doc. 181 at 2-3).

In *Highlands*, the case cited by Defendants in their Motion, the Seventh Circuit noted that "[t]he decision to permit a third-party complaint is within the

sound discretion of the trial court, based on the timeliness of the motion and reasons for delay." *Id*. The Circuit Court there upheld a district court's denial of a defendant's motion for leave to file a third-party complaint because the defendant "waited until after discovery and three weeks before summary judgment motions were due to file its motion, with no excuse other than that its counsel was trying to save money for his client. Adding parties at such a late date would have substantially delayed the proceedings and unnecessarily complicated them." *Id*. Here, Defendants do not give any reason for waiting so long to file their Motion for Leave to File Third-Party Complaint. However, it does not appear that it would substantially lengthen discovery or the other proceedings in this case to determine whether Tandeski is liable for contribution to Defendants, and it does make sense to resolve that question along with the question of Defendants' liability to Plaintiff; indeed, Plaintiff's arguments do not address the timing of the Motion.

Plaintiff, though, argues that Defendants' claims for contribution against Tandeski are "futile" and thus should not be permitted. (Doc. 190). Plaintiff's argument that a doomed claim for contribution should not be allowed, as it would only increase the expense, complexity, and delay of this case without serving any purpose, makes sense, but it does not follow the standard practice under Rule 14(a), which typically permits the third-party complaint to be filed, with the court later determining whether the third-party plaintiff states a viable cause of action. However, at least two courts of this Circuit have stated that a third-party complaint should not be allowed if it clearly states no claim to relief. *In re HA-LO Industries, Inc.*, No. 02 B 12059, 2004 WL 45499, *4 (Bkrtcy. N.D. Ill. Jan. 5, 2004) ("Kelley

cannot state a viable claim for contribution. Therefore, he will not be permitted to file his third-party complaint."); *Creek v. Village of Westhaven*, No. 83 C 1851, 1989 WL 24088 at *5 (N.D. Ill. March 15, 1989). *See also, e.g., Center Physicians Inc, Profit Sharing Trust v. PaineWebber Group*, No. 4:95CV00215 GFG, 1996 WL 622470, *2 (E.D. Mo. May 8, 1996). *Cf. Elsevier Inc. v. Comprehensive Microfilm & Scanning Services, Inc.*, No. 3:10cv2513, 2011 WL 1883824, *2 (M.D. Pa. May 17, 2011) (third-party complaint allowed where it stated at least one viable claim for contribution, though court delayed decision on argument that other claims in third-party complaint were futile). In addition, if a third-party plaintiff seeks to amend his third-party complaint, the court may deny leave to amend on the basis of futility, and this Court believes, in this context, that there is no significant different between the initial filing and a proposed amendment.

Therefore, the Court will determine whether Defendants' proposed claim against Tandeski truly is "futile." Plaintiff cites no cases establishing the Court's standard for reviewing a third-party complaint for "futility" in this context, but the Court assumes that it would have to be somewhat lower than the bar for a motion to dismiss, which would require the court to "treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009) (*citing Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The Court will not delve deeply into the proposed Third-Party Complaint, but will merely determine whether it is plain that the contribution claims are futile.

Plaintiff argues, first, that his federal statutory claims do not provide for contribution claims by Defendants, citing to a number of federal cases. (Doc. 190 at 2-6). It is true, that, as stated by the Seventh Circuit in *Anderson v. Griffin*, federal courts "have become reluctant to recognize a right of contribution as a matter either of federal common law or of statute," because the right "is not required to achieve either the compensatory or the deterrent objectives of the law." 397 F.3d 515, 523 (7th Cir. 2005) (citations omitted). In their Reply, Defendants assert that the claim for contribution on all counts is made under the Illinois Joint Tortfeasor Contribution Act, and that both Plaintiff's federal and state claims are subject to contribution under that statute.

Defendants cite to *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.*, in which the Seventh Circuit discussed the applicability of the Illinois Joint Tortfeasor Contribution Act to claims arising from sources other than Illinois tort law, and indicated that the Illinois Joint Tortfeasor Contribution Act could apply to both federal and state statutory claims so long as the plaintiff could have raised a tort claim against the third-party defendant and certain other requirements were met. 522 F.3d 776, 782-85 (7th Cir. 2008) ("Although a party's complaint is relevant, Illinois courts consistently have held that the plaintiff's own theory of liability is not conclusive for the purposes of the Contribution Act."). *Anderson* merely held that contribution claims under federal statutes are not supportable "as a matter either of *federal* common law or of statute," but does not preclude such claims under state law, where appropriate. Having reviewed *Sompo*, the Court now finds that Defendants' claims for contribution under the federal statutes are not plainly futile.

Plaintiff also argues that the contribution claims are barred because he charges Defendants under statutes requiring a showing of intent, for which there is no right of contribution. However, the same rule applies: so long as Plaintiff *could have* made a claim under a negligence theory for the actions at issue, Defendants might be able to claim contribution from Tandeski. *See In re Ulz*, 401 B.R. 321, 330-31 (Bkrtcy. N.D. Ill. 2009) (citations omitted) ("It makes no difference, then, that New Freedom chose to allege fraud by Conrad rather than negligent misrepresentation. As long as Conrad was potentially liable for negligent misrepresentation, he was 'subject to liability in tort,' and the Act applies."). Thus, Defendants' proposed Third-Party Complaint is not plainly futile, and the Court will allow them to file it.

The Court notes that this determination is not in any way a prejudgment of these or similar issues raised on a potential Motion to Dismiss by Tandeski, as he, the one who has the greatest incentive to fully litigate the issues, has not been afforded the chance to do so; the parties are warned against relying on it to support their arguments in relation to such a Motion.

## CONCLUSION

Plaintiff's Motion for Summary Judgment (Doc. 187) is DENIED, Defendants' Motion for Leave to File Third-Party Complaint for Contribution (Doc. 181) is GRANTED, Defendants' Motion for Leave to File a Reply in support of their Motion for Leave to File Third-Party Complaint for Contribution (Doc. 192) is GRANTED, and Plaintiff's Motion to File Affidavit of John Tandeski Under Seal (Doc. 206) is GRANTED. The Clerk of the Court is directed to FILE Defendants' Reply, attached

as Exhibit A of their Motion for Leave to File a Reply (Doc. 192); to FILE Defendants' Third-Party Complaint for Contribution against John Tandeski, attached as Exhibit A of their Motion for Leave to File Third-Party Complaint for Contribution (Doc. 181); and to MAINTAIN the Affidavit of John Tandeski and its accompanying exhibits (Doc. 206) under seal.

This matter is referred to Magistrate Judge Gorman for further pretrial proceedings.

IT IS SO ORDERED.

Entered this <u>29th</u> day of November, 2011.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge