# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

JAMISON J. SHEFTS,       )
                           )
     Plaintiff,          )
                           )
        v.             )      Case No.  10-cv-1104
                           )
JOHN PETRAKIS, KEVIN MORGAN,  )
and  HEIDI HUFFMAN,         )
                           )
     Defendants.       )

## O R D E R   &   O P I N I O N

This matter is before the Court on the parties' Cross-Motions for Summary Judgment on the issue of whether the Access2Go Board could and did grant post-hoc authorization to Defendants' accession of Plaintiff's Access2Go email. (Docs. 213 & 223). Both Motions are fully briefed and ready for disposition. For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted.

As the general background of this case has been explained multiple times by the parties and the Court over the course of this litigation, it is unnecessary to review it in detail. In Count III of his Amended Complaint, Plaintiff alleges that Defendants, by accessing Plaintiff's stored emails on his Access2Go-provided email account, emails on his personal Yahoo! web-based email account, and his text messages, violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701. As explained in its November 29, 2011 Orders on the parties' earlier Motions for Summary Judgment, the SCA, also referred to as Title II of the ECPA, creates a

cause of action when any person "intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains...access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a). Authorization to access a "facility" can be given by the entity providing the electronic communications service, which includes a private employer that provides email service to its employees – Access2Go itself thus had the right to authorize access to Plaintiff's Access2Go email account. 18 U.S.C. § 2701(c)(1); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 115 (3d Cir. 2003); *Devine v. Kapasi*, 729 F.Supp.2d 1024, 1028 (N.D. Ill. 2010) (relying on *Fraser* to hold that § 2701 applies to private employers, even when they do not provide electronic communications service to the public). If Defendants were authorized to access Plaintiff's communications, there was no SCA violation.

In the briefing leading up to the November 29, 2011 Orders, Petrakis raised the argument that he had authorization from Access2Go to access Plaintiff's Access2Go-provided email because the corporation had ratified his actions after the fact. In the Court's Order on Plaintiff's second Motion for Summary Judgment, the Court explained that a definitive ruling on that question was not possible because both legal and factual issues were as yet insufficiently developed. (Doc. 210 at 16-18). Now the parties present Cross-Motions for Summary Judgment, each arguing for a definitive ruling in their favor on the question of whether the Board could and did ratify Defendants' actions in order to exempt them from § 2701 liability.

## LEGAL STANDARD

"On cross-motions for summary judgment, the same standard of review in Federal Rule of Civil Procedure 56 applies to each movant." *Continental Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir.2005). The United States Court of Appeals for the Seventh Circuit has explained that courts "look to the burden of proof that each party would bear on an issue of trial; we then require that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact." *Diaz v. Prudential Ins. Co. of America*, 499 F.3d 540, 643 (7th Cir.2007) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997)).

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the Court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The Court draws only reasonable inferences. *Id.*

Once the movant has met its burden of showing the Court that there are no genuine issues of material fact, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Group*, 258

F.3d 557, 563 (7th Cir. 2001) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

### UNDISPUTED MATERIAL FACTS

Access2Go is a Peoria, Illinois-based telecommunications company. From January 1, 2000 to January 1, 2006, Plaintiff owned 100% of the voting stock in Access2Go and was the sole member of its Board of Directors. (Doc. 170, Ex. A ¶¶ 3-6). On January 1, 2006, Plaintiff sold shares of Access2Go to Defendants Petrakis and Morgan, as well as John Tandeski. (Doc. 152, Ex. A at ¶ 4). Plaintiff, Petrakis, and Morgan each owned 30% of the stock, and Tandeski owned 10%. (Doc. 152, Ex. A at ¶ 4). These men constituted the four-member Board of Directors for Access2Go, with each having one vote. (Doc. 152, Ex. A at ¶¶ 4-5; Doc. 170, Ex. A at ¶ 8).

Before and at all times after January 1, 2006, Access2Go owned and provided its employees with an electronic communication system comprised of computers, servers, email accounts, and software, including an email server. Plaintiff had an email account provided by Access2Go, and his emails were stored on the company's server. (Doc. 60, Ex. 1 at ¶ 29). At times between January 1, 2006, and June 18, 2008, Petrakis read and reviewed certain emails from Plaintiff's Access2Go email

account, with Plaintiff's express limited permission.[1] (Doc. 219, Ex. 2 at ¶ 2). On June 16, 2008, at Petrakis' direction, Plaintiff's Access2Go email account was copied onto a hard drive, and stored within the "JS Directory." (Doc. 187, Ex. E at ¶ 21). The directory was opened later that day. (Doc. 187, Ex. E at ¶ 21).[2]

On June 18, 2008, the Board appointed Petrakis to be "employee liaison." (Doc. 219, Ex. 2 at ¶; Doc. 228, Ex. A at ¶ 8). After this date, Petrakis accessed Plaintiff's stored Access2Go email communications.[3] (Doc. 219, Ex. 2 at ¶ 4). Also

---

[1]  Plaintiff asserts that Petrakis has admitted to reading Plaintiff's emails prior to June 18, 2008, relying on Defendants' earlier admission that Petrakis "read and/or reviewed emails between Shefts and third parties prior to being appointed as security liaison for Access2Go pursuant to the Employee Manual," and prior to June 18, 2008. (Doc. 187, Ex. F at ¶¶ 1-2). In his current affidavit, Petrakis appears to admit only that during this period he looked at particular emails with Plaintiff's express, limited permission. (Doc. 219, Ex. B at ¶ 2). The Court must find that, for purposes of this motion, the undisputed facts are that Petrakis accessed particular emails with Plaintiff's express permission, as Petrakis' affidavit does not conflict with, but only clarifies, Defendants' prior admission.

[2]  Defendants appear to argue that because Petrakis did not necessarily *open* the emails on June 16, 2008, he did not "access" them on that date. Either way, Petrakis began to "access" the account within the meaning of the SCA on June 16, 2008, at the latest. In its previous Order on Plaintiff's second Motion for Summary Judgment, the Court found that "it is not required that a defendant open or read a communication in order to be in violation of § 2701." (Doc. 210 at 9-10 (citing *United States v. Smith*, 155 F.3d 1051, 1058-59 (9th Cir. 1998)).

> As a matter of law, Petrakis "accessed" Plaintiff's email account by directing Mr. Patton to make a copy of it from the Access2Go server – it was his access of the Access2Go server, a "facility through which an electronic communication service is provided," that puts his actions within the terms of the SCA, not accessing the copy on Petrakis' hard drive. It is immaterial whether he actually opened or read the copy.

(Doc. 210 at 10).

[3]  The parties have used "monitor" in several instances, but it is not clear whether "monitor," which has been used generically to encompass all of Defendants' alleged violations (including both "intercept" and "access," which are terms of art in this case), is meant to say that the person in question took action to obtain the communication contemporaneously with transmission (a possible "interception") or

after this date, Defendant Morgan, at Petrakis' direction, reviewed copies of Plaintiff's Access2Go emails that had been stored on a flash-memory device. (Doc. 152, Exs. 1-3).

Tandeski has testified that Huffman informed him in late 2007 and in 2008 that Petrakis used his Access2Go computer to "spy on" Access2Go employees' work activities and to obtain their personal information. (Doc. 6, Ex. 1 at ¶ 26). In early 2008, Tandeski became aware that Petrakis, Morgan, and Huffman were accessing Access2Go employees' email accounts, including the account used by Plaintiff; also in early 2008, Petrakis and Morgan told Tandeski that they were accessing Plaintiff's and other employees' stored Access2Go email.[4] (Doc. 6, Ex. 1 at ¶ 20; Doc. 18 at ¶ 13). Petrakis explained that he was doing so in order to compile evidence to support firing Plaintiff. (Doc. 18 at ¶ 4). In the summer of 2008, Tandeski learned that Petrakis had been using spyware to obtain Plaintiff's electronic communications; Petrakis showed him emails taken from Plaintiff's computer, and he states that Petrakis told him in July 2008 that he had had spyware installed on

---

to obtain stored communications (a possible "accession"). However, because the Court now knows, as explained in an Order also issued today, that the alleged "interception" of Plaintiff's Access2Go email did not begin until March 2009, months after the events at issue in this Order, the only reasonable inference is that "monitor" in this context means "access" from storage.

[4]    Here again the parties have used "monitor," but as explained in the previous footnote, it must have been that Petrakis and Morgan told Tandeski they were "accessing" these emails, since the device allegedly used to "intercept" had not been set up yet. Petrakis and Morgan do not appear to admit that they told Tandeski this, but merely assert that Tandeski has so testified.

the Access2Go computers in order to monitor employee activity.[5] (Doc. 18 at ¶ 8; Doc. 6, Ex. 1 at ¶ 22).

On August 21, 2008, Plaintiff sent six emails from his Access2Go email account to his personal Yahoo! email account, and later received a letter dated August 26, 2008 from Access2Go's attorneys, of the law firm Heyl, Royster, Voelker, and Allen ("HRVA"), stating that Plaintiff had sent the six emails, that they contained attachments of approximately 75 confidential Access2Go documents, and that Access2Go had suspended Plaintiff with full pay pending further investigation.[6] (Doc. 205, ¶ 22; Doc. 219, Ex. 1 of Ex. 2). Tandeski received a copy of this letter prior to September 8, 2008. (Doc. 219, Ex. 2 at ¶ 6). Also prior to September 8, 2008, Petrakis told Tandeski that he had discovered that Plaintiff had sent confidential documents concerning Access2Go's business to his personal Yahoo! email account. (Doc. 219, Ex. 2 at ¶ 7; Doc. 219, Ex. 3 at 208:5-18). On September 8, 2008, Tandeski and Morgan received an email from Petrakis, with attached emails

---

[5]     It is not clear here whether these emails were from the Access2Go email account or the Yahoo! email account. As discussed in the other Orders issued today, Plaintiff alleges that Defendants used spyware (SpectorPro) to intercept his communications on his Yahoo! email account.

[6]     Reviewing this letter, it is unclear whom HRVA represented at that time: Access2Go itself, or Petrakis, Morgan, and perhaps Tandeski. Defendants' statement of facts indicates that it represented Access2Go, and Plaintiff does not dispute this characterization, which is why the Court states that they represented the company. (Doc. 224 at 11; Doc. 228 at 4). On the other hand, the letter itself says that the HRVA's "clients, on behalf of Access2Go," suspended Plaintiff. (Doc. 219, Ex. 1 of Ex. 2). Petrakis' assertion that Tandeski received the letter prior to September 8, 2008, seems to imply that Tandeski learned about this action from the letter, not because he took part in the decision of HRVA's unnamed "clients." As has been explained elsewhere, without either Tandeski's or Plaintiff's participation (as Board members) or at least knowledge (as shareholders), Petrakis and Morgan did not have the authority to suspend Plaintiff "on behalf of Access2Go." This issue will be discussed further below.

from Plaintiff to several female Access2Go employees between December 3, 2007 and July 7, 2008. (Doc. 219, Ex. 4 at 48:3-12; Doc. 219, Ex. 5 at ¶ 1). Morgan knew that Petrakis had accessed Access2Go's electronic communication system to read and review the emails Plaintiff sent to the female employees. (Doc. 219, Ex. 5 at ¶ 1).

On September 9, 2008, the Board of Directors held a meeting at which Petrakis, Morgan, and Tandeski ratified Plaintiff's suspension, and recommended he be terminated based on evidence that he had, among other things, sexually harassed Access2Go employees. (Doc. 200 at 33; Doc. 205 at 4). On September 16, 2008, Tandeski, Morgan, and three HRVA attorneys attended an Access2Go shareholders' meeting at the HRVA offices with Plaintiff and his attorneys. (Doc. 93, Ex. 2 at ¶ 9). This meeting was convened for the purpose of the shareholders' voting on whether or not to terminate Plaintiff's Access2Go employment; Petrakis, Morgan, and Tandeski voted to defer making a determination on the Board's recommendation that his employment be terminated. (Doc. 213, Ex. 1 at 8).

Following this meeting, Morgan gave Tandeski seven stacks of documents, each containing Plaintiff's emails, his text messages, and a cover sheet explaining the alleged content of the messages within the respective stack. (Doc. 93, Ex. 2 at ¶ 10). On September 17, 2008, Petrakis forwarded to Tandeski an email from Morgan, to which Morgan had attached a group of emails sent by Plaintiff.[7] (Doc. 219, Ex. 6

---

[7]    It is unclear from the statement of facts and from the deposition exhibit included whether this email actually included the emails, or merely referred-to and described them. However, Tandeski's deposition testimony appears to imply that these emails were included with Petrakis' forwarded message, though he did not

at 51-52). Morgan had arranged this collection of emails into eight different categories: "Non Disclosure Violations," "Threats Against the Company," "In-Appropriate [*sic*] Emails to Employees," "In-Appropriate Emails to Customer," "Emails Pertaining to Taking Confidential Information Off Site," "Walking Away from the Company," "Non Compete Violations," and "Sexual Harassment." (Doc. 219, Ex. 6 at 51-52).

On January 7, 2009, the Board and shareholders discussed the terms of Plaintiff's suspension.[8] (Doc. 219, Ex. 2 at ¶ 9; Doc. 228, Ex. A at ¶ 9). On December 22, 2009, at an Access2Go shareholders meeting, Petrakis and Morgan, representing 60% of the Access2Go stock, voted to terminate Plaintiff's employment.[9] (Doc. 219, Ex. B at ¶ 10; Doc. 219, Ex. 3 of Ex. B).

## DISCUSSION

As noted above, Plaintiff previously moved for summary judgment on Count III, but the Court found that genuine issues of material fact precluded the entry of

---

specifically remember that they were all there, and did not read them all. (Doc. 219, Ex. 6 at 51-52).

[8]   Defendants assert that the Board and shareholders "by their affirmative vote, clarified the on-going terms of Shefts' suspension," but Plaintiff offers his own testimony that they merely discussed his suspension's terms, but did not take a vote or "clarify the terms" of the suspension. It is thus disputed whether they voted, but it does not appear to be in dispute that they at least discussed the suspension's terms.

[9]   Plaintiff characterizes this as disputed, but offers only his affidavit that at the *Board* meeting, he and Tandeski voted against Petrakis and Morgan on the question of whether to recommend his termination, such that the Board was deadlocked. (Doc. 228, Ex. 1 at ¶ 10). He does not offer evidence to contradict Defendants' assertion that, at the shareholders' portion of the meeting, 60% of the shareholders (Petrakis and Morgan) voted to terminate him, and so that point must be considered undisputed.

summary judgment in his favor. In addition, the parties had not adequately briefed the issue of whether Access2Go could and did ratify Petrakis' actions so as to exempt them from § 2701. There are both legal and factual questions, as explained by the Court in its November 29, 2011 Order on Plaintiff's second Motion for Summary Judgment:

> Petrakis primarily argues that because the Board did not disavow his actions, but rather relied on the results of Petrakis' accession of Plaintiff's communications to suspend Plaintiff from his position on September 9, 2008, he had implied authorization to access Plaintiff's communications. (Doc. 200 at 40-42 (citing *Joy v. Ditto, Inc.*, 356 Ill. 348, 357-58 (Ill. 1934); *McCormick v. Unity Co.*, 142 Ill. App. 159, 172 (Ill. App. Ct. 1908)).
>
> In his argument for ratification, Petrakis relies on the Board's formal suspension of Plaintiff on September 9, 2008, apparently based on sexually harassing behavior and other acts against the company's interest by Plaintiff, which Petrakis alleges was revealed by evidence obtained from Plaintiff's email account. He argues that this action constituted acquiescence to the accession that was sufficient to imply Board authority – a "ratification" of his acts. Under Illinois law, "[a] corporation may ratify the unauthorized acts of its officers and agents, and the subsequent ratification is ordinarily equivalent to previous authorization." 13 ILL. LAW AND PRAC. CORPORATIONS § 245. However, the "corporation must have knowledge or notice of the facts before it can be said to ratify a previously unauthorized transaction." *Id. See also* 13 ILL. LAW AND PRAC. CORPORATIONS § 247 ("the mere silence of the corporation or its failure to repudiate an unauthorized transaction will not amount to a ratification thereof where the corporation had not, and was not chargeable with, knowledge of the facts"). Plaintiff [and Petrakis do] not discuss the legal question of whether "ratification" can retroactively supply the authority needed to show an exception to § 2701, and so the Court will assume for the purposes of this Motion that it can.
>
> It is unclear from Petrakis' submissions what the Board relied on in making this decision or what the Board knew about the source of that information; he refers only to "evidence" of wrongdoing. He cites his own affidavit and its exhibits, including minutes of the relevant Board meeting, but neither of these give any further clarity to the question of what information the Board heard and if the Board knew of the source of that information. (Doc. 60, Ex. 7 of Ex. A). If it did not know that the evidence he had was obtained by accessing the Access2Go email server, its suspension of Plaintiff cannot be

considered a ratification of that act. If the Board relied on evidence produced by Petrakis' accession of the email account, and knew its source, then ratification can probably be implied such that Petrakis can be considered to have had authorization from Access2Go to access its email system.

As noted above, it is ultimately Plaintiff's burden to show that there are no genuine issues of material fact and that he is thus entitled to judgment as a matter of law. Petrakis has raised a legal question that could defeat Plaintiff's motion for summary judgment if the evidence supports his position, but Plaintiff does not come forward with evidence or argument to rebut it. Petrakis has thus identified a potentially decisive issue on which Plaintiff has failed to show an absence of factual dispute. Therefore, a genuine issue of material fact remains that must defeat Plaintiff's instant Motion for Summary Judgment: did the Board have sufficient knowledge of Petrakis' accession of Plaintiff's email account for its action or inaction to constitute a ratification of the accession, if ratification can indeed retroactively grant authorization within the meaning of the SCA?

(Doc. 210 at 16-18; *see also* Doc. 209 at 27-29). In sum, the legal question left open is whether the Board's post hoc "ratification" can supply the necessary authority under § 2701, and the factual question is whether the Board had enough information for its conduct to be considered a ratification.

It is important to note that Defendants' accession of Plaintiff's Yahoo! email account is not covered by the Court's analysis on this issue, as Access2Go was not the provider of that email service, and thus did not have the power to authorize anyone to access Plaintiff's stored communications by Yahoo! mail. In addition, though Access2Go provided the server upon which Plaintiff's Blackberry text messages were stored after synchronization and thus could arguably authorize Defendants to access them, there is no evidence that the Board members saw or relied on the text messages to support any of its actions, and so the Board cannot be

held to have ratified Defendants' accession of Plaintiff's text messages.[10] Therefore, the only type of communication at issue in this Order is Plaintiff's Access2Go email.

The final preliminary note is that the previous Order on Plaintiff's second Motion for Summary Judgment dealt only with accessions of Plaintiff's communications prior to the appointment of Petrakis to the "liaison" position and subsequent adoption of the Employee Manual. The instant Motions are not limited in time; if the Board could and did supply authorization for Defendants' actions via a post hoc ratification, such ratification applied to any accessions of Plaintiff's Access2Go email occurring prior to the ratification.

## I.   Whether post hoc ratification can supply "authorization" under SCA

The Court has already considered and rejected Defendants' arguments based on their control of half of the votes on the Access2Go Board and on the Illinois business judgment rule. (Doc. 209 at 27-29; Doc. 210 at 15-16). As explained in the November 29, 2011 Orders, merely having control of half the votes or a majority of the shares does not constitute actual corporate authority, and the Illinois business judgment rule cannot immunize illegal activities by a corporate officer from a third-party victim's suit.[11] Plaintiff's instant Motion for Summary Judgment, though,

---

[10]    This is not to say that the Board did not somehow otherwise authorize Defendants to access Plaintiff's text messages in storage on the Access2Go server, which was a question left open on a previous Motion for Summary Judgment. (Doc. 209 at 25, 27 fn. 26, 29-32).

[11]    Defendants' renewal of their business judgment rule argument is again rejected. As explained in the Court's previous Order on Plaintiff's second Motion for Summary Judgment, the business judgment rule, a doctrine of corporate law, protects a corporate officer, acting reasonably in the corporation's interest, from suit on behalf of the corporation for mismanagement of the corporation. (Doc. 210 at 15-

unnecessarily re-hashes both of these analyses in an effort to argue that the Board could not ratify the illegal actions of Defendants. As noted above, though, that is not the question. The Court did not leave open the issue of whether illegal actions can be ratified, but rather the issue of whether ratification could supply the authority needed to make Defendants' accessions of Plaintiff's communications *legal* under the SCA.

Defendants cite to the law of agency, which allows a principal to grant post hoc authority to an agent's actions. *See Staub v. Proctor Hosp.*, 131 S.Ct. 1186, 1191 (2011) (citations omitted) (In interpreting Congressionally-created tort law, "we consult general principles of law, agency law, which form the background against which federal tort laws are enacted."). Here, Defendants argue that they were acting as Access2Go's agents in accessing Plaintiff's Access2Go email account, because they were collecting evidence that he had sexually harassed employees, and was acting against the company's interest by taking confidential information and preparing to compete against it. As discussed in other Orders, there is a genuine issue of material fact as to whether Defendants had prior authorization from Access2Go to engage in this behavior. However, agents' actions can be "ratified" after the fact by the principal, which confers authority as though it had existed prior to the action. *See, e.g.*, *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1297 (Ill. App. Ct. 1987) (citing *Copley v. Pekin Insurance Co.*, 474 N.E.2d 57, 60 (Ill. App. Ct. 1985)) ("Ratification occurs upon the express or implied adoption of the acts of another by one for whom the other assumes to be acting, even without authority;

16). It cannot immunize him from suits by third-party victims of his conduct, and such a rule would unquestionably be against public policy.

and the consequences are the same as if the acts ratified had been fully authorized in the beginning."); RESTATEMENT (SECOND) OF AGENCY § 82 (1958) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.").[12] Here, if Access2Go adequately "ratified" Defendants' actions, such ratification has the same effect as original authorization would have had.

Plaintiff responds to Defendants' arguments on this point by claiming that only the "victim" of an unauthorized transaction can give later authorization. Authorization can only be given by an appropriate party, of course. *See* RESTATEMENT (SECOND) OF AGENCY § 84 (1958). Often, only the victim – for example, of forgery, or a fraudulent transfer – is in a position to authorize the transaction. However, the SCA specifically provides that "authorization" by the communication service provider renders an accession of communications legitimate. 18 U.S.C. § 2701(c)(1). Here, the only reason Defendants' actions would be in violation of the SCA would be because they were without either Plaintiff's or Access2Go's authority. Hence, "authorization" from Access2Go would be sufficient to render the access legal under the SCA, and so Access2Go's ratification would be effective. *Id*. ("(1) An act which, when done, could have been authorized by a

---

[12]     Illinois appears to use the Second Restatement of Agency, rather than the more-recent Third Restatement. *Adames v. Sheahan*, 233 Ill.2d 276, 275 (Ill. 2009) (citing *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007)). The Third Restatement does not appear to be materially different on this issue, though. *See* RESTATEMENT (THIRD) OF AGENCY §§ 4.01-4.08 (2006).

purported principal…can be ratified… . (2) An act which, when done, the purported or intended principal could not have authorized, he cannot ratify… .").

Plaintiff further appears to argue that even if Defendants had authorization, the accession was a violation of the SCA if he did not have actual notice of it. As explained in the Court's Order on Defendants' first Motion for Summary Judgment, the Electronic Communications Privacy Act ("ECPA") appears to require actual notice in order to imply employees' consent to monitoring. (Doc. 209 at 14-17). Though the two overlap, the SCA is governed by a separate body of law, and the key issue under the SCA is "authorization," which can be given by the service provider. The cases Plaintiff cites in support of his notice argument are cases dealing with the issue of consent under the ECPA. Plaintiff cites no cases, though, holding that the service provider must give actual notice that it has authorized someone to access a party's stored communications, and the statute does not contain such a requirement.

The Court therefore finds that post hoc "ratification" by the service provider is sufficient to grant "authorization" to access stored communications under the SCA. The Court must now turn to whether such "ratification" did in fact occur.

## II.   Whether ratification occurred

The Court's key reason for its previous decision not to grant summary judgment to Defendants on the basis of the Board's alleged post hoc ratification of Defendants' actions was that there was insufficient evidence that a majority of the Board's members knew that the monitoring had taken place, or that the evidence upon which they relied in ratifying Plaintiff's suspension and recommending his

termination on September 9, 2008 was obtained from that monitoring.[13] (Doc. 209 at 28-29). Defendants now assert that Board members Tandeski and Morgan, in addition to Petrakis, knew that Petrakis had accessed Plaintiff's Access2Go email on September 9, 2008, and that they relied on the information obtained from that account in ratifying his suspension and recommending termination.

Defendants point to the rule that a principal cannot accept the benefits of a previously unauthorized action without lending authorization to that action. RESTATEMENT (SECOND) OF AGENCY § 98 (1958). The accepted benefit must be "something to which he would not be entitled unless an act purported to be done for him were affirmed." *Id*. Here, unless it authorized access to Plaintiff's account, the Access2Go Board would not have been privy to the information it relied on in suspending him and recommending his termination. Moreover, there can be ratification where the principal maintains "[s]ilence under such circumstances that…one would naturally be expected to speak if he did not consent." RESTATEMENT (SECOND) OF AGENCY § 94 cmt. a (1958).

Defendants assert that there is undisputed evidence that Board members Petrakis, Tandeski, and Morgan relied on the information Petrakis obtained from Plaintiff's Access2Go email account in coming to their September 9, 2008 vote.[14]

---

[13]    The later termination of Plaintiff by 60% of the shares cannot be a basis for ratification, as the corporate By-Laws provide that the "business and affairs of the corporation shall be managed by or under the direction of a Board of Directors." (Doc 170, Ex. 1 of Ex. A, at 3). The shareholders were thus not empowered to grant authorization to access the Access2Go email system.

[14]    The Court notes that the undisputed evidence submitted in regard to the parties' motions regarding "interception" under the ECPA, explained in another Order issued today, shows that the action Plaintiff complains of as an "interception"

First, there is the August 26, 2008 letter regarding the six August 21, 2008 emails from Plaintiff's Access2Go account to his Yahoo! account, which contained confidential Access2Go documents. According to the letter, this action, coupled with Plaintiff's other activities, prompted Plaintiff's suspension. This letter was also given to Tandeski and Morgan prior to September 8, 2008. On September 8, 2008, Petrakis sent a packet of emails obtained from Plaintiff's Access2Go email account to Tandeski and Morgan, which included a set of arguably sexually inappropriate emails from Plaintiff to several female employees. In their September 9, 2008 meeting, the Access2Go Board confirmed Plaintiff's suspension and voted three to one to recommend the termination of Plaintiff's employment, based, among other actions, on his alleged sexually harassment of employees.

The Court cannot rely on the six August 21, 2008 emails sent from the Access2Go account to the Yahoo! account to find ratification, as Defendants could have obtained those from the Yahoo! account, the accession of which Access2Go cannot ratify. As discussed in the Court's Order on the parties' motions regarding "interception" under the ECPA, Defendants began to use the SpectorPro software to observe Plaintiff's Yahoo! email communications in late June 2008. Therefore, it is possible that they learned of the six emails referenced in the August 26, 2008 letter from their monitoring of the Yahoo! account, not from the accession of the Access2Go account.

---

of his Access2Go email account (the use of the "dummy account") did not begin until March 24, 2009. Therefore, messages from his account obtained by Defendants prior to that date, which are all that are at issue in the instant Motions, were necessarily "accessed" from storage within the meaning of the SCA.

However, the Court can rely on the September 8, 2008 packet of allegedly sexually harassing emails by Plaintiff, because there is no other plausible source for them. Reading the minutes of September 9, 2008 Board meeting in light of the evidence now presented by Defendants, the Court holds that a reasonable jury would have to find that the Board's September 9, 2008 actions were based on information obtained from Plaintiff's Access2Go email account, at least insofar as its action was based on Plaintiff's alleged sexual harassment of employees. Plaintiff puts on no evidence, such as testimony from Tandeski, that there was any basis other than the emails for the notion that Plaintiff had sexually harassed employees. The only reasonable inference is that the Board in fact relied on these emails in finding that Plaintiff had potentially sexually harassed the company's employees.[15]

In addition to relying on the information, though, the Board members must also have known of the source of that information in order for their vote to constitute a ratification. It is undisputed that Petrakis knew the source of the information, as he is the one who accessed it, and Morgan has stated that he knew Petrakis had obtained these emails from the Access2Go server. In addition, the undisputed facts show that Tandeski learned of Petrakis' monitoring activities in "early 2008," when Petrakis and Morgan informed him that they were accessing

---

[15]    While it might be argued that the Board relied on the other reasons given in making its decision, rather than the alleged sexual harassment, and that the accession of the emails was therefore not "ratified," such an argument fails for two reasons. First, such an argument would fly in the face of the reasons recorded by the Board itself; it chose to include sexual harassment along with the other reasons, and did not have to do so. In addition, this situation would certainly fall within the outlines of another form of ratification: silence, rather than repudiation, when presented with evidence of an unauthorized act. RESTATEMENT (SECOND) OF AGENCY § 94 cmt. a (1958).

Plaintiff's Access2Go email account in order to compile evidence against Plaintiff. In addition, Tandeski had received the September 8, 2008 email from Petrakis, which contained emails clearly lifted from Plaintiff's stored Access2Go email account. Since he already knew that Petrakis and Morgan had been accessing the email server to obtain evidence against Tandeski, it is not plausible to suggest that Tandeski was unaware of the source of this collection of emails. The only reasonable inference is therefore that Petrakis, Morgan, and Tandeski, the three Board members who voted against Plaintiff on September 9, 2008, knew that the allegedly sexually inappropriate emails had been obtained by accessing Plaintiff's Access2Go email account from storage on the Access2Go server.

Both parties raise the issue of Petrakis and Morgan's eligibility to vote on the suspension and recommended termination; without their votes, the Board could not have ratified the accession. This is an issue because Petrakis and Morgan are alleged by Plaintiff to have conspired to remove Plaintiff from his position within Access2Go so that they could take control of the company. While it is true that corporate officers are barred from attempting to vote on transactions that are in their own interest and against that of the company, they not are so barred when their actions do not harm the company, even if they incidentally benefit from the action.[16] 805 ILCS 5/8.60. Under the statute, Defendants must show that the action taken was fair to the corporation. *Id*. Here, Access2Go itself was in no way harmed by Defendants' accession of Plaintiff's Access2Go email account, and their conduct

---

[16]    Defendants correctly point out that Plaintiff's cited cases all involved transactions that were detrimental to the corporation. Plaintiff cites no rule against taking a potentially self-interested action that hurts only a fellow Board member or shareholder, which is the case here.

was at least arguably in the company's interest. Therefore, they were eligible to vote to authorize the accession.[17]

Finally, Plaintiff's argument that because he, as a Board member of Access2Go, was not informed of the monitoring, there was no ratification, is unavailing. Plaintiff's argument appears to be that the Board had to be informed, as a body, of the source of the information relied on in order for it to ratify Defendants' conduct. On the contrary, so long as the Board members voting to take action on the corporations' behalf based on the information obtained from Plaintiff's communications knew of the source of that information, it is sufficient. While it is true that no members of the Board can act independently as the Board – their votes make up the Board's actions – the Board's "knowledge" is made up of the members' knowledge. Indeed, the law on this issue speaks of whether the corporation was "chargeable with knowledge of the facts." 13 ILL. LAW & PRAC. CORPORATIONS § 247. The Board was "chargeable with knowledge" when a majority of its members had certain knowledge and relied on it in voting with the Board.

---

[17]   Another way of looking at this question is through the analysis of the Illinois Appellate Court in *Kern v. Arlington Ridge Pathology, S.C.*, in which two directors voted to amend the corporation's articles of incorporation in furtherance of their plan to remove a third director. 893 N.E.2d 999, 1007 (Ill. App. Ct. 2008). Though the two directors thereby "may have been able to increase their corporate ownership, this [was] not the type of 'transaction' contemplated by section 8.60," because it was only a matter of "internal corporate governance," not an "outside business transactions contrary to the corporate interests," so the statute did not apply to disqualify them from voting to amend the articles. *Id.* Here, likewise, though Petrakis and Morgan may have personally benefitted by voting to ratify the accession of Plaintiff's emails, the action they ratified was not an "outside business transactions contrary to the corporate interests," and so they are not disqualified.

CONCLUSION

The Court finds that Access2Go could and did provide the necessary authorization under the SCA for Defendants to access Plaintiff's stored Access2Go email communications when the Board voted, while relying on facts obtained from those email communications and knowing their source, to suspend him and to recommend his termination. For the foregoing reasons, Plaintiff's Motion for Summary Judgment on a Major Issue (Doc. 213) is DENIED, and Defendants' Cross-Motion for Summary Judgment (Doc. 223) is GRANTED.


Entered this 12th day of September, 2012.

                                        s/ Joe B. McDade
                                   _____
                                   JOE BILLY McDADE
                                   United States Senior District Judge